## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| PATRICIA ROYAL,<br>    *Plaintiff*,<br><br>  v.<br><br>PAWTUCKET SCHOOL COMMITTEE, by and through the School Committee Chair, OMAR REYES, in his official and individual capacities, and School Committee Members JAMES CHELLEL JR., in his official and individual capacities,  MATTHEW WILEDENHAIN, in his official and individual capacities, JOANNE BONOLLO, in her official and individual capacities, KIMBERLY GRANT, in her official and individual capacity, THE CITY OF PAWTUCKET, by and through Mayor Donald Grebien, MAYOR DONALD GREBIEN, in his individual and official capacities, Pawtucket Finance Department, MARK STANKIEWICZ, in his individual and official capacities, Pawtucket/PSD Chief of Technology and Innovation, HERSH CHRISTINO, in his individual and official capacities, the PAWTUCKET SCHOOL DISTRICT, by and through its Acting Superintendent, Randy Buck, in his official capacity only, Assistant Superintendent, LEE RABBIT, in her official and individual capacities, the PAWTUCKET TEACHERS' ALLIANCE, RON BEAUPRE, and John Does 1-10,<br><br>    *Defendants*. | C.A. No. 1:25-cv-00113-MRD-AEM<br><br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

This action is commenced by Plaintiff PATRICIA ROYAL against all Defendants,

PAWTUCKET SCHOOL COMMITTEE, by and through the School Committee Chair, OMAR

REYES, in his official and individual capacities, and School Committee Members JAMES

CHELLEL JR., in his official and individual capacities,  MATTHEW WILEDENHAIN, in his

1

official and individual capacities, JOANNE BONOLLO, in her official and individual capacities, KIMBERLY GRANT, in her official and individual capacities, JUAN PABLO BARRERA, in his official capacity only, and Angeliz Rosa, in her official capacity only, THE CITY OF PAWTUCKET, by and through MAYOR GREBIEN, in his individual and official capacities, Pawtucket Finance Department, MARK STANKIEWICZ, in his individual and official capacities, Pawtucket/PSD Chief of Technology and Innovation, HERSH CHRISTINO, in his individual and official capacities, the PAWTUCKET SCHOOL DISTRICT, by and through its Acting Superintendent, Randy Buck, in his official capacity only, Assistant Superintendent, LEE RABBIT, in her official and individual capacities, the PAWTUCKET TEACHERS' ALLIANCE, by and through its President, Ron Beaupre, RON BEAUPRE, and John Does 1-4, for a series of violations, including but not exclusive to, of Constitutional, Federal, and State laws including violation of the United States Constitution Procedural Due Process and Equal Protection under the Fifth and Fourteenth Amendment, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, Title I of the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), the Rhode Island Fair Employment Practices Act, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA"), the Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA), the Rhode Island Parental and Family Medical Leave Act (PFMLA) R.I. Gen. Laws § 28-48-5(b), and state law statutory law, Violation of the Rhode Island Whistleblowers' Protection Act (WPA), R.I. Gen. Law § 28-50-1, et seq., and common law for Defamation *per se,* Intentional Interference with Contract, Intentional Infliction of Emotional Distress, and Negligence.

2

## PARTIES

1. PLAINTIFF PATRICIA ROYAL, Superintendent of Pawtucket School Department (hereinafter "Plaintiff" or "Ms. Royal"), is a resident of the town of Cranston, in the County of Providence, State of Rhode Island.

2. PAWTUCKET SCHOOL COMMITTEE (hereinafter "PSC"), is a state actor and public body sued by and through its Chairperson, Omar Reyes in his official and individual capacities, which is the public body responsible for overseeing public education in the Pawtucket School District (hereinafter "PSD"); its principal offices are located in the City of Pawtucket, County of Providence, State of Rhode Island.

3. Pawtucket School Committee Chairman, OMAR REYES (hereinafter "Mr. Reyes" or "Chairman Reyes"), is a state actor is being sued in both his individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted proximate injury on Plaintiff; upon information and belief Defendant Chairman Reyes is a resident of the City of Pawtucket, in the County of Providence, State of Rhode Island.

4. Pawtucket School Committee Member, JAMES CHELLEL JR. (hereinafter "Mr. Chellel"), is a state actor is being sued in both his individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted proximate injury on Plaintiff; upon information and belief Defendant Mr. Chellel is a resident of the City of Pawtucket, in the County of Providence, State of Rhode Island.

5. Pawtucket School Committee Member, MATTHEW WILEDENHAIN (hereinafter "Mr. Wildenhain"), is a state actor is being sued in both his individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted

proximate injury on Plaintiff; upon information and belief Defendant Mr. Wildenhain is a resident of the City of Pawtucket, in the County of Providence, State of Rhode Island.

6. Pawtucket School Committee Member, JOANNE BONOLLO (hereinafter "Ms. Bonollo"), is a state actor is being sued in both her individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted proximate injury on Plaintiff; upon information and belief Defendant Ms. Bonollo is a resident of the City of Pawtucket, in the County of Providence, State of Rhode Island.

7. Pawtucket School Committee Member, KIMBERLY GRANT (hereinafter "Ms. Grant"), is a state actor is being sued in both her individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted proximate injury on Plaintiff; upon information and belief Defendant Ms. Grant is a resident of the City of Pawtucket, in the County of Providence, State of Rhode Island.

8. THE CITY OF PAWTUCKET, is a state actor and public body sued by and through its Mayor Donald R. Grebien in his individual and official capacities, which is the public body responsible for overseeing the governance in the City of Pawtucket (hereinafter "City"); its principal offices are located in the City of Pawtucket, County of Providence, State of Rhode Island.

9. MAYOR DONALD GREBIEN, is a state actor being sued in both his individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted proximate injury on Plaintiff; upon information and belief Defendant Mayor Grebien is a resident of the City of Pawtucket, in the County of Providence, State of Rhode Island.

10. Pawtucket current or former Finance Director, MARK STANKIEWICZ (hereinafter "Mr. Stankiewicz") is a state actor is being sued in both his individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted

4

proximate injury on Plaintiff; upon information and belief Defendant Mr. Stankiewicz is a resident of the City of Pawtucket, in the County of Providence, State of Rhode Island.

11. Pawtucket and PSD Chief of Technology and Innovation, HERSH CHRISTINO (hereinafter "Mr. Christino") is a state actor is being sued in both his individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted proximate injury on Plaintiff; upon information and belief Defendant Mr. Christino is a resident of the City of Pawtucket, in the County of Providence, State of Rhode is a resident of the State of Rhode Island; the exact city of residence is unknown.

12. PAWTUCKET SCHOOL DISTRICT, is a state actor and public body sued by and through its Interim/Acting Superintendent, Randy Buck (hereinafter "Mr. Buck" as "Acting Superintendent"[1]), in his official capacity only, which is the public body responsible for operating the Pawtucket School District (hereinafter "PSD"); its principal offices are located in the City of Pawtucket, County of Providence, State of Rhode Island.

13. LEE RABBIT (hereinafter "Ms. Rabbit"), Assistant Superintendent in PSD, is a state actor being sued in both her individual and official capacities for official and individual acts and omissions, undertaken under the color of law, that inflicted proximate injury on Plaintiff; upon information and belief Defendant Ms. Rabbit is a resident of the State of Rhode Island; the exact city of residence is unknown.

---

[1] On or about March 4, 2025, Plaintiff was replaced on the PSD website by a picture of Mr. Buck with the title "Interim Superintendent." For a period of time after that, the PSD website continued to list Mr. Buck as "Interim Superintendent" and then Mr. Buck's title was changed to "Acting Superintendent." Note that there is a substantial difference between an "Acting" and "Interim" Superintendent. In the context of education, and according to Plaintiff's understanding after decades in education, an "Acting" Superintendent is temporarily filling in, covering for the role, but the existing Superintendent still possesses his or her role. Whereas, an "Interim" Superintendent actually possesses the role during a period of transition when there is no longer a Superintendent. It is notable that during the short leave of absence by any Superintendent, such as the one Plaintiff was on when she was replaced by Mr. Buck, there is no need for either an Acting or Interim replacement; Superintendents assign designees to handle any issues in their absence. Plaintiff had designees at the time that PSD and PSC replaced her with Mr. Buck; this is unusual and not pattern and practice for PSD/PSC.

14. Defendants in paragraphs 2 through 13 are referred to collectively as Municipal Defendants.

15. Defendants in paragraphs 2-7 are referred to collectively as PSC.

16. Defendants in paragraphs 12-13 are collectively referred to as PSD.

17. PAWTUCKET TEACHERS' ALLIANCE is a non-state-actor Teacher's Union, upon information and belief, sued by and through its President, Ron Beaupre; upon information and belief, its principal offices are located in the City of Pawtucket, County of Providence, State of Rhode Island.

18. Pawtucket Teacher's Alliance President, RON BEAUPRE, upon information and belief, is a resident of the State of Rhode Island; the exact city of residence is unknown.

19. John Does 1-10 are state actors named to replace, in the future, any parties in their official capacity, should a party later change due to changes in governance in the PSC, City, or PSD.

## JURISDICTION AND VENUE

20. This Court has proper subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because Plaintiffs' state law claims are so related to Plaintiff's federal claims that they form part of the same case or controversy; consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

22. This Court has proper venue over this action pursuant to 28 U.S.C. § 1391(b) in that Defendants are subject to personal jurisdiction within the District of Rhode Island and the events giving rise to this action occurred in this District.

## NOTICE OF CLAIM PURSUANT TO R.I. GEN. LAWS § 45-15-5

23. A Notice of Claim pursuant to R.I. Gen. Laws § 45-15-5 was served on municipal Defendants on or about May 20, 2025.

24. On or about June 29, 2025, it was forty (40) days from service and there was no response to this Notice.

25. Thus, this Amended Complaint was filed after the time for response had elapsed.

## ADMINISTRATIVE EXHAUSTION

26. The Title VII and Rhode Island Fair Employment Practices Act (FEPA) claims of discrimination and retaliation require exhaustion through the Rhode Island Commission for Human Rights (RICHR) and the EEOC.

27. Charges of Discrimination were timely filed by Plaintiff, RICHR and co-filed with the EEOC (RICHR No. 25 EMP 227 / EEOC No. 16J-2025-00127), on or around March 26, 2025.

28. The charge of discrimination was amended, to add more recent events, on or about June 30, 2025 which was confirmed and exhausted the newer alleged claims from the more recent events.

29. On or about August 7, 2025, Plaintiff requested the right to sue from the RICHR and subsequently the EEOC. or about

30. The RICHR Right to Sue for the amended charge (RICHR No. 25 EMP 227) was signed on August 19, 2025.

31. The RICHR closed this with EEOC officially on August 4, 2025.

32. Additionally, on or about September 2, 2025, the EEOC provided notification the EEOC was processing the right to sue.

33. This Second Amended complaint was timely filed following administrative exhaustion with the RICHR and the EEOC.

## **FACTUAL ALLEGATIONS**

34. Plaintiff PATRICIA ROYAL (hereinafter "Superintendent Royal" or "Plaintiff") is a career public servant within public school districts, who worked her way up to be an Assistant Superintendent of Providence School District, and then was appointed Superintendent of Pawtucket School District in mid-2023.

35. Prior to being in Rhode Island, Plaintiff worked for approximately twenty-seven (27) years in Florida, starting as a teacher, then as a reading coach, then as an Assistant Principal, then as a Principal, then for a few years in Human Resources, then as a District Leadership Specialist (i.e. supervised K-12 Principals), and then in 2020 Plaintiff was asked by a respected colleague from Florida to take a job in Providence, Rhode Island.

36. Plaintiff is an African American female and as such, she is afforded protections under the 14th Amendment Equal Protection clause of the United States Constitution, the Rhode Island state constitution, as well as under Title VII[2] and state analogs.

37. As an American Citizen, and an employee of a municipal government and/or political subdivision, Plaintiff is afforded protections provided by the Federal and State Constitutions and federal laws, including but not exclusive to the additional protections under the 14th and 5th amendments for Substantive and Procedural due process.

38. Plaintiff has a binding, written contract with PSD/PSC, which ends in June of 2026.

39. Plaintiff's contract has automatic extensions for an additional three (3) years.

---

[2] These claims were simultaneously filed with the Rhode Island Commission of Human Rights (RICHR) and the EEOC to exhaust race and gender claims under Title VII and the Fair Employment Practices Act (FEPA) and amended to allege failure to accommodate under the Americans With Disabilities Act (ADA) and FEPA. Once those claims are administratively exhausted in or about late July or early August of 2025, Plaintiff will amend this complaint's Counts XI, XII, XIII, XIV, and XV, which allege those claims under the Rhode Island Civil Rights Act (RICRA) with additional statues of Title VII, ADA, and FEPA which cannot be added until administrative exhaustion.

40. The PSD is a school district with more than fifty (50) employees, and as such, Plaintiff was entitled to protections under Federal and State FMLA laws.

41. By way of brief background, in or around the start of the pandemic in 2020, in or around spring of 2020, Plaintiff was living in Florida and was contacted by Harrison Peters (hereinafter "Mr. Peters").

42. Plaintiff knew Mr. Peters from his time working in Florida in the same school district as Plaintiff.

43. Mr. Peters was the "Turn Around Superintendent" appointed by the RIDE Commissioner, Angélica Infante-Green (hereinafter "Commissioner Green"), after RIDE took over the Providence School District due to poor district performance.

44. Mr. Peters contacted Plaintiff and said that as the "Turn Around Superintendent," he "needed support turning [the] district around", and he knew Plaintiff's "skill set" was right to help.

45. Plaintiff was surprised that Mr. Peters knew her skillset because the school district in Florida where they worked, Hillsborough County, had over 300 schools and was the seventh-largest district in the nation.

46. Given that the district is so large, Plaintiff did not regularly have to interact with Mr. Peters.

47. On this call, Mr. Peter said, "I need your skillset to help me turn our elementary schools around."

48. Mr. Peters said, "I know that you are coming up on the end of a school year and the job won't start until July"; he provided Plaintiff with details of the position, which was to supervise sixteen (16) elementary schools in Providence.

49. The position was called "Executive Director of Elementary Schools."

50. Plaintiff wanted to make a difference, and in Hillsborough County, she had been exposed to cutting-edge and innovative strategies.

51. Plaintiff felt that the opportunity to "turn around" an urban school district was an opportunity to make a great impact.

52. Further, Mr. Peters was a great leader, and thus, Plaintiff wanted to work with him.

53. Following an interview with the Commissioner of RIDE, Commissioner Green, Plaintiff decided to take the job.

54. Plaintiff's position as the Executive Director of Elementary schools started on July 1, 2020, in Providence, Rhode Island.

55. While Plaintiff's primary residence was in Florida, she moved to Rhode Island; she returned to Florida during school vacations or other leave that her contract requires she take.

56. Plaintiff worked as the Executive Director of Elementary schools for approximately a year.

57. During this time, Plaintiff supervised many elementary school principals, including Dr. Javier Montanez (hereinafter "Dr. Montanez), who was a principal of one of the elementary schools.

58. After approximately a year, Mr. Peters left the Providence Public Schools.

59. After that, Dr. Javier Montanez (hereinafter "Dr. Montanez) was appointed, by Commissioner Green, to the Superintendent of Providence Public School District, in or around 2021.

60. At that time, in or around 2021, when Dr. Montanez was appointed to the Superintendent role, Plaintiff was appointed, also by Commissioner Green, to one of the Assistant Superintendent Roles in the Providence Public School District.

61. During her time as an Assistant Superintendent from approximately 2021 through mid-2023, Plaintiff accomplished many goals, including adding guidance counselors in schools (especially due to just coming out of covid), adding thirteen (13) assistant principals across twenty-one (21) elementary schools, improving attendance and behavior throughout the school system, implementing professional development training for leaders (principals, assistant principals, and teacher leaders), implementing the first district-wide elementary progress reports, facilitating instructional learning walks and data checks throughout the twenty-one (21) elementary schools, which provide effective feedback to improve instructions and learning outcomes, and for the first

time, Plaintiff also secured funding to allow kids to take home backpacks with books to build their home libraries.

62. During Plaintiff's time in Providence Public Schools, she worked with Jen Carney (hereinafter "Ms. Carney"), who was the Chief Data Officer working for Providence Public Schools.

63. By in or around January of 2023, Ms. Carney had just won a seat on the Pawtucket School Committee (hereinafter "PSC).

64. By or around early or early-to-mid 2023, Ms. Carney reached out to Plaintiff and told her to apply for the open Superintendent job in Pawtucket School District (hereinafter "PSD").

65. Ms. Carney further stated to Plaintiff that the city "needed [her]."

66. Plaintiff was up for the challenge, so she applied for the job.

67. Commissioner Green, even gave her support to Plaintiff; during a call between Plaintiff and Commissioner Green, she said to Plaintiff, "go for it, we need a good leader there," but she also said, "it's a very different city and it's a challenge but I think you can do it."

68. Notably, much later, and after racially charged hiring drama in PSD, Commissioner Green called Plaintiff personally to congratulate her.

69. Other Educational leaders supported Plaintiff applying to the PSD Superintendent job as well; Scott Sutherland, Chief of Staff in Providence Public Schools, Kinzel Thomas, School Board President at the time, and Joan Jackson (hereinafter "Ms. Jackson"), who is the Senior Advisor to the Superintendent of Providence School District, all supported Plaintiff and Ms. Jackson even said she "knew [Plaintiff] could do the job."

70. However, Ms. Jackson warned Plaintiff that she needed to be "careful."

71. Ms. Jackson expressed concern about the overwhelmingly Caucasian leadership in the City of Pawtucket (hereinafter "City"), and how that may play out if she were to be appointed the first African American, female Superintendent.

72. Specifically, Ms. Jackson, who is Caucasian, warned Plaintiff that she was going to be "the only dark 'spot' in that city," referring to the leadership of the City of Pawtucket (hereinafter "City") and PSD having few to no African American leaders and being predominantly Caucasian; Ms. Jackson also stated that Plaintiff  may need to "hire a Senior Advisor to assist [Plaintiff] with Pawtucket Politics."

73. In or around March of 2023, the PSC created a subcommittee to search for the new PSD Superintendent.

74. The open Superintendent job was posted on or about March 16, 2023.

75. On or about April 4, 2023, a Superintendent Search Subcommittee (hereinafter "Search Subcommittee") meeting was held to start sourcing and recruiting the new Superintendent.

76. At that time in mid-2023, the PSC was comprised of seven (7) members, which included Ms. Joanne Bonollo, (hereinafter "Ms. Bonollo"), Mr. Gerard Charbonneau (herein after "Mr. Charbonneau"), Mr. James Chellel, Jr. (hereinafter "Mr. Chellel"), Ms. Erin Dube (hereinafter "Ms. Dube"), Ms. Kimberly Grant (hereinafter "Ms. Grant"), Ms. Marsha Fernandes (hereinafter "Ms. Fernandes"), and Ms. Carney.

77. The Search Subcommittee, upon information and belief, included a few PSC members along with members of the community.

78. Notably, upon information and belief, Ms. Fernandes was the sole member of PSC who identified as a racial minority.

79. Between on or about April 4, 2023, and April 25, 2023, approximately thirty-three (33) resumes were submitted to the Search Subcommittee.

80. The Search Subcommittee reviewed and discussed those resumes, whittling them down to eleven (11) candidates to move on to the next stage of the selection process.

81. After further vetting by the Search Subcommittee, those eleven (11) candidates were narrowed down further to four (4), upon information and belief.

82. Notably, a Caucasian male candidate, Mr. Thomas Aubin, who appears much later in the hiring process, did *not* apply for the Superintendent job by the deadline, upon information and belief.

83. Thus, Mr. Aubin was not part of the eleven (11) candidates that were whittled down to four (4) candidates, upon information and belief.

84. According to PSC meeting minutes, on or about April 17, 2023, the Search Subcommittee recessed to executive session to open applications, review qualifications, references, and background checks for the four (4) candidates.

85. On or about April 25, 2023, the Search Subcommittee voted on the four (4) candidates to interview, including Plaintiff.

86. Between April 25, 2023, and May 1, 2023, one (1) candidate backed out of consideration for the Superintendent job, upon information and belief.

87. As of on or about May 1, 2023, there were three (3) candidates chosen by the Search Subcommittee to continue in the selection process: Plaintiff Patricia Royal, who is an African American female, Alexandra Montes McNeil, who is upon information and belief, is a Hispanic female, and Marie Elena Ahern, who is upon information and belief, a Caucasian female.

88. Each of the three (3) candidates was then interviewed by the Search Subcommittee in an open public session on or about May 1, 2023.

89. However, in the meantime, on or about May 4, 2023, the PSC was actively considering at least one new candidate, Mr. Thomas Aubin (hereinafter "Mr. Aubin"), who, upon information and belief, has personal ties to the Mayor, the Honorable Donald R. Grebien (hereinafter "Mayor Grebien" or "the Mayor").

90. Mr. Aubin is Caucasian, and his experience was in predominantly suburban, Caucasian school districts.

91. Even though he had not applied for the PSD Superintendent job by the deadline, upon information and belief, Mr. Aubin came into the Search Subcommittee's consideration.

92. Notably, Mr. Aubin was a late addition to consideration of the Superintendent role, despite the fact that he was comparatively inexperienced, in an urban school district, having worked mostly in the upscale Westport, Massachusetts school district, upon information and belief.

93. The Search Subcommittee met and voted to "Postpone Discussion" *on the three (3) existing candidates* until interviews with "additional candidates" could be conducted.

94. That motion was, according to the minutes from the May 4, 2023, meeting, seconded by the Pawtucket Teacher Alliance (hereinafter "PTA"), Union President, Ron Beaupre (hereinafter "Mr. Beaupre"), who is the Teachers' Union President.

95. Mr. Beaupre, an ally of Mayor Grebien, would later lead the charge against Plaintiff until she was unlawfully removed from her role as Superintendent.

96. On or about May 5, 2023, a PSC member sent Plaintiff an email that stated there were "***two additional interviews***" to be conducted.

97. However, despite the minutes stating there were "additional candidates", implying more than one, and despite the email to Plaintiff which that stated there were "two additional interviews" to be conducted, there was *really* only one additional candidate: Thomas Aubin, a Caucasian male candidate from a wealthy school district.

98. In fact, on or about May 10, 2023, with six (6) members present, "D. Zelazo, R. Beaupre, D. Fargnoli, E. Dube, M. Darosa, M. Fernandes," the meeting minutes list one agenda item: "1. Interview Candidate 4: Thomas Aubin."

14

99. On or about May 11, 2024, the Search Subcommittee met and discussed the now-four (4) finalists, including Mr. Aubin, and voted on each candidate continuing in the hiring process.

100. In discussing Mr. Aubin, three members of the Search Subcommittee noted that during the interview, Mr. Aubin "didn't fully answer [a] question."

101. Another member, Ms. Dube, noted that Mr. Aubin had a "[l]ack of experience with diverse community and [multi-language learners]"; two other members echoed this concern.

102. Another PSC member, Ms. Stachowiak, had a far greater concern about Mr. Aubin, noting in the meeting minutes, "[c]oncerns about some of the things he said that could be problematic and *the press could jump on* them."

103. As to the interview with Plaintiff, the meeting minutes – even for most PSC members that voted against her continuing to interview – were positive *with the exception* of some concerns (by those that voted against her) about lack of experience running the whole district (i.e. being the Superintendent versus the Assistant Superintendent like Plaintiff was in Providence.)

104. Notably, the *only* Search Committee member who was negative about Plaintiff in unique ways, no other member stated, according to the meeting minutes, was Mr. Beaupre; he also voted against Plaintiff continuing to the next interview.

105. According to the meeting minutes, Mr. Beaupre's negativity about Plaintiff was planned and stood out compared to other members.

106. In fact, some of the statements Mr. Beaupre made about Plaintiff during the selection process, including in the search committee meetings, were defamatory; others were negative about her coming from a "turn around district" in Providence.

107. For example, according to the minutes, Mr. Beaupre relayed to the committee that he "found some issue with… "Plaintiff being from a "turnaround administration" and called that a "problematic" issue.

15

108. Further, Mr. Beaupre made definitively broad statements, seemingly laying blame on Plaintiff, who had only recently become an Assistant Superintendent, that "there has not been turnaround in the city or Providence" as a reason to vote against her.

109. In contrast, Mr. Beaupre made glowing statements about Mr. Aubin, who came from a predominantly Caucasian district, such as that he was "kids first" and that he was "impressive."

110. The committee then voted on the candidates.

111. The committee voted for Ms. McNeill to remain in the selection process, but voted that no other candidate should continue.

112. Specifically, as to Mr. Aubin and Plaintiff, the Search Subcommittee voted, with a 4-4 vote as to each, that Mr. Aubin and Plaintiff would not continue in the final interview process.

113. Notably, Union President Mr. Beaupre voted for Mr. Aubin and against Plaintiff; thus, both Mr. Aubin and Plaintiff were supposed to be eliminated from the final interview process.

114. The final candidate, Ms. Ahern, was also rejected from continuing in the process.

115. However, motions to reconsider were then put forth as to Plaintiff and her Caucasian male counterpart, Mr. Aubin, separately.

116. The motion for reconsideration of Plaintiff appeared, at least in the meeting minutes, to occur without any discussion, and the motion failed by the same margin, 4-4, with Mr. Beaupre again voting against Plaintiff.

117. However, the motion for reconsideration for Mr. Aubin included discussion in the meeting minutes; a large bulk of the speaking–and by far the most positive speaking according to the minutes – was done by Mr. Beaupre.

118. The motion for reconsideration of Mr. Aubin passed.

119. The next day, on or about May 12, 2023, Plaintiff was informed she was rejected from consideration for the Superintendent position.

120. Mr. Aubin, upon information and belief, was notified that he would move forward with the final interview at or around the same time as Plaintiff was notified she was rejected.

121. Again, Mr. Aubin had not been part of the initial hiring process and did not, upon information and belief, apply by the deadline.

122. Thus, PSD and the PSC deviated from not only standard hiring procedures, but also deviated from the stated procedures, including the application deadline, used for hiring this role.

123. At a point later in the hiring process, prior to the final interviews on June 6, 2023, Plaintiff was brought back into the mix of candidates after some controversy related to Mr. Aubin's (late) inclusion and Plaintiff's elimination.

124. Plaintiff later understood, from PSC members, that Ms. Fernandes and Ms. Carney raised issues with the PSC – formally and informally – regarding the Caucasian male late to the process, Mr. Aubin, being accepted, and Plaintiff, an African American female, being rejected.

125. There were allegations, before that time and after, that some PSC members, and those on the Search Subcommittee, held (and expressed) racist beliefs, as described more fully *infra*.

126. Specifically, according to later conversations with Plaintiff, Ms. Fernandes and Ms. Carney also raised the issue that Plaintiff, they believed, was the most qualified of all candidates.

127. Deviations from standard and expected protocol for hiring of the Superintendent, coupled with the fact that such deviations resulted in the elimination of an African American female as a candidate, and the adding of a Caucasian Male as a candidate (with no urban school district experience), are significant and were raised as concerns by the community and some members.

128. More specifically, it was relayed to Plaintiff later that some members believed that the new Caucasian male candidate, Mr. Aubin, was "the mayor's guy."

129. Thus, on or about May 25, 2023, in a meeting, Ms. Fernandes pushed to reinstate all four candidates, rather than summarily dismissing some that had applied on time and been through the normal process until Mr. Aubin's addition.

130. During this meeting, according to the minutes, Ms. Fernandes raised the idea that the full school committee body, rather than the Search Committee, should interview all four candidates.

131. However, this was not an idea favored just by Ms. Fernandes; the minutes demonstrate that many members of PSC, who were not on the Search Subcommittee, desired to have a say in how many candidates were allowed to proceed to the final interview with the full PSC.

132. The vote decided that all four candidates would continue to final interviews on or about Tuesday, June 6, 2023.

133. However, between that time and the final interviews on or about June 6, 2023, two (2) of the four (4) candidates dropped out.

134. Specifically, Plaintiff later learned that, upon information and belief, Mr. Aubin was upset that Plaintiff had been allowed back into the hiring process.

135. Upon information and belief, Mr. Aubin sent an email, later characterized as unprofessional, to the PSC on that subject.

136. On or about Tuesday, June 6, 2023, during a public school committee meeting, the two (2) returning candidates, Plaintiff and Ms. McNeill, were interviewed in public session.

137. Before the interviews began, there was a public comment session.

138. During the time of the public session, Plaintiff had not been introduced yet, so the crowd did not know who she was.

139. However, Plaintiff got the sense that the audience was against her.

140. Plaintiff saw that many audience members had signs and realized the signs were about her.

141. Prior to the interviews, one of the PSC members, Ms. Fernandes, got up from her PSC member seat and went to the public comment podium to speak to the audience.

142. Ms. Fernandes' speech mentions "biases" in the Search Subcommittee process.

143. Notably, Ms. Fernandes was a member of the Superintendent Search Subcommittee and thus privy to those private conversations.

144. Very early in Ms. Fernandes' statement, as captured on video, she stated, "[i]t became very clear early on that this process that personal and professional biases would play a role in who this subcommittee would recommend via next superintendent."

145. Ms. Fernandes then pointed out that "one of the candidates stated they were coming from a school district that was 91% white."

146. Ms. Fernandes then said, "[t]hey also stated that it was important that the other 9% thought teachers looked like them. Which I completely agree…" and stated, "I also feel that, that 9% or in the case of Pawtucket over 68% of non-white students, should not only have teachers that look like them but also administrators that look like them."

147. Ms. Fernandes then pointed out to the huge crowd, as captured in video, that as a "…very important side note, we have 16 schools in the Pawtucket school district. We have ***not one*** black or brown principal."

148. Ms. Fernandes concluded, "[o]ur white and non-white students need to see they are worthy of all opportunities and education from educators to administrators."

149. Importantly, a couple of weeks later, the Providence Journal, upon reporting on Plaintiff's eventual appointment to Superintendent, published: "[a]ccording to School Committee member Marsha Fernandes, though, the race of the finalists was 'what it all boils down to."

150. The June 26, 2023, Providence Journal article quoted Ms. Fernandes as saying, "[i]n my opinion, there was really only one really good interview…[a]nd that was Patricia [Royal]."

151. The Providence Journal also quoted Ms. Fernandes as going on to "allege that racism was at play," and stating, "[t]hey didn't even want to give [Royal] the opportunity to interview in front of [the full PSC committee] because they were so threatened [by] having a Black superintendent ....I just want equal opportunities for everybody, and I'm quickly noticing in this City that's not the case."

152. Back to the June 6, 2023, final interview meeting, next up at public comment was Union President and Search Subcommittee member Mr. Beaupre.

153. Mr. Beaupre is a Caucasian male.

154. Upon information and belief, there are members of the community who have expressed their opinions that Mr. Beaupre is a "racist."

155. Moreover, Mr. Beaupre has *admitted to Plaintiff* that he has been accused of being a racist.

156. Specifically, during their first meeting, Mr. Beaupre asked Plaintiff about Ms. Kytheryne Bento (hereinafter "Ms. Bento"), a community activist, and he said to Plaintiff, "I'm petrified of her. She's relentless. **She calls me racist**. And I'm not."

157. Notably, at a later point in time after Plaintiff became Superintendent, Plaintiff personally witnessed behavior related to questionable racial relations by Mr. Beaupre.

158. Specifically, while Plaintiff was Superintendent, there was a teacher who made racial slurs at middle school kids, and Plaintiff was present when Mr. Beaupre defended the teacher.

159. More specifically, this teacher yelled at a mostly minority class of middle school *children*, calling them "*Niggers*."

160. The teacher did not stop there; the teacher yelled at the kids to, "take you *Nigger* papers with you," as the children were leaving the room, understandably *upset*.

161. Then, when one young female child pulled out her phone and said to the teacher, "you can't talk to us like that," this teacher grabbed the child's phone, threw it back at the young girl, and yelled at her condescendingly, "well, call the police then."

162. After this incident, when Mr. Beaupre met with Plaintiff about this event, Plaintiff—as Superintendent—was justifiably recommending termination for the teacher.

163. However, Mr. Beaupre and his lawyer adamantly defended the teacher's behavior and called her "nice".

164. Back on June 6, 2023, at the interviews for Superintendent, prior to the Plaintiff and Ms. McNeil's interviews for Superintendent, Mr. Beaupre took the podium during open session.

165. Notably, when Mr. Beaupre got up, multiple members of the Union, wearing blue, fell behind him as a pre-arranged backdrop.

166. During Mr. Beaupre's speech, he focused on how the PSC should have gone with the Search Subcommittee's initial recommendation of only two (2) candidates, including the late-arrival and Caucasian male, Mr. Aubin, rather than Plaintiff.

167. Importantly, the PSC voted, by majority, to interview all candidates, which is their right.

168. During Mr. Beaupre's comments, and throughout the public meeting, Plaintiff felt that many of the teachers had been turned against her for reasons she could not understand at the time.

169. Plaintiff later learned that Mr. Beaupre had also made several false and reputation-harming statements in meeting minutes, to school committee members, to members of his own union, and to teachers in that meeting.

170. Following the public comments, Plaintiff and Ms. McNiel were interviewed by the PSC.

171. The audience, upon information and belief, numbered approximately two-hundred (200) and were mostly teachers, who were predominantly Caucasian.

172. During the interview, the audience got louder, and Plaintiff turned to speak to the audience.

173. Plaintiff shared her vision, spoke from the heart about how she felt about children and learning, spoke about how she supports teachers, and how she would "work for" the teachers.

174. Plaintiff felt the audience finally heard her, and she continued with the interview.

175. After Plaintiff finished her interview, she grabbed her belongings and walked out.

176. In order to leave, Plaintiff had to go through the back of the room, and there was a ramp lined with teachers who had signs.

177. As Plaintiff passed, the teachers she passed *quietly* relayed positive remarks to Plaintiff.

178. It was apparent that teachers felt the need to hide any feelings of favorability towards Plaintiff.

179. For example, as Plaintiff walked up the ramp, the teachers standing there *whispered* words of support to Plaintiff, such as, "I hope you win," and "I love what you stand for."

180. However, these teachers *were whispering,* and there seemed to be no reason other than to hide what they were saying to her.

181. The false and reputation-harming comments made by Mr. Beaupre and agents of the Pawtucket Teachers' union were believed by many and resulted in actually harming Plaintiff's reputation.

182. Upon information and belief, it was this harm to her reputation that was palpable in the room that day, as union members who spoke to Plaintiff hid their compliments to her.

183. Plaintiff then asked one of the teachers if they knew where the restroom was.

184. One teacher said she would "love to" show Plaintiff.

185. While walking to the bathroom with a couple of teachers, one teacher stated to Plaintiff more kind words, such as, "that she loved her speech and hoped that [Plaintiff] got the Superintendent seat," as she would "love to work with her."

186. After the interviews were concluded, there was a recess for the PSC to convene in closed sessions so that they could discuss candidates.

187. On or about Wednesday, June 14, 2023, the PSC met again.

188. At this meeting, the PSC appointed Plaintiff to the position of Superintendent for PSD, subject to the successful negotiation of a contract with an anticipated start date of July 1, 2023.

189. The vote to appoint Plaintiff was as close as it gets, with a vote of 4 to 3.

190. Those voting against Plaintiff were PSC members Ms. Bonollo, Ms. Dube, and Mr. Chellel.

191. Plaintiff was notified she was appointed.

192. Nonetheless, from the time of her appointment as the First African American Female School Superintendent in Pawtucket (and in the state of Rhode Island), certain powerful people in the City of Pawtucket, including but not exclusive to the Mayor – upon information and belief - set Plaintiff up to fail; when that did not work, these people actively undermined and sabotaged, as well as defamed and abused Plaintiff, most of which was memorialized in some form of public record as exposed below.

193. Moreover, when Plaintiff took over as Superintendent, PSD was in a state of disrepair that posed additional, significant challenges.

194. First, Plaintiff walked into a district that had two different Interim Superintendents in just the prior few months, and Plaintiff walked into serious staffing issues, along with other issues created by the Interim Superintendents.

195. The two interim Superintendents were Lisa Ramzi (hereinafter "Ms. Ramzi"), who had been a Mayoral appointment[3] or Mayoral-inspired appointment, and Kim Moore (hereinafter "Ms. Moore").

196. Ms. Ramzi left in April of 2023, and Ms. Moore took over until Plaintiff started in July of 2023.

197. During the tenure of Ms. Ramzi and Ms. Moore, several key vacancies occurred, leaving Plaintiff with a difficult starting place for the district in July of 2023.

---

[3] And is the step-daughter of the Mayor's very close friend upon information and belief.

23

198. Further, Ms. Ramzi, Plaintiff found out, was misappropriating Title I funds, distributing the funds the way she saw fit instead of distributing the funds according to the Title I guidelines, which led to the most needy schools receiving the least amount of money; when Plaintiff later learned about this she stated to Ms. Ramzi, who, by then, was one of her Assistant Superintendents, "You can't do that, its illegal, we will correct that this year" and later, RIDE made Ms. Ramzi use ESSER funds to backfill the appropriate amount of money to each school.

199. Moreover, just prior to Plaintiff's appointment, PSD lost *several* key staff to resignation, termination, and contract ending; most of these roles were left vacant until Plaintiff started, and these employees' resignations were mostly provided to PSD prior to Plaintiff's start date.

200. For example, at the time of Plaintiff's appointment, PSD had no finance department whatsoever, except for two lower-level clerks; there were no financial department managers, no Controller, and no Chief Financial Officer (hereinafter "CFO").

201. A finance department is critically important to a school district.

202. Plaintiff also was left with several other vacant positions including the Director of Early Childhood Education, a leadership role in the Teaching and  Learning Departments, several key positions in, including at the highest levels, of Human Resources[4] (hereinafter "HR"), as well as a Principal vacancy in Shea High School, another Principal vacancy at Slater Middle School, and several other vacancies in Assistant Principal positions as well as multiple teacher vacancies.

203. Even though Plaintiff inherited these vacancies and remedied them in time, she was publicly blamed for them later.

204. The time during the 2023-2024 school year was better than the 2024-2025 school year, but 2023-2024 was still very difficult in that PSD was constantly missing deadlines due to the Assistant

---

[4] In fact, Ms. Lee Rabbit, an Assistant Superintendent that Plaintiff inherited, was running HR without official training or proper certification to oversee HR – notably, upon information and belief, as of present, Ms. Rabbit has again taken over HR, again without proper training or certification.

Superintendents, and certain cabinet members including the Mayor's and PSD's shared Technology Chief, Hersh Christino, withholding information from Plaintiff (as described more *infra*), due to frequent audits, and due to Plaintiff's ongoing struggle to forge positive working relationships and collaboration with the City/Mayor, the PSC, and the PSD finance team; however, Plaintiff endured, added staff and started to make great changes, accomplishing much.

205. However, as time went on, especially as Plaintiff entered the spring/summer and then fall/winter of 2024, through Plaintiff's unlawful removal in February of 2025, Plaintiff's detractors, including the Mayor and his allies, doubled their efforts to actively undermine, sabotage, and defame Plaintiff in an effort to discredit her out of her position.

206. Upon information and belief, Plaintiff's detractors did not want an African American (female) Superintendent.

207. Importantly, the Mayor has very few people of racial minority status in leadership positions within the City, despite the City being nearly 70% minority races; PSD also had mostly Caucasian teachers and virtually no administrative leadership that was not Caucasian, until Plaintiff.

208. This pattern of conduct reflects the municipal Defendants' well-established custom of excluding minorities from leadership positions within the City and PSD.

209. The selection of non-minorities for leadership positions was a practice, and unwritten policy, employed by top decisionmakers in the City and PSD/PSC.

210. This pattern of conduct was the moving force in Plaintiff's injuries.

211. Some of the Mayor's allies, and thus Plaintiff's detractors, included long-term school committee members such as Ms. Bonollo and Mr. Chellel, who both voted against Plaintiff; both, upon information and belief, have close ties to Mayor Grebien.

212. In fact, upon information and belief, during school committee meetings, Chellel has often been observed texting Mayor Grebien or his agents.

213. Another very close ally to the Mayor is Hersh Christino (hereinafter "Mr. Christino"), who is the Chief of Technology and Innovation for the City; he was also the top technology leader at the Pawtucket School District due to an odd set up, implemented by Mayor Grebien, between the City and PSD.

214. More specifically, Mayor Grebien set up a "shared" Chief of Technology and Innovation position whereby Mr. Christino was supposed to work equally for the City and for PSD.

215. Mayor Grebien also, in an unprecedented move as compared to prior Caucasian Superintendents, tried to pressure Plaintiff into having a shared Human Resources (hereinafter "HR") chief and a shared Finance Department.

216. To be clear, the City is supposed to have zero oversight and authority over the PSD, its technology, its finances, and its HR functions.

217. As to the shared "technology role" Mayor Grebien was able to set up with Mr. Christino, the model did not work and instead, resulted in significant impairments to the PSD technology progress, and still does today.

218. For example, Mr. Christino was rarely available to do the critical, and sometimes very time-sensitive, work requested by Plaintiff, despite his role supposedly being shared equally by PSD.

219. In reality, and practice, when the City needed Mr. Christino, that was his priority; unfortunately for Plaintiff, that occurred more often than not.

220. From Plaintiff's perspective, from the start, she obtained very little of the critical technology work needed, such as updating workflows, changes to and updates to the website, and other critical technology needs, which impacted progress.

221. Over time, the technology work that needed to be done came to a critical point, so Plaintiff hired a combined communications/PR staff member, Ariel Castillo (hereinafter "Mr. Castillo"), whom

Plaintiff knew from the Providence School District; Mr. Castillo had a technology background in addition to his communications/PR background.

222. However, Plaintiff's decision to use Mr. Castillo for technology work resulted in some blowback from Mayor Grebien, despite the fact that Plaintiff had complained multiple times that the "shared" Chief of Technology was not working for PSD and impaired PSD's progress.

223. Plaintiff later came to believe, upon information and belief, that Mayor Grebien had installed Mr. Christino in PSD to both block the School District's progress, and thus undermine Plaintiff, but also to be able to "spy" on her and PSD.

224. Again, Plaintiff's boss is *not* Mayor Grebien and certainly not Mr. Christino – it is the duly elected school committee, the PSC.

225. Thus, there is no legitimate reason for either Mayor Grebien or Mr. Christino to access Plaintiff's (or other PSD staff's) electronic files, electronic communications, and other electronic data.

226. Yet, Plaintiff is sure that Mr. Christino accessed Plaintiff's and her allies' electronic data.

227. Plaintiff has many reasons to believe the above is true, including but not exclusive to the fact that Mr. Christino – in a cabinet meeting and in front of Dr. Lahna Tate (hereinafter "Dr. Tate"), Chief of Schools for PSD, and Dale McGee (hereinafter "Mr. McGee"), CFO of PSD - admitted that he had a right to, and did, access to these data.

228. Upon information and belief, Mr. Christino has *improperly* accessed Plaintiff's computer and email, without notice or authorization, at the direction of Mayor Grebien, on multiple occasions.

229. This action is based upon the authority of decision maker Mayor Grebien, upon information and belief.

230. This action was further based upon the City and Mayor Grebien, and his agents' well-established custom of allowing unbridled access to PSD's electronic data.

231. Moreover, Mr. Christino took action to undermine Plaintiff, especially as Plaintiff's time in the Superintendent job went on, upon information and belief, at the direction of Mayor Grebien.

232. Another one of Mayor Grebien's allies and Plaintiff's detractors was Mayor Grebien's Financial Director, Defendant Mark Stankiewicz (hereinafter "Mr. Stankiewicz") who set Plaintiff up to fail, and later actively undermined, sabotaged, and defamed Plaintiff as well, at Mayor Grebien's direction, upon information and belief, until her unlawful removal in February of 2025.

233. For example, only a few months into Plaintiff's short tenure as Superintendent, Mayor Grebien and his Finance Director, Mr. Stankiewicz, began to interfere – directly – with PSD operation through manipulating their finances and financial systems[5], as well as through withholding funds that were lawfully owned by PSD; the City had **_no_** legal authority to do any of these actions.

234. This action was further based upon Defendants' well-established custom of allowing unbridled access to PSD's finances, was based upon the authority of decision maker Mayor Grebien, and was a moving force behind Plaintiff's injuries.

235. As to the withholding of funds owned by PSD, in or about September of 2023, approximately $3.2 million in funds allocated for the PSD, from the state, were deposited into the system shared by the City and PSD.

236. PSD noted this money in the system but yet, the City never turned the money over to the PSD.

---

[5] One other intertwined function between the City and PSD is an archaic information and financial system called MUNIS, which was effectively shared by the City and PSD. Through this system, the City has access to PSD financial systems; although, to be clear, the City has no authority to manipulate PSD financial data, interfere in PSD financial transactions, no right to PSD allocated funds, and the City has zero oversight or authority over PSD budget or finances. This MUNIS system had associated with it archaic procedures as well. Such as, for payments PSD has to make, PSD has to first deposit money into the system, then ask the City to write a check for a payment PSD owes, then the City mails that check to PSD, who, in turn, has to mail it to the vendor. This shared system, and archaic procedures, unwittingly intertwining Plaintiff's school district with the City gave the City the ability to commit unlawful acts, including what the PSD Attorney called "…a pattern of behavior that has frustrated administrative functions that are statutorily vested in the Superintendent of Schools, subject to the direction of the School Committee[]" including "repeatedly [withholding] funds, delay[ing] monitory transactions, and limit[ing] access…to [MUNIS which is] required for the day-to-day financial operation of PSD."

237. By in or around March of 2024, Plaintiff began to actively raise concerns about the perceived illegality of City's actions.

238. Plaintiff's actions, which involved reporting perceived violations of law to the PSD, PSC, and City, are a protected act under the Rhode Island Whistleblower Protection Act (RIWPA).

239. R.I. Gen. Laws § 28-50-3 provides protection to "employees that report…to a public body, verbally or in writing, a violation, that the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the law of this state…"

240. In March of 2024, Plaintiff alleged that City Finance Director Mr. Stankiewicz was unlawfully withholding approximately $3 million in School Housing Aid, belonging to PSD.

241. Notably, later, after the PSC gained more members who were loyal to Mayor Grebien after the election of 2024, as a result of these reports, the PSC retaliated against Plaintiff by forcing Plaintiff out of her position at PSD under pretextual reasons.

242. However, at that time, in or around March of 2024, Plaintiff started to take action to have the money returned to PSD and eventually succeeded.

243. Plaintiff first sent an email to several City officials on March 15, 2024, including Mr. Stankiewicz, the City's Finance Director, noting the $3.2 million deposit allocated for PSD.

244. Following this email, there was a dispute by the City, stating that this was the City's money, even though it was clearly a state allocation for the schools.

245. Specifically, in a March 18, 2024, email by Mr. Stankiewicz to Plaintiff and others, he stated in no uncertain terms – trying to keep the money - that, "[p]lease be advised the funds are not designated for the School Department's Capital Reserve Fund but are payments to the City's General Fund."

246. In response, one of the PSD attorneys clarified with Mr. Stankiewicz and the City that the money was for PSD.

247. Specifically, on or about March 19, 2024, Diony Garcia, Esq.

"Alternatively, I fear that Mark [Stankiewicz] is mischaracterizing the very nature of the funds recently released by RIDE because he does not understand what school housing aid is. What is most concerning is that the way in which Mark worded his email, I am not entirely sure whether or not he is under the mistaken belief that these funds somehow belong to the City.
As a matter of law, these funds belong to the school district, and we hope to clear up any misconception to the contrary by tomorrow's meeting. For starters, these funds are established by state law through a "foundation program for school housing," and intended to: (1) Guarantee adequate school housing for all public-school children in the state; and (2) Prevent the cost of school housing from interfering with the effective operation of the schools. See R.I.G.L. §§ 16-7-35 to 16-7-47…
…In an email sent by William Trimble, the RIDE School Building Authority Finance Officer, on January 31, 2024, to Pawtucket Administrators, Trimble described the September 2023 Housing Aid payment. In the same email Trimble also advised that an identical payment would be made on March 15, 2024. These payments were broken down as consisting of reimbursements for: (1) Capital Reserve Projects ($3,066,439.00); and (2) Bond-funded projects ($210,898.00). Both payments would each be for a total amount of $3,277,337.00. I am not sure if the Pawtucket School District claimed the September payment from the city, but both September and March payments were released by RIDE with the intent to reimburse the school district.
We should confirm that that September payment was claimed, and we should certainly be claiming the recent March payment."

248. Following that email, Mr. Stankiewicz relinquished, but only after Mr. Stankiewicz verified with RIDE.

249. Later, City Finance Director Mr. Stankiewicz finally returned the money.

250. As another example of the City's intentional interference with PSD, and thus Plaintiff's ability to competently perform her job, occurred in or around June of 2024.

251. Notably, one of the few responsibilities of the City and PSD that is somewhat intertwined is the reporting of yearly accounting and an annual audit, whereas both the PSD and the City must submit records to an auditor and the Auditor General of the State of Rhode Island; as described, also 'intertwined' is the MUNIS system, which is effectively jointly shared by the City and PSD, giving the City *access* to PSD financial transactions.

252. Importantly, despite the City having technical "access" to PSD financial transactions, the City has zero authority, and no oversight, over PSD financial management or transactions.

253. In or about early June of 2024, the City took actions to sabotage and undermine Plaintiff.

254. At that time, first, the City unilaterally and wrongfully placed a very short deadline on PSD to close their books for the Fiscal Year, without the normal notice; in fact, at the time of the City's arbitrary deadline, there were *still a couple weeks* left until the end of the Fiscal Year.

255. The City then intentionally <u>*deleted*</u> 33 of PSD's requisitions, causing significant disruption in PSD's ability to both close books, budget plan, pay vendors, and exposing PSD to liability.

256. This action is based upon the authority of decision maker Mayor Grebien, upon information and belief, was based upon a well-established custom of the City, Mayor Grebien, and his agents' unbridled access to PSD electronic data and interference with the same, and was a moving force behind Plaintiff's injuries.

257. That incident began on or about June 5, 2024, when Jeannine Bourski (hereinafter "Ms. Bourski"), who works for Mr. Stankiewicz, sent an email to Plaintiff and her CFO, Mr. McGee.

258. This email gave PSD only until midday June 12, 2024, to finalize all of the books for the 2024 Fiscal Year, which does not end until June 30, 2024, *without clear prior notice that this was going to occur*.

259. Then, on or about June 12, 2024, the City, through Mr. Stankiewicz, Ms. Bourski, and/or their agents, cancelled and deleted approximately thirty-three (33) PSD Purchase Orders and Requisitions.[6]

260. The City Finance department even cancelled outgoing checks that the PSD needed to pay expenses, despite PSD having allocated the money to make those payments.[7]

---

[6] See fn. 6, *supra* as to how the City could do this due to the shared MUNIS system and the archaic processes in place.

261. These actions resulted in significant disruption for PSD, including no knowledge of which expenses were unpaid, since the City deleted the entire records of those payments in addition to cancelling the payments.

262. Moreover, these actions caused the PSD great difficulty in creating the next Fiscal Year's budget.

263. The actions also caused PSD great difficulty, caused PSD staff to perform redundant work, attempting to recreate the requisitions and re-issue payment requests, and interfered with PSD's operation in other serious ways.

264. The City, through Ms. Bourski, claimed that it was using the same procedure it does every year.

265. However, this is untrue based on two different sources.

266. First, Mr. McGee, the CFO, stated in his June 14, 2024, email to Ms. Bourski that:

"I understand that you have stated in prior years the schools have usually pushed for this. As a result, **I reached out to the previous Business Team Office team to inquire about the end of year closing out process. They shared with me this has never been the practice especially during this time of the school year.** We still have to reconcile our budgets until the end of June 2024." (Emphasis added).

267. Additionally, the Committee Clerk, Diana Liss (hereinafter "Ms. Liss"), also investigated the City's claim that it was using the normal yearly process, which was not true, as stated in her June 18, 2024, email to the PSC:

"After a meeting with our accounts payable clerk to understand this process further, **we learned that in previous years, she had access to toggle back and forth between the current fiscal year and the following fiscal year. This year she does not have the same access making everything more difficult for her**." (Emphasis added).

268. Moreover, during this process, the City *also* shut off access to Munis for PSD for the 2024 school year, *prior to* the fiscal year ending.

269. This was verified as being abnormal by Ms. Liss in her email to the PSC, where she stated that the City and Ms. Bourski had deleted 33 requisitions, and that "Ms. Bourski was out of her

jurisdiction in deleting the 33 requisitions entered by the school district" improperly and without notice.

270. On or about June 14, 2024, Mr. McGee, in his function as CFO, asked for the deleted requisitions to be restored and raised serious concerns about the City's action.

271. Specifically, in his email, Mr. McGee stated:

"It is a little unsettling that these have been deleted without warning. The work that was put into entering the requisition by the staff and also that the city's ability to just go in and delete work that has been done on the district's side is problematic. As I remember per our discussion in our weekly ride meeting held Tuesday, May 28th, **everyone on the call from the city was very adamant that the city was not in the district side of Munis, our budget platform. Based on that meeting and the email I received I am confused how this happened. I would like FY 24 reopened so that we can complete our business operations**." (Emphasis added).

272. On or about June 19, 2024, Plaintiff wrote a letter, on behalf of PSD, to Mr. Stankiewicz, stating, in part, that the, "Pawtucket finance Department has no authority to approve budget transfers, purchase requisitions, or any other financial transactions by the Pawtucket School Department Finance office."

273. The letter further alleged that the "Pawtucket Finance Department unilaterally removed access to Munis without any authority to do so," and it stated that on "June 12th, the Pawtucket Finance Department unilaterally, and without authority, deleted 33 Pawtucket School Department purchase requisition that were logged into Munis to process payments."

274. Plaintiff's letter further directed the Pawtucket Finance Department to "restore full access to the Munis system to the School Department finance office immediately. The information uploaded by the School Department finance office shall not be altered within the Munis system without the approval of the Superintendent or her designee."

275. In response to Plaintiff's June 19, 2024, letter, the City – including Mr. Stankiewicz – issued no substantive response.

276. This action is based upon the authority of decision maker Mayor Grebien, upon information and belief, was based upon this Defendants' well-established custom of withholding information and actions that Plaintiff required to run PSD, and was a moving force behind Plaintiff's injuries.

277. Thus, on or about June 24, 2024, PSD legal counsel, William J. Conley, Jr. (hereinafter "Mr. Conley"), wrote a letter to the City and Mr. Stankiewicz titled: "Unlawful Interference with School Department Fiscal Matters."

278. Mr. Conley clearly stated that the purpose of the letter was "follow up" for a "lack of a substantive response to the letter that Superintendent Royal sent to [the City] on June 19, 2024."

279. Mr. Conley's letter stated, in no uncertain terms, that the "City Finance Department has engaged in a pattern of behavior that has frustrated administrative functions that are **statutorily vested in the Superintendent of Schools, subject to the direction of the School Committee."** (Emphasis added).

280. Mr. Conley's letter further stated that the "City Finance Department has repeatedly withheld funds, delayed monitory transactions, and limited access of the Pawtucket School Department (PSD) to the Municipal Uniform Information System (MUNIS) required for the day-to-day financial operation of PSD."

281. Mr. Conley's letter further alleged, "[m]ost recently the City Finance Department unilaterally truncated PSD's FY24 fiscal year without authority by imposing a hard deadline of June 12, 2024, for all purchase requisition requests[]" and further alleged that the "City Finance Department intentionally deleted approximately 33 properly uploaded purchase requisition without warning."

282. Mr. Conley's letter further alleged, that the "City Finance Department thereafter continued to limit PSD access to MUNIS" and stated that these "actions have cause PSD to waste time, effort and resources, and have also exposed PSD to possible legal and financial liabilities."

283. Mr. Conley's letter provided the applicable legal citations for Plaintiff's statutory authority that condemned the City's unlawful actions.

284. Specifically, Mr. Conley's letter advised the City that it has a "limited statutory role…as defined by Chapter 2 of Title 16 of Rhode Island General Laws."

285. Mr. Conley's letter emphasized that the "**City Finance Department does not have the authority to approve, cancel or delete budge transfers, purchase requisitions, or any other financial transaction made by PSD, through the Superintendent of Schools or her designee.**" (Emphasis in original).

286. Mr. Conley's letter specifically cited, "[p]ursuant to R.I.G.L. §§ 16-2-9 and 16-2-11, only Superintendent Royal, or her designee, is statutorily authorized to make all such actions, and only the Pawtucket School Committee is statutorily authorized to supervise such transactions."

287. Mr. Conely's letter concluded with a warning that if "corrective action is not taken immediately," or "any further interference in the financial affairs of PSD in violation of Title 16" occurred, that PSD would "take appropriate legal action."

288. Mayor Grebien, the Pawtucket City Council, and the PSC were all copied on the letter.

289. In response, Mr. Stankiewicz wrote a letter, on or about June 24, 2024, on behalf of himself, his Finance Department, and Mayor Grebien, denying wrongdoing and claiming that there was a "long-standing process" related to opening a new Fiscal Year prior to June 30th; Mr. Stankiewicz also denied it had "closed" the Munis system to PSD for 2024.

290. On or about June 25, 2024, after further communications, the City, through Mr. Stankiewicz, sent a second letter.

291. This second letter further attempted to deny its wrongdoing by the City, attempting to blame the situation on Plaintiff, implying it was Plaintiff's ignorance that caused the issue.

292. Specifically, Mr. Stankiewicz, on behalf of the City and Mayor, wrote that there was "misunderstandings on the part of [Attorney Conley's] client."

293. Mr. Stankiewicz's second letter also claimed there were "numerous false allegations about what the City Finance department has done or not done, including a lack of response" in Attorney Conley's letter, but Mr. Stankiewicz's letter denied these allegations vaguely and without clear explanation.

294. For example, in Mr. Stankiewicz second letter, Mr. Stankiewicz pled ignorance, stating as to the PSD allegation that the City had "repeatedly withheld funds, delayed monetary transactions, and limited access…to [MUNIS]," that the City could not deny that allegation simply because Attorney Conley did "not offer any facts or specific factual allegations..."

295. In the end, that situation was "resolved," just like so many other issues with the City had been resolved, with the City claiming the situation was all a big misunderstanding, often blaming Plaintiff for said "misunderstanding," while Plaintiff took the high road and moved on for the sake of her ongoing need to work with the City.

296. Notably, even inside PSD, Plaintiff had detractors, who were allies of Mayor Grebien, that was worked to undermine, sabotage, and defame Plaintiff from the inside; one such detractor was one of Plaintiff's Assistant Superintendents, Lee Rabbit (hereinafter "Ms. Rabbit").

297. Ms. Rabbit has connections to the Mayor, upon information and belief.

298. Importantly, prior to Plaintiff's tenure, Ms. Rabbit's contract was not going to be renewed.

299. However, during Ms. Ramzi's tenure as Interim Superintendent, Ms. Ramzi, without approval of the PSC, renewed Ms. Rabbit's contract for two (2) years.

300. Then, upon Plaintiff's appointment as Superintendent, Ms. Ramzi was appointed as an Assistant Superintendent.

301. Moreover, since Plaintiff was not able to terminate Ms. Rabbit due to Ms. Ramzi's renewal of Ms. Rabbit's contract just prior to Plaintiff being appointed, Ms. Rabbit stayed on and was Plaintiff's Second Assistant Superintendent.

302. This pattern of conduct reflects Defendants' well-established custom of usurping and undermining Plaintiff's supervisory authority and functioned to marginalize and prevent Plaintiff from performing her professional duties without interference, which was a moving force behind her injuries.

303. Importantly, from the start, Ms. Rabbit's animus towards Plaintiff, and those of her staff who are also of minority races, was evident.

304. In fact, much later, and just after Plaintiff's unlawful removal in early 2025, Ms. Rabbit began targeting many of the staff members that Plaintiff hired, **especially** those who are not Caucasian.

305. Importantly, Ms. Rabbit did not target those who were *just* as loyal to Plaintiff but Caucasian.

306. From the start of Plaintiff's appointment, Ms. Rabbit's actions to undermine and sabotage Plaintiff were evident.

307. For example, Ms. Rabbit would direct Plaintiff's staff around – rudely – in front of Plaintiff.

308. For example, on one such occasion, Terry Pereira (hereinafter "Ms. Pereira") from HR was in Plaintiff's office to talk to *Plaintiff* about a matter not involving Ms. Rabbit.

309. However, Ms. Rabbit invited herself into Plaintiff's office, then proceeded to yell at Ms. Pereira asking, "what are you doing in here!?"

310. On other occasions, Ms. Rabbit's undermining of Plaintiff was more direct and with more serious implications.

311. For example, on multiple occasions, after Plaintiff – as Superintendent – gave directives to a school under her command, Ms. Rabbit would provide counter-directions such as telling the school leadership that they did not need to do what Plaintiff had expressly directed; she would

also direct Plaintiff's staff to report to, and obtain information through, her and Ms. Ramzi, rather than Plaintiff, which Plaintiff later learned about through staff themselves.

312. This pattern of conduct reflects Defendants' well-established custom of usurping and undermining Plaintiff's supervisory authority and functioned to marginalize and prevent Plaintiff from performing her professional duties without interference, which was a moving force behind her injuries.

313. Ms. Rabbit would also improperly withhold information from Plaintiff.

314. For example, Ms. Rabbit was supposed to be overseeing certain grants related to early childhood education but on several occasions, Ms. Rabbit failed to apply for those grants, after being directed to do so by Plaintiff; then, Ms. Rabbit would fail to share (or hide) that she had not applied for the grants.

315. Ms. Rabbit also intentionally withheld information that resulted in Plaintiff looking bad and impeded the proper management of PSD.

316. This pattern of conduct reflects Defendants' well-established custom of usurping and undermining Plaintiff's supervisory authority and functioned to marginalize and prevent Plaintiff from performing her professional duties without interference, which was the moving force behind her injuries.

317. In fact, as to some matters, Plaintiff's second Assistant Superintendent, Ms. Ramzi, would withhold information from Plaintiff along with Ms. Rabbit.

318. For example, after Plaintiff's appointment, Ms. Rabbit and Ms. Ramzi left themselves as the contacts for RIDE regarding school testing, despite the fact that this information should have gone to Plaintiff's new Chief of Schools, Dr. Lahna Tate (hereinafter "Dr. Tate").

319. Both Ms. Rabbit and Ms. Ramzi proceeded to hide the fact that they were the RIDE contacts from Plaintiff.

320. In fact, after Plaintiff directly inquired of Ms. Rabbit and Ms. Ramzi if they were receiving the RIDE testing information, both of them misrepresented that they did not receive it.

321. This pattern of conduct reflects Defendants' well-established custom of withholding material information from Plaintiff to undermine her ability to perform her job, which was a moving force behind her injuries.

322. Plaintiff had to contact RIDE and ask who at PSD was getting the testing information, only to discover that Ms. Rabbit and Ms. Ramzi had bold-faced lied to her about getting the emails, as they *were* the recipients.

323. Regarding Plaintiff's detractors in the PSC, at first, it was a minority of members, which allowed Plaintiff to do her job and retain her position.

324. However, as the PSC members changed after the contentious November 2024 election, so did Plaintiff's job security.

325. However, even at the start of Plaintiff's appointment in 2023, the PSC had members who were Plaintiff's detractors, including PSC members Ms. Bonollo and the first PSC Chairman during Plaintiff's tenure, and an ongoing member, Mr. Chellel.

326. Ms. Bonollo and Mr. Chellel began to sabotage Plaintiff even prior to her formally beginning her new role as Superintendent.

327. For example, prior to the start of her new role, Plaintiff had a scheduled conference to attend out of town; this conference continued a few days past Plaintiff's start date of July 1, 2023.

328. Thus, upon her being offered the job following the final interviews, Plaintiff informed the Chairman at the time, Mr. Chellel, that she was scheduled to attend a conference, so she could not physically be present at PSD on the July 1, 2023, start date.

329. Chairman Chellel reassured Plaintiff that it was not an issue in any way.

330. Plaintiff fully expected, as is normal pattern and practice, that the Chairman would inform the other PSC members about Plaintiff being out of town at a conference.

331. Mr. Chellel, however, never relayed that information to the PSC members.

332. This pattern of conduct reflects Defendants' well-established custom of omitting material information in regard to Plaintiff and otherwise undermine and impair Plaintiff's ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

333. Thus, during Plaintiff's conference, Plaintiff learned that Ms. Bonollo was trying to locate her, and was asking "where [Plaintiff] was."

334. Later, upon Plaintiff's return from the conference and physically starting her new job at PSD, Ms. Bonollo approached Plaintiff and *scolded* her.

335. Ms. Bonollo, in a condescending tone, stated to Plaintiff that she needed to "notify the school committee" when she "was going to be out."

336. Plaintiff respectfully informed Ms. Bonollo that she had provided exactly that notification to Chairman Chellel.

337. Ms. Bonollo did not seem to believe Plaintiff and acted surprised.

338. Plaintiff promptly reassured Ms. Bonollo, despite having done nothing wrong, that she would work on ensuring communication about the "days [Plaintiff] was going to be out" would be "better communicated."

339. Plaintiff's initial impression of Ms. Bonollo was that she was very condescending to her, and that Ms. Bonollo did not speak to Plaintiff in a manner that it would be expected for a PSC member to speak to the Superintendent; for example, in one of her first interactions with Plaintiff, she had told her – as to PSC meetings – that "those meeting are not *your* meetings."

340. Specifically, on the issue of Plaintiff being out of town, Ms. Bonollo did not simply say, "were you around…"

40

341. Instead, Ms. Bonollo *scolded* Plaintiff for not being around on her start date, without giving Plaintiff the benefit of the doubt that she had a reason to be out <u>and</u> approval from the Chairman.

342. Notably, Ms. Bonollo had been on PSC for nearly twenty (20) years and had never treated male, and/or non-African American Superintendents, in this same condescending way that she treated Plaintiff *from that point forward*.

343. Ms. Bonollo, as it became evident to Plaintiff, did not like Plaintiff because of her race/color.

344. To be sure, on *several occasions,* Ms. Bonollo made *explicitly racist* comments *to Plaintiff*.

345. In fact, on one occasion, Ms. Bonollo <u>*even admitted to being a racist*</u>; this admission was made in front of Plaintiff, an African American woman, another PSC member, Ms. Fernandes, a Hispanic woman, and Plaintiff's PR/Communications staff member, Mr. Castillo, who is a Hispanic male.

346. To be sure, Ms. Bonollo, throughout Plaintiff's approximate year-and-a-half tenure, regularly made racially related comments *to Plaintiff*.

347. For example, Ms. Bonollo *frequently* made degrading comments about Plaintiff's hair.

348. As one example of these highly inappropriate comments, Ms. Bonollo would regularly tell Plaintiff, an African American woman who straightens her hair frequently, that she "should wear her hair curly *so she can relate better to the little black and brown girls.*"

349. This action is based upon Defendants' well-established custom of marginalizing minority groups, which was the moving force behind Plaintiff's injuries.

350. On other occasions, Ms. Bonollo – who was being (justly) criticized by a community activist, Ms. Bento, a Cape Verdean female – asked Plaintiff to speak to Ms. Bento about Ms. Bento's criticisms of Ms. Bonollo on social media.

351. Ms. Bonollo implied to Plaintiff, if not stated, that she wanted Plaintiff to speak to Ms. Bento on her behalf, due to Plaintiff and Ms. Bento having *shared characteristics* (i.e., they are both People of Color).

352. Ms. Bento's criticism of Ms. Bonollo was—expressly—for being a "racist."

353. Ms. Bonollo made other inappropriate racial statements to Plaintiff while she and Plaintiff were discussing Plaintiff's push to "diversify the administrative and teaching staff".

354. On several occasions, Plaintiff advocated for diversity in staffing, saying that "kids need to see people that look like them" and that "representation is important."

355. Importantly, the City is nearly 70% persons of minority races, upon information and belief.

356. On one occasion, while discussing hiring, Ms. Bonollo blurted out, inappropriately dehumanizing candidates based solely on ethnicity, "are we going to hire *any Hispanics*?"

357. Plaintiff patiently pointed out that she had already hired several people of such an ethnicity, and stated that she had several "Spanish speaking employees in the district."

358. At that point, Ms. Bonollo inappropriately asked, "what about *the Asians*?"

359. Plaintiff, annoyed, maintained composure and responded, "what *about* the Asians?"

360. Ms. Bonollo responded, "[y]ou going to recruit *some Asians,*" and then Ms. Bonollo repeated, "what about *the Asians*?"

361. Plaintiff was shocked.

362. Plaintiff responded, slightly mocking Ms. Bonollo without her knowledge, stating, "matter of fact, we have *one now* – she is the Assistant Principal at Shea High School[8]."

363. Plaintiff continued, "[s]he is there if you want to go over there and see her."

364. Ms. Bonollo responded, "I didn't know we had '*an Asian*' in the District."

365. Plaintiff said, "let me ask you this, what did you do to recruit before I came?"

366. Ms. Bonollo seemed stumped.

367. Then Ms. Bonollo responded," [w]ell, we didn't do anything - *we were 'whitewashed.'*"

---

[8] This Assistant Principal was one of the many Persons of Color that Plaintiff brought to Pawtucket Administration and teaching staff.

368. Ms. Bonollo continued with emphasis, "the *whole city* is whitewashed."

369. This action is based upon Defendants' well-established custom of marginalizing minority groups, which was the moving force behind Plaintiff's injuries.

370. Those are far from the only examples of Ms. Bonollo, a long-term PSC member, using racially inappropriate language in front of Plaintiff and others of minority races/colors.

371. In fact, just prior to the 2024 elections, and Plaintiff's subsequent rapid, and unjust removal from her position, Ms. Bonollo, PSC member Ms. Fernandes, Plaintiff, and Plaintiff's PR/Communications staff member, Mr. Castillo, were touring Curvin McCabe Elementary School when Ms. Bonollo admitted to being a "racist" and "not liking" "People of Color."

372. Specifically, on that day, touring the Elementary School, the tour began with Ms. Bonollo claiming—inaccurately—to the school's Principal, that the group was there for an "inspection."

373. On multiple occasions during the tour, PSC co-member, Ms. Fernandes, had to correct Ms. Bonollo that it was a "tour" and not an "inspection."

374. During the tour, Ms. Bonollo frequently made negative comments about the school; she also made snarky remarks and used a condescending tone.

375. After touring, the group was outside of the school talking, and Ms. Fernandes stated to Ms. Bonollo that she found her to be "inappropriate and extremely negative during the entire tour of the school"; Ms. Fernandes also relayed that Ms. Bonollo had said "things that are not true."

376. Ms. Fernandes seemed to be trying to be polite, not knowing how to raise the *real issue* to Ms. Bonollo, and Ms. Bonollo was not getting it.

377. Thus, Ms. Fernandes stated bluntly to Ms. Bonollo, in front of the group, that Ms. Bonollo's "biases are coming out."

378. Ms. Fernandes continued, transitioning to complaining to Ms. Bonollo about her unfair treatment of Plaintiff, stating that Ms. Bonollo, "often says rude things, questioning [Plaintiff] constantly."

43

379. Further, as to Plaintiff, Ms. Fernandes stated to Ms. Bonollo that Ms. Bonollo was "giving [Plaintiff] a hard time" and that Ms. Bonollo was disrespectful, "questioning [Plaintiff's] skills and abilities" without reason.

380. Ms. Fernandes also stated to Ms. Bonollo that she "need[ed] to stop" and asked her, "[w]hy are you doing this?"

381. Ms. Fernandes continued, *further* stating, "[y]ou've been on the district for 18 years and this City has been deplorable. It's not new."

382. Ms. Fernandes then stated exactly what she seemed to be trying to say to Ms. Bonollo regarding her unfair and disrespectful treatment of Plaintiff without reason:

"I feel like you're racist [Ms. Bonollo], [Plaintiff] comes in and you all [referring to members of PSC and the city] attack her."

383. Ms. Bonollo's response, in front of three members of minority races (i.e., "People of Color"), was shocking:

"You know what? I can't help it that my mother raised me *to avoid colored people*, I was *brought up to not like people of color*." (Emphasis added)

384. This action is based upon Defendants' well-established custom of marginalizing minority groups, which was the moving force behind Plaintiff's injuries.

385. Thus, Ms. Bonollo admitted to being a racist even though *every member of her group*—including Ms. Fernandes, Mr. Castillo, and Plaintiff, were *all of minority races and "People of Color*."

386. Ms. Fernandes responded with, "[y]ou are going on 70 years old, it's time to let that go."

387. Ms. Fernandes thought for a moment and seemed to come to a realization based on Ms. Bonollo's confession.

388. Ms. Fernandes asked Ms. Bonollo, "[y]ou're saying that you sat on the committee [all that time] as a racist?"

389. At that point, Plaintiff interjected and attempted to mediate, stating to both women, "you are brave for sharing that [Ms. Bonollo], and I appreciate that you did. [Ms. Fernandes], I understand and I'm sorry but we have to come together and work together and, [Ms. Bonollo] you need to use a different lens. Just imagine if you were the only white woman in a whole community of Black people."

390. Ms. Fernandes then stated, "[t]his is how the kids feel. If they speak out they're afraid."

391. Plaintiff added her coined phrase, "representation counts," and the interaction ended.

392. Despite PSC members like Ms. Bonollo, Plaintiff worked hard to build relationships with key stakeholders and PSC members during her tenure but in the end, nothing was good enough.

393. In fact, at points, Plaintiff would call each individual member of PSC *daily* to touch base so none of the PSC members felt (or could claim to be) ignored.

394. Despite these challenges, as PSD's first female, African American Superintendent, Plaintiff was driven to make critical changes at PSD from day one.

395. For example, before Plaintiff even started work on site at PSD, while still at that out-of-town conference in early July of 2023, and upon returning, Plaintiff and her legal counsel negotiated *a successful* new teacher's contract.

396. The negotiations resulted in the Teachers Union obtaining a 3% raise every year for three (3) years.

397. Then, at the end of her tenure (just before being unlawfully pushed out of her position), Plaintiff negotiated a precedential contract for other PSD staff.

398. Specifically, Plaintiff negotiated a contract for the 1352 Union members, which is comprised of non-certified staff, such as janitors, lunch staff, Teaching Assistants, and Clerks.

399. That precedential contract for 1352 Union members included not only a 3% pay raise each year on a three (3) year contract for all staff, but in addition, for Teaching Assistants, Plaintiff

*additionally* obtained a $0.50 *per dollar per hour raise* on top of the 3% increases yearly, for maintenance staff she *additionally* obtained a *$10.00 per hour* raise, and for the Coaches and the Referees she *additionally* obtained a rare raise; the pay increases Plaintiff obtained were significant as many of those staff had not been given any notable raises in twenty (20) years.

400. Moreover, during Plaintiff's brief tenure, she accomplished and implemented significant improvements for PSD, some of which were also precedential.

401. For example, Plaintiff implemented the district's first free lunch program, ensuring all students had access to free breakfast and lunch to eliminate food insecurity.

402. Plaintiff created the first district-wide band program, which was inspired by student requests and fostered creativity, engagement, and school pride.

403. Plaintiff initiated the Electric Boat Workforce Development Partnership, creating a high school-to-career pipeline that allowed students to graduate with skills to build submarines for the U.S. Government.

404. Plaintiff started the first Superintendent's Parent Advisory Committee and Superintendent's Student Advisory Committee to actively engage with the community and students as well as gain valuable input and feedback.

405. In Plaintiff's mere year-and-a-half, she also increased the district's graduation rate from 69% to 72%, reduced student suspensions, and promoted a more restorative and supportive approach to student discipline.

406. Plaintiff expanded the Brown University Tutoring Partnership by adding high schools and middle schools, increasing access to academic support.

407. Plaintiff also identified the need for an alternative school to provide equitable services for the most vulnerable students, ensuring support was targeted from trained personnel and social workers; to do so, Plaintiff implemented a placement process and had a pathway to matriculate.

408. Plaintiff also restructured the Teaching and Learning Department to ensure that principals and school leaders had additional support to better meet their schools' instructional needs.

409. That list is an abbreviated list of Plaintiff's accomplishments; in fact, Plaintiff achieved more notable successes in a year-and-a-half than many of her predecessors did in a full three (3) year term, or multiple terms.

410. Plaintiff made all of these accomplishments despite a constant battle against undermining, sabotage, defamatory claims—and at times verbal abuse—by some PSC members, Mayor Grebien and his allies, and other detractors within her ranks.

411. Unfortunately, after a year of being the first African American Superintendent, pushing back against the increasing defamatory comments by detractors, and after both whistleblowing about the City's unlawful actions regarding finances, in the summer of 2024, matters got worse.

412. From the summer of 2024, through the 2024 campaign season, and the November 2024 elections, Plaintiff was targeted even more.

413. For example, Mayor Grebien had his Assistant tongue-lash Plaintiff for taking a picture with and speaking to the Mayor's rivals during non-partisan charity events that Plaintiff put on.

414. This action is based upon the authority of decision maker, Mayor Grebien, upon information and belief, and was the moving force behind Plaintiff's injuries.

415. By way of brief background, during the summer of 2024, Plaintiff successfully executed a precedential charity event that involved non-profit organizations within the community coming together, at Plaintiff's behest, to give kids in need free school supplies.

416. This event was notable and precedential, as these sorts of events had always been held by prior Superintendents, *on the affluent side of Pawtucket*.

417. However, Plaintiff made history by holding her event on the "less affluent" side of town.

418. Upon information and belief, certain PSC members and City officials did not like Plaintiff giving such attention to the "less affluent" side of town to the 'detriment' of the affluent side of town.

419. The event was a big deal and thus, many state politicians – and even the governor, Dan McKee, attended the event.

420. Plaintiff, as Superintendent, and the reason that the event was even happening for the first time on the "less affluent" side of town, was asked to take pictures with many of the politicians.

421. One of these pictures was with the former, unsuccessful Mayoral candidate – Camron Segalla (hereinafter "Mr. Segalla").

422. After the event, Plaintiff received a phone call from Tracy Gerard (hereinafter "Ms. Gerard"), the Mayor's Director of Administration Assistant (hereinafter "Assistant"), who proceeded to verbally tongue lash Plaintiff.

423. Ms. Gerard told Plaintiff, in no uncertain and quite firm terms, that the "Mayor was upset."

424. Plaintiff knew she had pulled off a very successful event so she did not understand why he would be "upset" with her.

425. Ms. Gerard clarified that the Mayor was upset that Plaintiff took pictures with "certain politicians" as well as "members of the community whom [she] should not be interacting."

426. This action is based upon the authority of decision maker, Mayor Grebien, upon information and belief, and demonstrates City and its agents' Defendants' well-established custom of chastising and degrading Plaintiff for legitimate reason, which was the moving force behind Plaintiff's injuries.

427. Plaintiff responded, "like who?"

428. Ms. Gerard said, "for example, Camron Segalla."

429. Plaintiff responded, confused, "why would I not talk to him?"

430. Ms. Gerard responded, "because he ran against the Mayor."

431. Mr. Segalla had been instrumental in helping with the charity event.

432. More importantly, Plaintiff – in her role as Superintendent – is not supposed to be political.

433. Plaintiff responded, "what does that have to do with me – he helped raise supplies and get resources for kids – so why wouldn't he be involved?"

434. Ms. Gerard said, "well you are not supposed to talk to *certain* people, you just got to be careful."

435. To reiterate, not only is Plaintiff's role a-political, even if it were not, she does *not work for or report to the Mayor.*

436. Plaintiff responded, "I don't understand."

437. Ms. Gerard reiterated, "you just have to be careful."

438. Plaintiff paused and questioned, "is there a hate list?"

439. Ms. Gerard said, "there's not a hate list but…" and continued, "I'm not saying it's a hate list…"

440. Plaintiff responded, "so what are you saying Tracy [Gerard]."

441. Ms. Gerard said, "[w]ell you know you just have to be careful who you talk to" and then she brought up that Plaintiff had taken a picture with Mr. Segalla.

442. Notably, the picture with Mr. Segalla was a *group picture with several people.*

443. As such, Plaintiff responded, "so explain to me how I would not take a picture with him in it – he is on one end – what am I supposed to do, say 'get out of the picture, you can't be in here.'"

444. Ms. Gerard responded, in full seriousness, "you could like walk away and avoid them - so you don't take a picture with them," referring to Mr. Segalla and the other politicians that were apparently off limits to Plaintiff according to the Mayor and his Assistant.

445. Somewhere in this conversation, Ms. Gerard also noted others that Plaintiff was supposed to avoid in public, according to her (and the Mayor, upon information and belief).

446. Plaintiff responded, "well I would have never known to do such a thing – nor would I ever *thought* to that as we are all there around the same cause, which is our students."

447. Plaintiff continued, with slight sarcasm, "is there a class I am supposed to be taking? Or how about this, you go and show me how to do this," referring to avoiding pictures with certain people the Mayor did not like.

448. Ms. Gerard responded, not catching Plaintiff's hint of sarcasm, "I don't know about that, maybe I can come and help you out…"

449. Plaintiff was shocked.

450. Plaintiff responded, "so let me understand – there are people I am not supposed to engage with because the Mayor doesn't want me to?"

451. Ms. Gerard responded, "ya."

452. Plaintiff said, "well I don't know which people so now what am I supposed to do with that information?"

453. Ms. Gerard responded, "let me talk to him, say we spoke, and call you back."

454. The call ended, leaving Plaintiff perplexed.

455. Prior to Ms. Gerard calling back, Plaintiff happened to run into Mayor Grebien later that same day at an open house.

456. The Mayor was near Dr. Tate so Plaintiff approached them.

457. Plaintiff stated to Mayor Grebien, "I got a strange call from Tracy about the event we were giving away free supplies – I'm confused she is telling me your upset with me."

458. Mayor Grebien scrunched his face and uttered, "she did?"

459. Plaintiff continued, "yes because I spoke to politicians and people in the community that I'm not supposed to – she said you and the City Council Members are upset with me because I took a picture with people I'm not supposed to interact with…"

460. Mayor Grebien claimed to have no idea, saying "I don't know what she is talking about."

461. Mayor Grebien then used the City's out – he said, "it must be a misunderstanding of some sort."

462. Plaintiff continued, "that's why I pulled you aside, no one told me about a hate list."

463. Mayor Grebien stumbled, "no, no, no one said 'hate list'."

464. Plaintiff responded, "what am I supposed to call it – a list of people I am not supposed to talk to?"

465. Plaintiff continued, "I am not a politician, I don't know who I am not supposed to talk to and no one told me anything about this but now you are mad."

466. Mayor Grebien responded, "no, not mad."

467. Plaintiff responded, "that is what Tracy [Gerard] said on the call this morning."

468. Mayor Grebien responded, "I will have to call her and clarify."

469. Plaintiff stated, "well, that is why I am glad I ran into you - why I pulled you aside – I wanted to hear from you what you want me to do, I am confused because we came together for one cause to give supplies to kids so we could have a successful event I pulled whoever would help with that cause together."

470. Plaintiff continued, reiterating what she thought was a goal of her role as Superintendent, "I am supposed to pull city together."

471. Plaintiff also pointed out, "even the Governor was there – in fact, he stayed quite a while - then I wake up today to find out you and the City Council are upset so I am confused."

472. Mayor Grebien responded, "don't worry we are good, I will call Tracy [Gerard]."

473. Mayor Grebien then added again what Plaintiff often heard from him: "it is just a huge misunderstanding don't even worry about it."

474. The interaction ended.

475. Decision maker Mayor Grebien's pattern of speaking negatively about Plaintiff to others—while feigning professional rapport in direct conversations—demonstrates the Mayor's and City's – by and through his agents – of well-established custom of discrediting and isolating Plaintiff, which was the moving force behind Plaintiff's injuries.

476. Not long after, in or about late summer of 2024, Plaintiff learned from Lisa Odom-Villella (hereinafter "Ms. Odom-Villella"), a Deputy Commissioner of RIDE, the first confirmation of what she had been increasingly hearing – which were rumors that Mayor Grebien was publicly stating Plaintiff was "difficult to work with" and like degrading statements.

477. Specifically, in late August of 2024, Ms. Odom-Villella contacted Plaintiff and asked her to coffee on August 23, 2024, at 8:15 AM.

478. Ms. Odom-Villella told Plaintiff that Mayor Grebien had called her and asked her to speak with Plaintiff because he thought Plaintiff and him were "struggling with work relationships."

479. According to Ms. Odom-Villella's recounting of her conversation with Mayor Grebien about Plaintiff, Mayor Grebien asked her to help him "build" a "working relationship" with Plaintiff.

480. Notably, at that point, Plaintiff had been working with Mayor Grebien for a year-and-a-half and she felt they had long prior "build" a working relationship, as best as Plaintiff could under the circumstances.

481. Moreover, at no point until after the March and June 2024 disputes over the City withholding PSD's $3.2 million dollars and the City's interference in PSD finances, did Mayor Grebien raise *any* issues in working with Plaintiff that she ever heard of.

482. According to the later conversation between Plaintiff and Ms. Odom-Villella on or about August 23, 2024, Mayor Grebien had told Ms. Odom-Villella that he also thought Plaintiff was "unreachable" in addition to being "difficult to work with."

483. Plaintiff had, during her conversation with Ms. Odom-Villella on that matter, asked her, "what did he say I should be doing exactly? or not doing?"

484. Ms. Odom-Villella responded that she had "asked the Mayor to elaborate, and he wouldn't land on anything."

485. Ms. Odom-Villella then mentioned that Mayor Grebien was the type of man that "liked to be catered to."

486. Plaintiff asked Ms. Odom-Villella, "and what does that look like?"

487. Ms. Odom-Villella responded, "I'm not sure but maybe call and check in on him more frequently asking him 'is there anything you need' - Reach out to him as much as you can."

488. Plaintiff responded that the Mayor wanted to meet once a month to share information and she is happy to meet more if he wants; moreover, she pointed out that the Mayor had both her work and private numbers and calls her frequently.

489. Ms. Odom-Villella seemed surprised to hear there was regular contact between Plaintiff and the Mayor.

490. In response, Ms. Odom-Villella said she would reach out to the Mayor to get more information to further clarify what the Mayor's concerns actually were, and get back to Plaintiff.

491. Plaintiff never heard back from Ms. Odom-Villella on the matter.

492. In or about the same time in the fall of 2024, Plaintiff continued to hear that Mayor Grebien was sharing publicly that Plaintiff was "difficult to work with" and the like defamatory statements.

493. When Plaintiff would subsequently and respectfully ask the Mayor about the comments she was hearing about, he would claim everything was fine and that Plaintiff was mistaken in her information that he made such statements.

494. Decision maker Mayor Grebien's pattern of speaking negatively about Plaintiff to others—while feigning professional rapport in direct conversations—constitutes the City, the Mayor's and his agents' well-established custom of discrediting and isolating Plaintiff, which was a moving force behind Plaintiff's injuries.

495. On one of these occasions in the fall of 2024, at a school Open House, Plaintiff asked the Mayor about those types of comments which were being relayed back to her as coming from the Mayor.

496. In response, Mayor Grebien stated to Plaintiff, without hesitation, that "we are good Superintendent."

497. Plaintiff continued to hear from others that Mayor Grebien was making negative comments about her and about their working relationship, out of nowhere, in the remaining fall of 2024 through Plaintiff's unlawful removal in February of 2025.

498. In response, when Plaintiff would see the Mayor during this timeframe, she would respectfully confront the Mayor and ask him about these comments coming from others.

499. Mayor Grebien would always say "we are good."

500. On those occasions, Plaintiff would follow up with the Mayor and ask him, "what is it that you need from me[]" or "[w]hat do you need me to do to support our working relationship."

501. Mayor Grebien just constantly responded to Plaintiff, "we are good."

502. On or about October 30, 2024, there was a PSC meeting where the public comment session included former Mayoral candidate, Mr. Segalla, raising concerns about election flyers – about PSC members – calling Plaintiff, "inexperienced and severely over matched."

503. Then, on or about November 12, 2024, Mr. Segalla spoke again at a school committee meeting.

504. During this PSC meeting, unlike other school districts in Rhode Island, but common at PSC meetings, discussions about race often erupted.

505. For example, Mr. Segalla raised issues with racism and unjustified attacks against Plaintiff, stating:

"I also want to discuss Superintendent. I want to say thank you very much for everything that you've done been doing for our schools and our students and its very much appreciated. She hasn't been here long but she's done so much seriously. People see it and the community sees it. I recently found out the other day not only is she the first African American Superintendent in Pawtucket but the first in Rhode Island **We should all be very proud that our city's strengths lie in our diversity and it should be celebrated never railroaded. Unfortunately there are forces out there that don't want her here and no one seems to have a good or any good reason why**." (Emphasis added).

506. Even Ms. Bonollo got involved throwing race around, albeit inappropriately.

507. Ms. Bonollo stated on video as to the 2024 newly elected PSC members:

"You know its just not what we are what we are. I'm white, you're black [pointing at Plaintiff, the only person of color at the panel]. But we are what we are. It's you know, um, I was the one who said that we had people of color and I didn't say we had people of color. I said we had a diverse committee. Which I meant was, we have *a Columbian* coming in, we have *a Puerto Rican*, we have *a Dominican*…"

508. This action is based upon Defendants' well-established custom of marginalizing minority groups, which was the moving force behind Plaintiff's injuries.

509. During this meeting, Ms. Fernandes, who had just been voted off the committee, spoke about race as well, making comments such as "I heard someone on this committee, and I won't name names, someone on this committee who said well at least there'll be three people of color on the committee… yeah we have three people of color now on our committee okay but do you guys remember… that Wildenhain, who couldn't even shake someone's hand and had the nerve to sit and yell at the superintendent, that's who this city voted in. "

510. Ms. Fernandes stated, "I know all of you are sitting out there thinking no no this doesn't exist and every time I hear anybody bring up race I hear people say no no not here, not here, not here."

511. Ms. Fernandes also stated, with respect to the Mayor's and Pawtucket Teachers' Alliance (and Mr. Beaupre's) control over PSD, that:

"I don't vote the way that people want me to vote just like the teachers alliance. I didn't realize when I first ran that asking for an endorsement meant I was signing away my soul and if I didn't vote just like the teachers alliance wanted me to vote then they too, like the mayors office, would I don't know would black list me. Whatever it is you all did with your dirty schemes."

512. In the fall of 2024, the Mayor again attempted to usurp power over PSD finances.

513. Specifically, during a meeting at City Hall that Plaintiff was told to attend without knowing the purpose, a friend of the Mayor was in attendance; he worked for an audit firm called PFM and during the meeting, there was another partner of PFM on the phone.

514. Plaintiff was suddenly bombarded with the Mayor and PFM suggesting that the City and PSD
partner together, use the City's auditing firm vendor, PFM, to audit PSD, and he also wanted
Plaintiff to consider joining PSD to the City's finance department.

515. During this meeting, the man who was apparently a friend of the Mayor, who worked for PFM,
tried to convince Plaintiff to use their services to *willingly audit* her own finance department.

516. Plaintiff relayed that she already had a financial/audit vendor, Marcum.

517. PFM boldly told Plaintiff to terminate Marcum and hire them.

518. The PFM representatives also stated, as to the 'voluntary' audit of the PSD, that "we will write a
report" and Plaintiff asked, "who is going to get it"; PFM responded, "only the finance teams," as
in PSD *and the City's team*.

519. Plaintiff was skeptical, given the history with the City in the realm of finances, so she asked PFM,
"will the report be printed in the newspaper?"

520. Mayor Grebien jumped in quickly to answer, stating, "oh no no no, it will just be amongst us."

521. Plaintiff's trust of the Mayor's statement was restricted by the Valley Breeze coverage she had
received since being appointed; the Mayor and some of his allies are known to have connections
with the local paper.

522. In fact, Pawtucket Valley Breeze newspaper was often the vehicle for Mr. Beaupre, Mayor
Grebien and his allies, (later) PSC Chairman Reyes, and other PSC members, to actively spread
misinformation about Plaintiff, with the newspaper taking the City or PSC's position on facts that,
at times, publishing information despite knowing the information was false (or published in
reckless disregard of the truth); as such, there is a companion lawsuit against The Valley Breeze
newspaper and its owner, upon information and belief, OBW-BREEZE LLC.

523. Given her concerns about PFM, and the Mayor's uncomfortable push for Plaintiff to hire PFM,
she relayed she could not commit PSD to PFM but requested a proposal be sent to her.

524. However, upon reading PFM's proposal, Plaintiff's concern rose that the City and the Mayor wanted Plaintiff to have the City's own vendor, PFM, investigate the PSD Finance Department and write a report which would evaluate the Finance Department's staff, their roles, interview staff, *and* would allow PFM to go through PSD's Finance system (MUNIS).

525. Plaintiff felt – at minimum – that such an investigation and report was unnecessary and intrusive given that she had remedied the inoperability of the Finance Department long before.

526. Plaintiff also did not trust the City and its vendors/staff with PSD finances given recent history.

527. Plaintiff respectfully declined the Mayor's push to be 'voluntarily' audited by the City's vendor PFM by suggesting the cost was prohibitive and also suggesting that she could not make the decision without the Chairman Mr. Charbonneau weighing in substantially.

528. Defendants' efforts, under the authority of Mayor Grebien, to pressure Plaintiff to engage a preferred financial firm reflects Defendants' custom of interfering with Plaintiff's financial decision making authority and undermining and impairing Plaintiff's ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

529. Chairman Mr. Charbonneau, who had also just been voted off PSC, had been a strong ally of Plaintiff.

530. Plaintiff thought the matter of PFM had been avoided, but it was not.

531. On Wednesday, December 4, 2024, at 12:51p.m. Ms. Gerard, the Mayor' Assistant and City of Pawtucket Director of Administration, text messaged Plaintiff on the day before a school committee meeting, stating in her text, "It's a bit time sensitive since it's regarding tomorrow's school committee agenda."

532. At 5:14 p.m. the same day Ms. Gerard sent Plaintiff another text, stating "…let me know if you'd like PFM [at the PSC meeting]."

533. Plaintiff had already relayed her respectful lack of interest in using PFM; she also relayed that they needed to contact Chairman Charbonneau.

534. Ms. Gerard, however, continued to push in texts to just Plaintiff, "[i]f you let them know by tomorrow morning, they should be able to attend for support."

535. Upon information and belief, Ms. Gerard was trying to go around Chairman Mr. Charbonneau to push Plaintiff into have PFM to be invited to the PSC meeting.

536. However, then Plaintiff herself reached out to Chairman Mr. Charbonneau, since he had not been informed about the City's push to strong-arm PSD into use PFM.

537. Defendants' efforts, under the authority of Mayor Grebien, to pressure Plaintiff to engage a preferred financial firm reflects Defendants' custom of interfering with Plaintiff's financial decision making authority and undermining and impairing Plaintiff's ability to be successful in her role as Superintendent, which was a moving force behind Plaintiff's injuries.

538. Once Mr. Charbonneau got involved, the Mayor's assistant, Ms. Gerard, backed off.

539. Notably, the PSC voted to not use PFM.

540. In fact, on the video of that December 5, 2024 PSC meeting, Mr. Charbonneau stated, pointedly:

"While our business office was in transition this opportunity for collaboration wasn't extended to the school department. But **now that our business office is financially sound and there's a new committee coming in there's also the attempt to bring in an outside firm to operationally audit the school department. I find that to be curious time. I find it to be coincidence at best. Suspect at worst**." (Emphasis added).

541. Mr. Charbonneau added:

"The point is we're being asked to collaborate with the same administration **that's asked for money from us countless times over the last five years and has gone back on their word countless times over the last five years**…while they don't have money to contribute to the operational budget they have money to come in and do an operational audit…" (Emphasis added).

542. Notably, upon information and belief, it is rumored that that the City and the Mayor have previously borrowed money from PSD; in the recent past, upon information and belief, the City

again requested funds, but that time, PSC declined, however in the past they had not, upon information and belief.

543. Mr. Charbonneau then added, "this is an attempt to end around this committee for one purpose - They ***don't like the candidate we chose for superintendent***. That's it. That's the truth." (Emphasis added).

544. In or around the same time in or about late fall/early winter of 2024, the City and PSD's annual audit was under way.

545. According to Plaintiff and her CFO Dale McGee (hereinafter "Mr. McGee"), PSD had finished their portion of the audit, and shared so during a meeting with PSD, City officials, the audit firm, and the Auditor General for the State of Rhode Island.

546. Specially, PSD officials shared with those in the room, including the Auditor General, that PSD did not need an extension.

547. However, the City stated they had a few more pieces of information to provide and asked for an extension.

548. This "audit extension" became a basis for the City and PSC to wrongfully discredit Plaintiff publicly later, as the City would blame PSD for the need for extension which was not true.

549. By way of brief background, the City of Pawtucket submits to an annual audit which PSD must participate in; they hire an auditing firm and has to collect the required documents to submit to the auditor by December 31 of each year; the Auditor General of the state is also involved.

550. While the City does not supervise the PSD or its budget, the audit does require information from the PSD.

551. In 2023, Plaintiff had just taken over at the time of the audit and she had no finance department; Plaintiff was also new to the audit process.

552. For those reasons in 2023, PSD needed an extension to complete their work. **(20231222_RI Aud General Audit Extension Request).**

553. Thus, in 2024, Plaintiff vowed to complete all work on time or early.

554. As the audit neared, Plaintiff had her staff working hard to ensure all information required of them was completed and submitted well prior to the final rounds of meetings.

555. In fact, the timeline of PSD's audit activities were later summarized by PSD CFO Mr. McGee, once the City started to unjustly blame PSD for their need for an extension.

556. At an important meeting, with the auditing firm and the Rhode Island State Auditor General himself, Plaintiff and her team represented that they had submitted all required information to the auditor, per their request.

557. The City however, though the City Finance Director, Mr. Stankiewicz, represented to those present that the City still owed some required information and that they would need an extension.

558. An extension was not an issue and relatively common, according to the Rhode Island Auditor General.[9]

559. Despite this fact, the City Finance Director Mr. Stankiewicz, kept trying to blame PSD.

560. Mr. Stankiewicz kept saying that "we" need more time, referring to Plaintiff and PSD as well.

561. Plaintiff corrected Mr. Stankiewicz several times that PSD's information was already complete.

562. Mr. Stankiewicz kept saying "we," as if to blame Plaintiff and PSD for the need for extension.

563. The Auditor General then spoke and stated that if an extension was needed, he did not need any "finger pointing" and instead, just needed a high-level email asking for an extension and stating the date until which the extension would be requested.

---

[9] Quoted in the Valley Breeze in the next article covering the late audit, "Rhode Island Auditor Gen. David Bergantino countered comments made by councilors last week about the rarity of audit extension requests by saying that they're not actually infrequent. Since becoming AG in 2023, he told The Breeze that about 30 percent of municipalities filed by Dec. 31 as required."

564. Then, during this same meeting and *after* the Auditor General spoke, Mr. Stankiewicz *then* tried to lobby the Auditor General to require Plaintiff's name on the extension letter.

565. This action, in repeatedly attempting to blame PSD for audit delays—even though PSD had timely completed its responsibilities—is based upon the authority of decision maker Mayor Grebien, upon information and belief, reflects the City Defendants' custom of undermining and attempting to discredit Plaintiff and her ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

566. Plaintiff pushed back – again clarifying that she and PSD's responsibilities, with respect to the audit, were complete and thus her name would not be needed on any extension letter.

567. The Auditor General agreed Plaintiff's name did not need to be on the letter but for a more general reason.

568. Specifically, the Auditor General clarified that Plaintiff's name would not be needed on such a letter in any case, as an additional signer with the City; in effect, all that was needed was the City's signature.

569. On Christmas Eve 2024, Plaintiff received a copy of City's letter, submitted to the Auditor General, requesting an extension; the letter blamed PSD for the City's need for extension.

570. Specifically, the letter stated, "It is the city's understanding that the CLA audit staff requested meetings with the PSD, but were unable to schedule one until the end of October," and made other statements which falsely imply blame should fall on PSD for the extension.

571. The letter also spoke of the timeframes of other steps completed by PSD incorrectly.

572. This action, in repeatedly attempting to blame PSD for audit delays—even though PSD had timely completed its responsibilities—is based upon the authority of decision maker Mayor Grebien, upon information and belief, reflects the City Defendants' custom of undermining and

attempting to discredit Plaintiff and her ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

573. In response, Plaintiff directed her CFO, Mr. McGee, to write a detailed timeline of events and submit it to the auditor and Auditor General; Mr. McGee produced such a letter and timeline on or about January 1, 2025.

574. The City, specifically Mr. Stankiewicz, then in advance of an upcoming City Council meeting, sent the extension letter to the City Council on or about January 22, 2025.

575. However, in doing so, Mr. Stankiewicz left off Mr. McGee's letter with the PSD's audit completion timeline, which rebutted the City's claims that PSD was to blame for the extension.

576. Mr. McGee and Plaintiff did not know at the time that Mr. Stankiewicz had simply not attached their rebuttal letter with the timeline to the City Council.

577. This action, in repeatedly attempting to blame PSD for audit delays—even though PSD had timely completed its responsibilities—is based upon the authority of decision maker Mayor Grebien, upon information and belief, reflects the City Defendants' custom of undermining and attempting to discredit Plaintiff and her ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

578. On or about the next day, Mr. McGee got request for a copy of his timeline from City clerk, Richard Goldstein (hereinafter "Mr. Goldstein").

579. It is not known how Mr. Goldstein learned about the unattached letter from PSD.

580. Mr. Goldstein relayed that the Council had learned about Mr. McGee's letter and PSD audit timeline that was not attached to the City's communication to Council members and wanted that letter sent to the City Council.

581. On or around January 23, 2025, Mr. McGee sent the letter with the timeline to the City Clerk.

582. In the same timeframe, and despite the PSD's letter/timeline, a Valley Breeze article blamed PSD for the extension, parroting the City's letter and ignoring the PSD's letter.

583. The City's agents' action of drafting a false and degrading letter, as to Plaintiff, is based upon the authority of decision maker Mayor Grebien, upon information and belief, and reflects the City Defendants' custom of undermining, degrading Plaintiff and impairing her ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

584. Upon information and belief, the City's sharing of this false and degrading letter, as to Plaintiff, with the Valley Breeze is based upon the authority of decision maker Mayor Grebien, upon information and belief, and reflects the City Defendants' custom of undermining, degrading Plaintiff and impairing her ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

585.

586. In the Valley Breeze article, one of the City Council members was quoted as saying: "Mercer said he'd be willing to guarantee that there are no other municipalities in the state that have requested extensions two years in a row."

587. Mercer's statement was untrue, and the City should have known that; the City of Pawtucket had in fact requested back-to-back extensions in 2014 and 2015.

588. Thus, not long after, at a PSC meeting on January 30, 2025, Mr. McGee brought the Valley Breeze article, where the Mercer had claimed 'no other municipalities…have requested extensions two years in a row', and Mr. McGee **held it up along with the proof of the 2014 and 2015 City audit extensions**, showing the City's statement was patently false.

589. Further, Mr. McGee noted during this PSC meeting that, "roughly 30% of municipalities with a December 31st deadline require extensions, making it a common occurrence."

590. Further, the State Auditor General approved the extension without issue.

591. Notably by then the new 2025 PSC members had taken their seats, and a new Chairman (and member), Omar Reyes (hereinafter "Mr. Reyes" or "Chairman Reyes") had been appointed.

592. Importantly, during the meeting where Mr. McGee was pointing out the City's prior back-to-back audit extensions and Mr. Mercer's misrepresentation in the Valley Breeze, Mr. Reyes banged the gavel and yelled at Mr. McGee to "stop, stop, you have to stop, you can't say those things – you got to stop him – I can't allow you to say those things you got to stop."

593. Notably, following that Valley Breeze article, somehow the State Auditor General clarified that, despite the huge deal the City was making about the extension, and blaming PSD in the midst, that extensions are quite common.

594. Following those events, the Mayor and his allies, along with the new PSC members that were both the Mayor's allies and allies of the PSC members that had been Plaintiff's detractors, escalated their collective attacks of Plaintiff.

595. As noted as well, following the November 2024 elections, several of the existing PSC members turned over, including some of Plaintiff's allies such as Ms. Fernandes and Chairman Jay Charbonneau; other allies had not run for re-election given the negative direction of the PSC.

596. Specifically, after the 2024 election, and worsening in January of 2025 when the new members took their seats, marked the beginning of the end of Plaintiff as Superintendent.

597. Some of the notable new PSC members that were new detractors of Plaintiff included Omar Reyes (hereinafter "Mr. Reyes"), who became Chairman in January of 2025, Angeliz Rosa (hereinafter "Ms. Rosa"), who campaigned with and was close to Mr. Reyes, as well as Mr. Wildenhain.

598. Notably, in the lead up to the elections, Plaintiff went out of her way to meet as many of those PSC candidates that were running for PSC as was possible, but she was never able to meet

candidate Matthew Wildenhain (hereinafter "Mr. Wildenhain"), who had a brother on the City Council, and succeeded in winning a seat on the PSC for 2025.

599. Soon after the elections, in winter of 2025, on or about November 12, 2024, Plaintiff was walking into a School Committee meeting that was attended by some newly elected PSC members, and Plaintiff got a taste of what she was about to face from January 2025 until her unlawful removal on February 28, 2025.

600. Specifically, as Plaintiff walked into the media center for the PSC meeting just following the elections on or about November 12, 2024, Plaintiff found the newly elected Angeliz Rosa, Omar Reyes, and Matt Wildenhain (hereinafter "Mr. Wildenhain") meeting privately.

601. Upon Plaintiff heading to talk to the Committee Clerk, Ms. Liss, Mr. Wildenhain looked at Plaintiff and said, "you're the Superintendent, right?"

602. Plaintiff confirmed and went to meet the man seeking her attention.

603. However, immediately after that, Mr. Wildenhain started yelling, "your administrative team never does what they are supposed to do – they are horrible – it's just horrible – you and your administrative team.

604. Mr. Wildenhain then continued to make false, reputation harming statements – publicly – to Plaintiff which did in fact harm her reputation.

605. Plaintiff turned to the Clerk, Ms. Liss, who had been the clerk for decades and knew everyone, and asked Ms. Liss who the man was; she responded that is "Matthew Wildenhain who just became one of your school committee members."

606. Plaintiff said, "oh, ok" and reached out to shake Mr. Wildenhain's hand, despite it being obvious he seemed aggressive towards Plaintiff; she said, "nice to meet you."

607. Mr. Wildenhain responded by stepping back from Plaintiff, as if he was disgusted by her.

608. Plaintiff, attempting to de-escalate the situation, put her hand right at Mr. Wildenhain's stomach and he reluctantly shook her hand, but then he started yelling at her aggressively.

609. Mr. Wildenhain said angrily in a loud voice, "admit your team is horrible – they don't communicate and don't respond…"

610. Plaintiff responded calmly, "help me understand what you are talking about."

611. Apparently, Mr. Wildenhain is a former maintenance worker in PSD.

612. Mr. Wildenhain continued, "[w]ell I've been trying to call HR for retirement and benefits."

613. Plaintiff responded, "who did you speak to?"

614. Mr. Wildenhain responded, "[t]hat is the problem, no one has gotten back to me," still with an angry, raised voice.

615. At that point, Dr. Tate entered the area and stopped, looking right at Mr. Wildenhain, as he continued to yell loudly and disrespectfully at Plaintiff.

616. Mr. Wildenhain continued, "[y]ou know about hole in playground at Winters [Elementary School]."

617. Mr. Wildenhain also angrily said something about a ditch by the handicap parking at the same school and expressed anger that someone could fall into the ditch.

618. Dr. Tate then asked, "what is going on?"

619. Plaintiff calmly said to Dr. Tate, "this is Matthew Wildenhain, our new committee member, he says an HR person has not gotten back to him and there is a hole in the playground in Winter Elementary and a ditch on the side by the handicap parking, which should be covered so someone does not fall in when they get into their car."

620. Note that no one had fallen in any ditch during Plaintiff's tenure, as well as the fact that neither the ditch, nor had the hole, had not been brought to Plaintiff's attention.

621. Dr. Tate responded, "no, I did not get any calls about that, I can see if they know about it."

622. Mr. Wildenhain said, "no, no need don't worry."

623. Plaintiff was confused and offered help with his HR issue, stating "what about HR?"

624. Mr. Wildenhain then totally contradicted himself and said, "that's been taken care of."

625. Plaintiff restated what he said, confused, "so the HR issue with your benefits is taken care of? Who took care of it?"

626. Mr. Wildenhain then identified, "some lady Krystal or Terry."

627. Mr. Wildenhain was referring to Krystal Lofton and Terry Pereira (hereinafter "Ms. Pereira") from HR.

628. Mr. Wildenhain's reference to those two people shows he *did speak* to PSD HR, despite his false claim to the contrary.

629. Still confused why Mr. Wildenhain had been yelling at her if all was taken care of, Plaintiff restated, "ok so they took care of your concerns?"

630. Mr. Wildenhain responded "yeah."

631. Plaintiff then stated, "Ok well the playground issue, I will look into it –."

632. Mr. Wildenhain cut Plaintiff off and stammered something to the effect of, "fine, just like all of your admin team, look into the playground – you are horrible – you and your team."

633. During this exchange, the soon-to-become Chairman Mr. Reyes and Ms. Rosa just looked on.

634. Mr. Wildenhain's chastising of Plaintiff demonstrates a well-established custom of undermining, degrading Plaintiff, and impairing her ability to be successful in her role as Superintendent as well as to marginalize and discredit Plaintiff, which was the moving force behind Plaintiff's injuries.

635. However, as the exchange went on, more of the PSC members and others heard Mr. Wildenhain yelling at Plaintiff, and this became a big issue for those few who were supporters of Plaintiff.

636. When Plaintiff took her seat as the meeting was about to start, the Chairman at the time, Mr. Charbeneau, an ally of Plaintiff – who had just lost the election and would be leaving PSC in January of 2025 – got Plaintiff's attention to ask her what had happened.

637. Specifically, the Chairman Jay Charbonneau asked Plaintiff what had just happened with Mr. Wildenhain.

638. Plaintiff relayed she did not know and that she would "explain what happened later."

639. The meeting started.

640. Just after the meeting started, PSC member Ms. Fernandes, who had just been voted off PSC as well, but was still on the committee until January 2025, got up to speak about racism, as well as about the power over the PSD possessed by the Mayor and Mr. Beaupre's Teachers' Alliance.

641. Ms. Fernandes also focused on the issue of Mr. Wildenhain yelling at Plaintiff, stating: "I saw new school committee members here which I was really happy to see and then there was one who was up there [she points to the back] already pointing fingers in our superintendent's face. Disgusting. Disgusting."

642. During her comments, all captured on video, Ms. Fernandes raised the fact that Mr. Wildenhain was reluctant to shake Plaintiff's hand.

643. Others, later, spoke about Mr. Wildenhain's yelling at Plaintiff and how grossly improper it was.

644. For example, at the December 5, 2024, PSC meeting, community activist Ms. Bento got up at public comment and stated, "…Wildenhain a brand-new school committee member who hasn't even taken his seat yet. Has the nerve to come in here acting a fool. Yelling and screaming, whatever he was doing. Being disrespectful to an official. Wildenhain being a white male was in this room disrespecting a female."

645. Ms. Bento also posted about this, as well as her feelings that the PSC and Mr. Beaupre were racist.

646. After these events, the Mayor seemed, to Plaintiff, to be in 'attack mode' against her.

647. For example, in or around this time, the Mayor increased his negative statements about Plaintiff in public and in the media.

648. Plaintiff also got the feeling that the Mayor was sharing with powerful people in Pawtucket and the State, to "not talk" to Plaintiff; she believes this because several prior contacts – who were also contacts of the Mayor – stopped responding to Plaintiff around this time.

649. Further, from this time on, the Mayor shunned and avoided Plaintiff for the most part.

650. Moreover, if Plaintiff reached out to the Mayor, he would not respond; the same occurred when she reached out to the Mayor's Chief of Staff, Ryan Holt; during this time she was also trying to schedule a meeting with the Pawtucket Chief of Police and he rescheduled their meeting several times and then the meeting never occurred.

651. At one point, the Mayor blamed Plaintiff for not being "reachable," despite his access to all of her personal and work contact information, her acts reaching out to him several times, and then the Mayor assigned another person to talk to Plaintiff instead of him.

652. Decision maker Mayor Grebien's pattern of speaking negatively about Plaintiff to others and avoiding Plaintiff's outreach constitutes a well-established custom of discrediting and isolating Plaintiff, which was the moving force behind Plaintiff's injuries.

653. During this same timeframe in late November of 2024, newly elected PSC member Mr. Reyes asked to meet with Plaintiff just prior to his appointment.

654. Plaintiff met with Mr. Reyes, and another newly elected member, Ms. Rosa – who campaigned with Mr. Reyes – on or about November 21, 2024.

655. During the meeting, Mr. Reyes shared surprising news with Plaintiff.

656. That news was that this *newly elected PSC member* was going to be the Chair of the Committee.

657. Notably, Mr. Reyes is, upon information and belief, of Dominican Republic descent.

658. As such, Mr. Reyes visually looks more like Plaintiff than any other member of the PSC.

659. Later, Ms. Bonollo made several statements confirming that – as may be suspected – that Mr. Reyes may have been selected to be the Chairman because of the color of his skin, to mount a 'more defensible' final assault on Plaintiff in 2025, stating in part the "Chair had to be a person of color."

660. Specifically, after a meeting a couple months later on or about January 31, 2025, in response to Dr. Tate asking Ms. Bonollo why she was not made Chairman as expected, Ms. Bonollo responded – in front of Plaintiff and Dr. Tate - with a shocking admission that clarified PSC strategy in naming the newly elected Reyes to the Chairman role.

661. Specifically, Ms. Bonollo stated, "[t]hey didn't want a little old white lady. They said the Chair had to be a person of color."

662. This action is based upon Defendants' well-established custom of marginalizing minority groups, which was the moving force behind Plaintiff's injuries.

663. On or about December 12, 2024, Mr. Reyes again requested to meet with Plaintiff on or about December 16, 2024, at 11:00 AM.

664. Just prior to Plaintiff's meeting with Mr. Reyes, Plaintiff learned that Mr. Reyes was reaching out to Ms. Liss, the Committee Clerk, requesting Plaintiff's job description and additional information.

665. No prior Chairman had requested information about Plaintiff's job in that manner or the type of information Mr. Reyes was (and would continue to) request *about* Plaintiff.

666. Mr. Reyes' actions demonstrate a well-established custom of undermining and impairing Plaintiff's ability to be successful in her role as Superintendent as well as demonstrates the well-established custom of PSC members, including Mr. Reyes, marginalizing and attempting to discredit Plaintiff, which was the moving force behind Plaintiff's injuries.

667. Moreover, upon information and belief, upon Mr. Reyes and others removing Plaintiff as Superintendent in February of 2025, and replacing her with Randy Buck (hereinafter "Mr. Buck"), Mr. Reyes did not ask for this type of information from or about Mr. Buck, who is male.

668. Notably, Mr. Reyes' requests for information were made even before Mr. Reyes was sworn into the position as Chairman.

669. At that point, Plaintiff was still reporting to the existing Chairman, Charbonneau.

670. Mr. Reyes' bombardment for information continued through Plaintiff's unlawful removal.

671. Notably, despite the extensive information and time PSD staff put into preparing it for Mr. Reyes over the next two months, upon delivering the information to Mr. Reyes, he never seemed to use or even discuss the information with Plaintiff *or with his PSC members*.

672. Moreover, these requests for information were always pressured and made to be time-sensitive.

673. Many of these requests, such as the request for all protocol and regulations related to special education, required Plaintiff to pull her staff from normal duties to produce multi-inch-thick binders of information for Chairman Reyes.

674. Again, Mr. Reyes did not, upon information and belief, ever use this information substantively.

675. Without question, Mr. Reyes did not ever discuss any of this information with Plaintiff; in fact after it being delivered, he did not look at it and *left it on Plaintiff's table*.

676. Again notably, many of these unreasonable requests started well before Chairman Reyes was even sworn in and given had the authority to do so, which would not occur until January of 2025.

677. Decision maker, Mr. Reyes', repeated demands that Plaintiff produce extensive documentation, without subsequently utilizing the information, upon information and belief, reflects Mr. Reyes' and other PSC members' custom of utilizing burdensome requests to undermine and impair Plaintiff's success, and was the moving force behind Plaintiff's injuries.

678. For example, on or about December 18, 2024, Mr. Reyes sent Plaintiff an email requesting they have bi-weekly meetings and he also requested other information from her.

679. On or about that same date, Mr. Reyes requested the organizational chart which applied to Plaintiff.

680. After the PSD winter break ended, on or about January 6, 2025, the inauguration was held and Plaintiff attended.

681. During this event, the new Chairman Mr. Reyes did not even speak to Plaintiff, his own Superintendent.

682. Moreover, during his inauguration, Mayor Grebien mentioned several names of key staff, including persons Plaintiff did not see at the inauguration.

683. However, noticeably absent from the Mayor's mention was Plaintiff's name, despite her presence.

684. Late that same night, Mayor Grebien called Plaintiff in a rare communication since late fall/early winter of 2024.

685. On that call, Mayor Grebien stated, "I'm just calling to let you know that um I didn't mean to overlook you at the inauguration. I didn't see you. So I apologize."

686. Plaintiff responded that she had a "card for [him]" and asked, "can I bring it by the office?"

687. Mayor Grebien said, "[d]on't bring them tomorrow," and they discussed a coffee meeting so Plaintiff could bring the cards, but the Mayor never set up the meeting with Plaintiff.

688. Following that call, Plaintiff attempted, on *several* occasions, to set up a meeting with the Mayor, but he never responded.

689. That is the point at which Mayor Grebien began to have Ms. Gerard, his Assistant, be the point of contact for Plaintiff, instead of himself.

690. Moreover, Mayor Grebien justified this action by *blaming* Plaintiff for being "hard to reach" when she had multiple calls and emails into him without response.

691. Decision maker, Mayor Grebien's, pattern of speaking negatively about Plaintiff to others and ignoring Plaintiff constitutes a well-established custom of the City, the Mayor and his agents' attempt to discredit and isolate Plaintiff, which was the moving force behind Plaintiff's injuries.

692. The day after the inauguration, on or about January 7, 2025, new Chairman Reyes also had to apologize to Plaintiff for not speaking to her, but he did it through text.

693. In the meantime, on or about January 7, 2025, new Chairman Reyes was making notable changes in the PSC, including removing the longtime Clerk – Ms. Liss - who had been the clerk of the PSC for approximately one and a half decades; she was suddenly replaced by Jill Crawley (hereinafter "Mr. Crawley").

694. Plaintiff learned through others that Mr. Reyes had worked with Ms. Crawley and he brought her onto the PSC, replacing the long-standing clerk.

695. Soon after, Mr. Reyes began to filter the information Plaintiff was providing in response to Mr. Reyes' obtrusive requests, and often only had Plaintiff's staff send the information to him and his clerk.

696. Mr. Reyes also immediately began to involve Plaintiff in matters, taking up her time, which were not her role.

697. For example, on or around early January 10, 2025, Mr. Reyes called Plaintiff to ask her to intervene in a matter involving the old clerk, Ms. Liss, which had nothing to do with Plaintiff's job; Mr. Reyes wanted Plaintiff to pressure the old clerk, Ms. Liss, into producing sealed executive session minutes to him and his new clerk, Ms. Crawley.

698. As Plaintiff understood it, Ms. Liss was not withholding the minutes, but instead, she was waiting for an answer from the government ethics office to evaluate the propriety of the request under the Open Meeting Act, as well as waiting to hear from the PSD attorney.

699. Mr. Reyes refused to wait and instead wanted Plaintiff to strong-arm Ms. Liss into turning over the sealed minutes.

700. Plaintiff responded, respectfully, that she would see what she could do.

701. However, there was literally nothing Plaintiff could do as the issue did not involve her at all, and Ms. Liss was taking the proper actions to ensure propriety of Mr. Reyes' requests.

702. Then, despite having this conversation, on or about January 10, 2025, Mr. Reyes' new clerk Ms. Crawley, sent an email requesting Executive Session school committee minutes.

703. From that time on, Chairman Mr. Reyes bombarded Plaintiff *nearly daily* with requests for unnecessary information, pulling Plaintiff and her staff from necessary duties to comply with.

704. Decision maker, Mr. Reyes', repeated demands that Plaintiff produce extensive documentation, without subsequently utilizing the information, upon information and belief, reflects Defendants' custom of utilizing burdensome requests to undermine and impair Plaintiff, and was the moving force behind Plaintiff's injuries.

705. For example, on or about Saturday, January 11, 2025, Mr. Reyes sent Plaintiff an email titled Agenda clarification, again requesting Plaintiff and her team to send additional information to him.

706. In fact, the number and breath of Mr. Reyes' requests were so substantial that on or about January 14, 2025, Plaintiff's secretary, Irma Deleon (hereinafter "Ms. Deleon"), began a running log of the information Mr. Reyes was requesting to keep up with the extremely fast pace of the requests.

707. The log was started after a biweekly meeting between Plaintiff and Chairman Reyes, where he again requested a lot of information, including information from the CFO, Mr. McGee.

708. Thus, Plaintiff had the CFO, Mr. McGee, prepare information and bring into the meeting, placing it on the table.

709. Upon seeing the information, Mr. Reyes stated something about it being "too much information," and how he would need to "find out what specifically [he] need[ed] and will get back to you."

710. Mr. Reyes then *left the stack of information*, painstakingly prepared by Mr. McGee, Plaintiff, and others, *on the table.*

711. Notably, Mr. Reyes never followed up as he said he would.

712. This sort of event happened frequently where Plaintiff's staff spent much of their critical time preparing information for Mr. Reyes – seemingly for the sake of Mr. Reyes watching them work.

713. On or about January 14, 2025, there was a PSC meeting where new Chairman Reyes seemed as surprised as many others about his appointment, stating: "[w]e're going to start off with the city FY 2024 audit extension [looking at papers] oh that one says chairperson, who would've thought that I'm the chairperson. Am I the chairperson, who knows."

714. On or about January 15, 2025, Mr. Reyes started his push to offensively micromanage Plaintiff's time off and future medical leave, sending an email asking Plaintiff how he could track her PTO time.

715. On or about the same time, Plaintiff began to consistently send the Mayor her bi-weekly updates, to keep him updated because his communication with her was so limited at that point.

716. On or about January 15, 2025, Mayor Grebien called Plaintiff, which was uncommon at that point.

717. The Mayor claimed he called to inform her that he was sending a letter to RIDE and he wanted to ask her how he and City Council can "assist" with the schools in CSIP and Redesign; he explained simply that he wanted Plaintiff to know before sending the letter.

718. During this conversation, Plaintiff explained to the Mayor the data and the next steps in the process; he asked a couple of questions regarding the data, he clearly expressed a lack of concern, and claimed to just be calling to "help."

75

719. However, later on the same day of the nonchalant phone conversation, or about January 15, 2025, Mayor Grebien sent the letter to the RIDE department, regarding his and the City Council's concerns about the schools, where the tone was completely different than his call with Plaintiff.

720. In the Mayor's January 15, 2025, letter, he wrote to RIDE, "I am gravely concerned for my community; our schools are in a downward spiral in all areas…"

721. Decision maker Mayor Grebien's pattern of speaking negatively about Plaintiff to others—while feigning professional rapport in direct conversations—constitutes a well-established custom of attempting to discredit, undermine, and isolate Plaintiff, which was the moving force behind Plaintiff's injuries.

722. Importantly, the Mayor knew *both* that the downward spiral was being slowed by Plaintiff, *and* that the data that provided the basis for the schools needing CSIP and Redesign status, was based on data since 2018, virtually entirely predating Plaintiff's tenure.

723. Importantly, even RIDE had pointed out, around this time, that under the Mayor's watch, PSD was significantly underfunded compared to other school districts.

724. Specifically, according to RIDE's February 3, 2025 email to Plaintiff, "Pawtucket expends less per pupil than peer LEAs of Providence, Central Falls, and Woonsocket, and the % of Pawtucket's budget made up of local funds has decreased by 1.9%pts over the last five years."

725. Notably, to change the data on test scores and other metrics, first changes needed to be made in the schools, and then there is a time delay before any noticeable improvement could be seen.

726. Plaintiff had only been in her role for a year and a half, since mid 2023, but had made changes, some of which were starting to be noticeable.

727. Despite her good work, the PSC members against Plaintiff mounted their final attack clearly based upon animus.

728. For example, on or about January 18, 2025, Plaintiff and all school committee members except for Mr. Chellel, attended the School Committee 101 – RIASC training for all committee members statewide; it was held at the Crowne Plaza in Warwick from 8:00-4:00.

729. When Plaintiff first entered the room, only Mr. Wildenhain, Ms. Grant, and another school district's committee member, were present and sitting together.

730. Plaintiff said "good morning" to them, and neither Mr. Wildenhain nor Ms. Grant spoke back.

731. Plaintiff said "good morning" a second time, and only the committee member from the other district school spoke back; still, neither PSC committee member responded to Plaintiff, ignoring her.

732. Plaintiff then put her items down at the table and walked out to get her breakfast but when she returned, her personal items had been moved way down on the other side of the table.

733. Plaintiff just sat down and started eating her breakfast but as the other PSC members came into the room, they asked Plaintiff to move *again* to fit in Ms. Bonollo; Plaintiff moved.

734. While Plaintiff was on the other side of the table, she heard Ms. Grant ask her outside committee friend, "how do you get rid of a superintendent?"

735. Ms. Grant seemed to think she was whispering but Plaintiff could hear her ask that question.

736. After Ms. Grant spoke more on the subject, Mr. Reyes entered the conversation and stated, "we needed to do *something*, and we will discuss later."

737. The PSC members' actions demonstrate a well-established custom of humiliating and marginalizing Plaintiff as well as undermining and impairing Plaintiff's ability to be successful in her role as Superintendent, which was the moving force behind Plaintiff's injuries.

738. The entire meeting, the PSC members largely if not entirely ignored Plaintiff, their Superintendent; interestingly when the presenter was talking about how districts can need city

funding, Mr. Wildenhain stated "[t]hat's dead on arrival" and both Ms. Grant and Ms. Bonollo said, "[t]hat won't happen. We are *not* going against the City."

739. That day Plaintiff talked to PSD attorney Bill Conley about how to "build relationships" with Mr. Reyes, and in the process, also complained about his "demeaning" manner towards her.

740. In response, PSD attorney Conley stated that he had tried to talk to Mr. Reyes regarding RI General laws and the Open Meeting Law compliance but it had not been effective.

741. Notably, during this conversation, Attorney Conley confirmed that Plaintiff was one of the best Superintendents he has worked with, and he even said he told Mr. Reyes the same as well.

742. On or about January 21, 2025, Mr. Reyes requested another large amount of information, and admitted the same.

743. Mr. Reyes requested extensive information on all of Plaintiff's Cabinet staff, which include all of her "Chiefs" – the top leaders in the district in HR, Finance, Operations, IT, Assistant Superintendent, and Chief of Schools – including "resumes[,…]cover letters…contracts, salary history, and any increases or title changes/any documented justifications for their increases."

744. Mr. Reyes also requested, "any documents on PSD hiring procedures at the district level, information on how salaries are calculated, Search committee procedures, HR procedures on discharging time for district staff, and process for creating new positions."

745. Additionally, on or about January 21, 2025, Mr. Reyes sent an email requesting a Capital Reserve report for a Finance Sub-Committee meeting; notably, this information request served no purpose because the sub-committee only met once that year.

746. Additionally, on or about January 21, 2025, Mr. Reyes sent Plaintiff an email requesting a copy of her legislative priorities for his legislative session that he scheduled for the upcoming Monday.

747. Plaintiff sent her legislative priorities to Mr. Reyes, but then he never informed Plaintiff what he used of her information.

748. Plaintiff noted it was odd that, given the degree to which Mr. Reyes had insulted Plaintiff's abilities to date, that he would ask to use her legislative priorities for his own meeting.

749. On or about January 27, 2025, Mr. Reyes sent another email asking for more information from a prior email that Plaintiff's staff had already sent to him; some of this information included the "Cabinet Contracts," which was one of the subjects of the prior email and was also information that Plaintiff's staff had sent to Mr. Reyes on or about January 24, 2025.

750. Decision maker, Mr. Reyes', repeated demands that Plaintiff produce extensive documentation, without subsequently utilizing the information, upon information and belief, reflects Defendants' custom of utilizing burdensome requests to undermine and impair Plaintiff, and was the moving force behind Plaintiff's injuries.

751. On or about this same timeframe, Plaintiff sought medical treatment due to extreme work stress.

752. On or about January 31, 2025, during a scheduled meeting with Mr. Reyes, Ms. Bonollo, Ms. Rosa, Dr. Tate and Plaintiff, Plaintiff took notes at this meeting because of Mr. Reyes condescending and threatening behavior.

753. Specifically, during this meeting, as witnessed by Dr. Tate[10], Mr. Reyes was very rude, condescending, and aggressive towards Plaintiff (and Dr. Tate).

754. During this meeting, Mr. Reyes demanded Plaintiff admit fault as to the extension for the audit and pushed Plaintiff to blame her CFO, Mr. McGee.

755. For example, Mr. Reyes clapped his hands in a threatening manner and made unjustified, condescending statements to Plaintiff about her CFO, Mr. McGee.

756. Specially, Mr. Reyes stated, "I told you specifically to tell Dale [McGee] to own it and apologize and say it won't happen again, just own it."

---

[10] Note that immediately following Plaintiff's removal as Superintendent on February 28, 2025, Dr. Tate – an ally of Plaintiff – was put out on administrative leave for an unspecified period of time. Following that, as well, Dr. Tate received a threatening call about her and Plaintiff, as noted *infra*.

757. Mr. Reyes was referring to Mr. McGee defending PSD and pointing out the City's lies that were made by a City Council member and in the Valley Breeze.

758. That was the article the Valley Breeze quoted the City as incorrectly stating: "Mercer said he'd be willing to guarantee that there are no other municipalities in the state that have requested extensions two years in a row."

759. As noted, that statement was untrue and the City should have known, *because the City had requested back-to-back extensions in* 2014 and 2015.

760. In fact, during the PSC meeting on or about January 14, 2025, only a couple weeks before the present meeting between Plaintiff, Dr. Tate, Mr. Reyes, and others, Mr. McGee had pointed out that City's mistruth, stating:

"A council member said he'd be willing to guarantee that there are no other municipalities in the state that have requested extension two years in a row, I feel like that's a very bold statement…As I stand here before you I have the city of Pawtucket extension letters for 2014 and 2015. That is back-to-back years."

761. Plaintiff responded, during the present meeting, to Mr. Reyes, that "the information that was written in the newspaper was not true."

762. Mr. Reyes then suddenly raised his voice and shouted, "you should fire him."

763. Plaintiff diplomatically stated, she "would speak to him" even though Plaintiff knew there was nothing wrong with anything Mr. McGee had done.

764. Mr. Reyes then demanded, "you need to write him up, at least reprimand him…"

765. While Mr. Reyes was yelling at Plaintiff, Ms. Bonollo reached out to touch Mr. Reyes on his arm and told him, "[y]ou really need to calm down."

766. This action is based on the authority of a decision maker, Mr. Reyes, based upon the PSC Defendants' well-established custom of superseding Plaintiff's authority and undermining and

impairing Plaintiff's ability to be successful in her role as Superintendent, was the moving force behind Plaintiff's injuries.

767. After the meeting is when Dr. Tate told Ms. Bonollo, "I though you would be the Chair since you have been there the longest" and Ms. Bonollo responded, "[t]hey didn't want a little old white lady.  They said the Chair *had to be a person of color.*" (Emphasis added).

768. After that meeting, Mr. Reyes increased his unjustified harassment and abuse of Plaintiff.

769. On or about early February 2025, due to the ongoing harassment by Chairman Reyes, Mayor Grebien, and Mr. Beaupre, Plaintiff had extremely high anxiety and had to continue seeking medical attention.

770. On or about February 4, 2025, there was an email exchange between Mayor Grebien and RIDE which Plaintiff and Mr. Reyes were copied; the email was about a meeting with RIDE scheduled for February 5, 2025, which was about the PSD schools that were identified by RIDE as CSIP and Redesign Schools.

771. In Mayor Grebien's February 4, 2025, email Mayor Grebien stated that he wanted to bring more people from his office than RIDE requested to attend the meeting, including a City Council member and his legal counsel.

772. Mayor Grebien was, upon information and belief, called by the Commissioner, and the Mayor agreed not to bring the extra people.

773. Importantly, Mr. Reyes was on these emails, and he attended the meeting the next day, about the CSIP and Redesign schools in PSD.

774. Mr. Reyes, soon after at the February 11, 2025, PSC meeting, however, claimed – along with other PSC members – to know nothing about CSIP and Redesign schools.

775. The statement made by Mr. Reyes that he did not know about the Redesign/CSIP and that Plaintiff had not told him were false and reputation harming; Mr. Reyes made these defamatory statements about Plaintiff on multiple occasions in multiple public forums.

776. The PSC members' actions demonstrate a well-established custom of humiliating and marginalizing Plaintiff, which was the moving force behind Plaintiff's injuries.

777. At all times relevant since taking office, or very soon after that, Mr. Reyes was informed about the Redesign/CSIP.

778. For example, on or about February 5, 2025, the meeting was held at RIDE to discuss the PSD CSIP and Redesign schools.

779. During the meeting, the Mayor and Mr. Reyes tried to claim that Plaintiff had not shared any information about these schools being in Redesign/CSIP with Mr. Reyes or the Mayor; that is the same thing Mr. Reyes claimed at a later PSC meeting, *despite* having been on emails, being in this meeting, and having had updates from Plaintiff.

780. Plaintiff called Mr. Reyes on his mistruth and said, "Omar [Reyes], I called you on the phone."

781. At that point, Mr. Reyes said, "ok, ok, yeah you did."

782. In that time in early 2025, PSD had approximately four (4) schools in CSIP status and one (1) in the Redesign status.

783. Importantly, a school which is identified to be a CSIP and Redesign has to have multiple years of data showing the school to be in trouble; in fact, RIDE even explained during the February 5, 2025 meeting, that schools in CSIP and Redesign are identified after only years of poor performance; as to Pawtucket, the data reached back to 2018, which is five (5) years prior to Plaintiff's appointment.

784. Again, Plaintiff had only been in her role for one-and-a-half years, and had made changes, which were starting to have an effect, but not enough time had passed to show the real impact.

785. Thus, any schools which were in the CSIP and Redesign were that way primarily, if not exclusively, due to Plaintiff's predecessor Superintendents.

786. The schools were also that way due to, upon information and belief, the Mayor's 'level funding' which was also discussed at this meeting with RIDE that day.

787. In fact, during the meeting with RIDE, Mayor Grebien repeatedly claimed he was at the meeting only to learn how to better "support" Plaintiff and the PSD.

788. In response, Deputy Commissioner Mr. Echelson stated to Mayor Grebien that he could "support" the schools by "giving them money to improve academic outcomes."

789. Further, it was pointed out that the Mayor's decision to "continue to level fund the schools for a 5th year is not helping the needs of the schools."

790. Level funding, upon information and belief, is a term for a City providing a school district the same set amount of funding year after year, despite inflation, the changing needs of the district, and despite increased costs, such as new contracts.

791. Mayor Grebien had "level funded" PSD for five years by providing only approximately $3 million per year, upon information and belief, despite inflation, the changing needs of the district, and despite increased costs.

792. This action is based on the authority of a decision maker, Mayor Grebien, and was the moving force behind Plaintiff's injuries.

793. In fact, in a February 3, 2025, email by RIDE officials, it is clear that Mayor Grebien and the City have not increased funding of the schools since the 2019-2020 school year; this same email shows that Pawtucket spends, according to RIDE, less per pupil than any other comparable district including Providence, Woonsocket, and Central Falls.

794. In fact, RIDE discussed in this meeting that the PSD requested money from the City to cover the agreed-upon pay raises provided to PSD staff.

795. The Mayor referenced that Plaintiff had "extra dollars" from the State.

796. At that point, Ms. Odom-Villella, a Deputy Commissioner at RIDE, then spoke up and stated to the Mayor something to the effect of, "that does not mean the same thing," and that the Mayor had to "cover the district and 'kick in'"; she also stated, "[t]he city needs to support the needs of the schools by not level funding them another year – you have been level funding 3 million for 5 years" which was an issue according to Ms. Odom-Villella.

797. Deputy Commissioner Mr. Echelson then clarified even further to the Mayor, stating, "she is asking you to help."

798. Mayor Grebien retorted, "she need to be more clear."

799. At that point, Deputy Commissioner Mr. Echelson plainly stated, "she was very clear in this meeting what she needs."

800. After the meeting with RIDE, which Mr. Reyes and Mayor Grebien seemed unhappy with, Mr. Reyes continued his assault on Plaintiff through information requests and verbal abuse.

801. Around this time, Mr. Reyes was also actively taking over Plaintiff's role in the Community Advisory Board (CAB) intended for feedback on the school Redesign and ongoing school issues.

802. The CAB was, under Plaintiff's direction, a collection of students, parents, and community partners, brought together to give input in the Slater redesign and other school performance issue Plaintiff was actively working on remedying.

803. Notably, the process for a school Redesign is dictated by regulation which Plaintiff must follow as the LEA leader.

804. Ultimately, Plaintiff is responsible for the decisions on the Redesign, but she greatly relies on the PSC, her team, and the CAB.

805. At the time, in or about late January or early February of 2025, Plaintiff had a small CAB with less than fifteen (15) members who were students, parents, and community partners.

806. Plaintiff's understanding of the CAB is that it should not include politicians or most PSC members, as the purpose is community input.

807. However, in short order, Mr. Reyes took over Plaintiff's CAB as well.

808. Mr. Reyes began to add members to the CAB, including PSC members, City Council members, and allies of him and the Mayor from the community.

809. As a result, the CAB doubled in size and by then, included the sorts of members – politicians largely – that were never intended to be on the CAB.

810. Then later, for the next CAB meeting, once Mr. Reyes had taken over and once Plaintiff was out on leave (which occurred around this same time), Mr. Reyes suddenly cancelled an in-person CAB meeting not providing notice to many of the original members.

811. Upon information and belief, Mr. Reyes only notified *certain members of CAB* about the meeting cancellation; as a result, Plaintiff heard from many on the CAB that they had showed up to the meeting in person, only to find there was no meeting *and* to find out that Mr. Reyes had not notified them, but had notified others on CAB.

812. Importantly, by the time of the next CAB meeting, Plaintiff—who had by then been unlawfully removed and replaced with Mr. Randy Buck—learned that Mr. Reyes was not even in attendance.

813. Upon information and belief, the CAB was only important to Mr. Reyes as yet another means to control, abuse, and discredit Plaintiff out of a job; once he completed that mission, he no longer needed to be involved.

814. Just prior to her initially voluntary leave, in mid-February of 2025, Plaintiff had a medical procedure scheduled; she had previously requested and been granted time off.

815. However, despite prior approval, on or about February 10, 2025, Mr. Reyes condescendingly asked Plaintiff, "[h]ave all proper sick leave procedures been completed for your requested time off for 2/24-2/28?"; Plaintiff, through Ms. Deleon, responded with the required information.

816. On or about February 10, 2025, as well, Mr. Reyes emailed asking for detailed information about how the district would be managed in Plaintiff's very short absence.

817. Mr. Reyes' request was insulting in that Plaintiff had been out of work prior to Mr. Reyes being Chairman and had procedures in place; she did not need Mr. Reyes' supervision of how to handle the district in her short absence.

818. The PSC members' actions demonstrate a well-established custom of attempting to usurp Plaintiff's authority, humiliate, marginalize, and undermine Plaintiff's ability to run the District, which was the moving force behind Plaintiff's injuries.

819. On or about February 11, 2025, there was a PSC meeting, where Ms. Bento again raised race as an ongoing issue, along with the Valley Breeze "amplify[ing]":

"Thank you Mr. Mcgee you made a choice last meeting to allow yourself to show up with respect regardless of the rude behaviors **of some of these racists city officials**. The ones on the city council who started the lies are the ones in the Valley Breeze who amplified the lies and then the ones in this room who did not allow you clarify due to their true alliance with the mayor and his secret agenda…If talking truths about the corruption by the mayor especially when it comes to him taking money from school funds bothers them so much well then be prepared to be super bothered…**the racists tendencies will not be tolerated**."  (Emphasis added).

820. Mr. Reyes then called time for Ms. Bento, seemingly cutting her time short.

821. Notably, after the February 11, 2025, meeting, there were allegations upon information and belief, of the PSC meeting videos and/or audio being tampered with, prior to placing them online.

822. Moreover, Plaintiff recalls a part to this meeting that is not on audio/video; importantly, during this meeting, there was parts when the microphone cut out.

823. Plaintiff recalls, but cannot find in the video, where the PSC are expressly accusing her and Dr. Tate of not sharing the Slater Redesign information with the PSC.

824. Obviously, Plaintiff did in fact share this many times – and Mr. Reyes was directly involved in a meeting only days earlier, on February 5, 2025, with RIDE, on this subject, along with being copied on emails about this meeting.

825. Plaintiff recalls that the accusation as, something to the effect of, "you should have told school committee."

826. None of that is on the video.

827. But this subject is brought up over and over again after this meeting.

828. Notably, the video does show at 1:40:02 Mr. Reyes state, "the information about the schools in CSIP and Slater going into redesign, the committee should have known as soon as it happened."

829. Dr. Tate then responds, "they did. It was the old committee, and they knew. It's in the records."

830. Mr. Reyes turns to Mr. Chellel, and states, "the old committee, Mr. Chellel?" and the microphone cuts out as Mr. Chellel starts talking.

831. The minute mark is 1:40:31 when the microphone cuts out as Chellel is speaking.

832. The microphone is silent for nearly a minute; the grainy video makes it hard to tell who is talking.

833. The video cuts back in at 1:41:22 with the argument about lack of notice continuing.

834. What was said during that nearly one minute of silence seems lost.

835. At the very next PSC meeting, on or about February 27, 2025, Ms. Bento – who was present on February 11, 2025, upon information and belief - made an interesting statement seemingly about this missing event, stating:

"I'm here to clear that up I was not answering a question for anybody. I was calling you out on a lie that you were telling now if you didn't have the video edited before putting it online then people would have saw what really happened so what **I'm here to tell you today is you didn't find out about slater after you took your seat because you met with me on January 4th Camron and I and you told us all about slater and what was going to happen so you knew**." **(See 20250227_minutes from buck appoint).**

836. Mr. Reyes and the PSC unequivocally had the information about the Slater Redesign.

837. The next day, on or about February 12, 2025, Randy Buck (hereinafter "Mr. Buck"), who would become Plaintiff's replacement sixteen (16) days later, on February 28, 2025, took FMLA leave *until April 1, 2025.*

838. On or about February 12, 2025, Plaintiff responded to Mr. Reyes about more requested information.

839. During a meeting in or around February 13, 2025, CFO Mr. McGee had been speaking about his budgeting process to Mr. Reyes and mentioned, in passing, that he has run through "scenarios" in his head for different circumstances – such as the need for more TAs, or a building issue, etc.

840. As a result, during Mr. Reyes' next request for unnecessary information, he requested information on Mr. McGee's mental scenarios which were informal and not reduced to writing; he also requested data on many other matters, including on Multi-Language Learners and differently-able students, which would need to be put together for the meeting Mr. Reyes had just scheduled.

841. Mr. McGee could not possibly reduce all of the mental scenarios to writing or it would take a very significant amount of time, thus he could not produce that; in a subsequent PSC meeting, Mr. McGee had to explain to the whole PSC why he had not complied with Mr. Reyes' request, essentially stating it was impossible.

842. At that time, the PSC – as a whole – had no idea that Chairman Reyes was requesting so much, varying information, almost daily.

843. In fact, the kind of information, the extensiveness of the information Mr. Reyes had been requesting for two months, and the urgency of the information requested by Mr. Reyes, was unprecedented for a PSC Chairman to request from a Superintendent.

844. Neither of Plaintiff's two prior PSC Chairmen had requested any measure of the breadth and frequency of information from Plaintiff, and certainly not done so with the same urgency or seemingly without ever reviewing or discussing the requested information.

845. Additionally, on or about February 13, 2025, Mr. Reyes sends Ms. Deleon an email, "[p]lease confirm when the doctor's note has been provided [for Plaintiff's preplanned leave] As it is close to the requested sick time date."

846. On or about Saturday, February 15, 2025, Mr. Reyes sent an email right before Plaintiff was leaving for her medical procedure, titled "Outstanding items while Sup Royal is out" asking for six (6) items of information.

847. In that email, Mr. Reyes again instructed Plaintiff's staff to only send that information to him and his clerk and they would decide what is necessary information to share with the rest of the school committee, specifically stating: "[p]lease only respond to those in this email as our clerk will share the necessary information with the rest of the school committee."

848. On or about the day after Monday, February 17, 2025, Presidents day, school was already off and Plaintiff started her approved leave for school winter break; previous to this the former Chairman had approved this leave.

849. The following week, Plaintiff was approved for medical leave for February 24, 2025 through February 28, 2025 to recover from a complication from a minor medical procedure.

850. Importantly, at this time, Plaintiff's latest return to work date was the following Monday, March 3, 2025

851. In short, Plaintiff's time out of work, prior to the final end date of February 28, 2025, was short and not based on FMLA.

852. However, after the below events between February 17, 2025 and February 28, 2025, including Plaintiff suddenly being removed from her position on or about February 27, 2025 and February 28, 2025, just before her return from a minor medical procedure, as well as after unjustifiably being placed on administrative leave, and learning about her claimed impending termination from the Valley Breeze on or about February 27, 2025 and February 28, 2025, Plaintiff did, only at that time, apply for and was granted FMLA for severe emotional distress.

853. On or about February 19, 2025, while on just school vacation, Plaintiff received an email from Ms. Deleon noting that certain individuals had been going in and out of her office and dedicated, private space.

854. On or about February 20, 2025, there was a School Committee Meeting where Mr. Segalla referenced the same untrue accusations by PSD that Plaintiff and her staff withheld information about the Slater redesign, stating:

> "Last weeks meeting was shameful members of this committee have decided to play politics some of you seem to have amnesia. Veteran committee members seem shocked that slater was entering redesign status, the superintendent and her team have been keeping the committee and the previous committee informed about the slater status, so where's the confusion?"

855. On or about February 25, 2025, Mr. Reyes started his charge to get medical information about Plaintiff, sending an email to Ms. Deleon, copying two (2) PSD attorneys, stating, "[d]id we ever receive any leave paperwork for the superintendent? Can you connect me to the appropriate HR person so that they confirm and forward the information[]"; the email went to Ms. Deleon, Ms. Crowley and Attorney Bill Conley.

856. Plaintiff was, by this time, on a short medical leave from February 24, 2025 through February 28, 2025, with a return date of the following Monday, March 3, 2025; note the medical leave was in fact documented by a medical note.

857. In the February 25, 2025 email, Mr. Reyes stated he wanted to be connected with someone in HR about Plaintiff's leave.

858. Mr. Reyes relentlessly continued trying to get medical documents and information about Plaintiff.

859. Plaintiff heard about such ongoing and intrusive requests and was extremely distressed while recovering from a minor medical procedure.

860. This action is based on the authority of a decision maker, Mr. Reyes, demonstrates a well-established custom of humiliating, undermining, and marginalizing Plaintiff, and was the moving force behind Plaintiff's injuries.

861. On or about February 25, 2025, Mr. Reyes had the PSD attorney, Diony Garcia, sent an email requesting Plaintiff's *full* personnel file.

862. Plaintiff also heard during this time that Mr. Reyes was asking around "what was wrong with her," trying to find out Plaintiff's specific medical condition.

863. On or about February 25, 2025, former PSC member, Ms. Fernandes, sent a scathing letter to RIDE about Chairman Reyes, stating, in part:

"The manner in which Chairman Reyes verbally attacked Superintendent Royal during the 2/11 meeting and Dr. Tate during the 2/20 meeting was completely out of line and humiliating to both Superintendent Royal and Dr. Tate. Chairman Reyes arrogantly informed the Superintendent, the committee and the public that his employment with the state and his close relationship with RIDE allowed him to be privy to information about Pawtucket schools and that he knew better than the Superintendent; making statements such as, 'My friends at RIDE' and 'I know a lot of people at RIDE.' He stated that he was aware of the redesign plans before the Superintendent was. These statements gave the community the impression that he was more knowledgeable than the Superintendent regarding the redesign because of his close relationship with RIDE. I have serious concerns about someone that does NOT work for RIDE gaining knowledge of specific education issues, such as a redesign prior to the community or the Superintendent of Schools."

864. On or about February 25, 2025, a letter went out to Plaintiff, noticing her under the Open Meetings Act, that on February 27, 2025, there would be a "discussion of [her] job performance, character or physical or mental health."

865. Upon information and belief, it was at this meeting that PSC and PSD discussed replacing Plaintiff.

866. This action is based on the authority of a decision maker, the PSC, upon information and belief, and was the moving force behind Plaintiff's injuries.

867. Note at this time, on February 25, 2025, Plaintiff's short-term medical leave to recover from a minor procedure was ending in approximately three (3) days, on Friday, February 28, 2025; she

was therefore returning to work on or about Monday, March 3, 2025 as of the date of that February 25, 2025 letter.

868. At around 7:42 PM on February 26, 2025, Ms. Bento sent an email to a huge swath of persons, including what appears to be state representatives, and said "[w]hy are they appointing an acting Superintendent when THE SUPERINTENDENT has done nothing but her job and the committee has no cause. Did she do something wrong NO Is she on leave NOo ---- his need to go to ethical board…This is racism and the voters need to vote him out the seat they put him in Unreal."

869. On February 27, 2025, Plaintiff was shocked to learn that PSD and PSC were about to fire her.

870. Plaintiff learned of that plan in a Valley Breeze article titled "Pawtucket Superintendent Faces Potential Firing."

871. This article and all of the text of the article, except that which was caught by screen shot or which still shows on search engines, has now disappeared and been replaced with a different article.

872. On or about February 27, 2025 and/or February 28, 2025 there was another Valley Breeze article which was titled "Pawtucket Superintendent Potentially on Her Way Out."

873. This *additional* article and all of the text of the article, except that which was caught by a screen shot or which still shows on search engines, has *also* now disappeared and been replaced with a different article.

874. On February 27, 2025, after hearing the constant attacks by Mr. Reyes, that her office was being searched, and seeing the Valley Breeze headlines about her impending termination, the emotional distress was too much for Plaintiff to handle and she saw her doctor.

875. Plaintiff's doctor wrote Plaintiff out of work for "WORK RELATED ANXIETY" until March 31, 2025.

876. On or about that same day, February 27, 2025, Plaintiff sent her medical documentation to PSD and PSC officials, along with a letter requesting FMLA and relaying dismay, after listing her

many accomplishments in her short tenure, that she had to take medical leave due to the "by ongoing harassment, discrimination, a hostile work environment, and public embarrassment."

877. In her letter requesting FMLA, Plaintiff specifically stated, "I am writing to formally request Family and Medical Leave Act (FMLA) leave due to my most recent medical documentation, which confirms the need for leave as a result of anxiety and stress caused by ongoing harassment, discrimination, a hostile work environment, and public embarrassment."

878. Further, Plaintiff stated, "[i]t is profoundly disheartening that a special meeting has been scheduled for Friday, February 28, at 9:00 a.m. to discuss acting Superintendent, and I was never notified of this decision. The way this has been handled appears to be an attempt to ruin my reputation publicly, targeting me unfairly, further adding to the distress I have been experiencing."

879. Later that day, a social media post went out about a protest against removing Plaintiff as Superintendent.

880. Upon information and belief, or about February 27, 2025, and again on February 28, 2025, the school committee discussed removing Plaintiff from her role as Superintendent and appointing Mr. Buck to the Acting Superintendent role.

881. Plaintiff later learned that she was replaced by Mr. Buck for the pretextual reason that she was on medical leave.

882. Again, at that time, Plaintiff's medical leave was ending *the next day on February 28, 2025* and she was to return to week the following Monday.

883. Notably, at the time of his appointment to take over *Plaintiff's role as Superintendent*, Mr. Buck was, himself, on medical leave for much longer – until *April 1*).

884. Upon information and belief, because Plaintiff's replacement Mr. Buck was out of work on FMLA until April 1, 2025, the PSC and PSD administration and/or Ms. Rabbit had pressured Mr. Buck to return so he could become Plaintiff's sudden replacement.

885. On or about February 28, 2025, Jessica Santiago of HR confirmed that on the day before, on or about February 27, 2025, Plaintiff's FMLA request and medical documentation had been received by PSD and it was then approved.

886. Note that at the time of Plaintiff receiving confirmation that her FMLA documents were received and processed, the PSC was already in the process of *discussing, and voted on*, replacing Plaintiff with Mr. Buck; the sealed executive session minutes would demonstrate this fact, upon information and belief.

887. Meaning, PSC made the decision to remove Plaintiff and replace her with Mr. Buck due to merely a short-term medical leave that, at the time, was ending the very next day on February 28, 2025.

888. Stated another way, PSC voted to remove and replace Plaintiff due to her medical leave despite the fact that her return date was the following Monday, March 3, 2025.

889. On February 28, 2025, Plaintiff also received confirmation that HR had entered the FMLA leave in the proper system.

890. On or about February 28, 2025, Mr. Buck was formally appointed Acting Superintendent.

891. This action is based on the authority of a decision maker, the PSC, upon information and belief, was based on the well-established custom of attempting to – and finally succeeding in – sabotaging and undermining Plaintiff's ability to do her job, and was the moving force behind Plaintiff's injuries.

892. Importantly, by the time of Plaintiff's formal removal on February 28, 2025, PSD and PSC had already received Plaintiff's FMLA request, on February 27, 2025.

893. Thus, Defendants violated FMLA by removing Plaintiff from her job despite her having job protection triggered by the request for FMLA leave.

894. On or about February 28, 2025, Plaintiff was formally notified by letter that the PSC, "voted to approve placing [her] on administrative leave, effective immediately, until [she] can provide medical documentation to support medical leave as required under your contract."

895. At that time, as noted, Plaintiff had *already* provided medical documentation.

896. Plaintiff therefore found the letter to be evidence of more unnecessary harassment.

897. Just after Plaintiff was removed and replaced as Superintendent with Mr. Buck, PSD—through Mr. Hersch—turned off Plaintiff's access to all of the systems and her emails were sent to her replacement, Mr. Buck.

898. This action is based upon the authority of decision maker, Mr. Reyes and/or PSC members and/or Ms. Rabbit, in conjunction with Mr. Buck, demonstrates a well-established custom of undermining and isolating Plaintiff, and this was a moving force in her injuries.

899. It is not PSD pattern, practice, or policy to remove access to systems or forward emails when a person is on FMLA.

900. It is especially unusual to shut off access to systems and forward email when, at the time, Plaintiff only requested a few weeks of FMLA.

901. This action is based on the authority of a decision maker, Mr. Reyes and/or PSC and/or the City, Mayor Grebien and his agents, and was the moving force behind Plaintiff's injuries.

902. Just after Plaintiff was removed as Superintendent, within days, on or about March 3, 2025 or March 4, 2025, Mr. Buck's picture and bio replaced Plaintiff's on the PSD website.

903. This change was noticed by Plaintiff on March 4, 2025 or March 5, 2025.

904. Importantly, at that time on or about March 4, 2025 or March 5, 2025, Mr. Buck was listed as "*Interim" Superintendent* rather than Acting Superintendent.

905. There is a difference between these titles, upon information and belief, with "interim" being effectively a take-over of the role, as if there is no longer a Superintendent; an "acting" superintendent is only "covering" for the role, in effect.

906. Thus, it is notable that Mr. Buck was initially named the "interim" superintendent on the website.

907. After a period of time, Mr. Buck's title was changed to the "acting" role.

908. Upon information and belief, following Plaintiff's unlawful removal on February 28, 2025, Dr. Tate, Plaintiff's strong ally, was removed from her position and placed on administrative leave.

909. Additionally, since that time, several of Plaintiff's hires – especially those that are of minority races – have been targeted by PSD leadership and specifically Ms. Rabbit.

910. Plaintiff was not provided notice that she was going to be replaced as Superintendent by Mr. Buck.

911. Plaintiff only learned that she had been formally replaced as Superintendent through the letter that went out to the PSD on February 28, 2025, the same day she was notified she was placed on administrative leave.

912. Again, Plaintiff was formally replaced and notified formally of her removal *after* her request for FMLA.

913. On or about March 10, 2025, Dr. Tate (and her husband) received a threatening call.

914. On that call, the conversation was as follows: "unknown person- Hello may I speak to Robert Tate; Husband."

915. Mr. Tate, Dr. Tate's husband, responded, "[t]his is Robert."

916. The Unknown person then stated, threateningly, "[t]his is a friend of Heather, tell Patty Royal 'checkmate bitches.'"

917. Similar harassment occurred again on or about March 25, 2025 when a text message from an unknown number, not belonging to Plaintiff, was sent to PSD staff impersonating Plaintiff asking if the staff member could "help [her] out with something right away."

918. While on FMLA, on or about March 24, 2025, upon information and belief, PSD leadership altered or attempted to alter Plaintiff's leave type and/or source of pay in the computer system used from being coded as FMLA and/or being coded as paid administrative or sick leave, to being coded as some other form of leave that did not provide job protection and/or some other leave reason which resulted in using Plaintiff's PTO/sick/vacation time instead. PSD/PSC including but not exclusive to Ms. Rabbit and/or Mr. Reyes, upon information and belief, and was a moving force behind Plaintiff's injuries.

919. During Plaintiff's FMLA, she continued to learn about PSD and PSC's undermining, as well as the sabotage of her work and the ongoing work of her staff.

920. Further, during Plaintiff's FMLA, she continued to learn about PSD's decisions that undid some of the positive work created by Plaintiff and her staff, such as related to the diversity initiatives.

921. During the time after Plaintiff was replaced by Mr. Buck and while she was out on FMLA leave, the PSC meetings often included degradation and false statements made about Plaintiff and her management of PSD by various school committee members and other individual Defendants.

922. Upon information and belief, the full videos and minutes of the school committee meetings between February 28, 2025, and the date on which this amended complaint was filed, and ongoing, evidence these defamatory statements.

923. Upon information and belief, not all videos of school committee meetings are currently posted or are not full and complete representation of the meetings during this time.

924. The lack of full and complete videos posted publicly may, upon information and belief, now afflict videos of meetings predating February 28, 2025.

925. During many of the PSC meetings while Plaintiff was unable to defend herself as she was out on FMLA, the Chairman Defendant Mr. Reyes was particularly degrading with respect to Plaintiff and her operation of the school district.

926. The statements made by Mr. Reyes were false, known to be false, and were of the type of statements which a reasonable person would expect to harm Plaintiff's reputation.

927. Mr. Reyes also often targeted Plaintiff's staff that spoke at school committee meetings for the same type of degradation and defamation.

928. A non-exclusive example of the defamatory statements made by school committee member during these school committee meetings include the repeated known false statements by PSC members, other named Defendants, and others, that the PSD was "operating at a deficit" during the present school year, while Plaintiff was Superintendent.

929. The claim that Plaintiff left a PSD operating at a deficit is untrue, is known by those making the statement to be untrue, and casts Plaintiff and her tenure as PSD's superintendent in a light which would be reasonable expected to lessen Plaintiff's character in the eyes of others, the public, and future employers.

930. The truth is that Plaintiff left PSD with a substantial surplus of approximately $8.4 million dollars.

931. When Plaintiff's employee, the CFO Mr. McGee, attempted to correct the false and defamatory information that Plaintiff had PSD "operating at a deficit" with PSC, Mr. McGee and his work were also defamed.

932. Mr. Reyes and other school committee members made many other known false statements that damaged Plaintiff's reputation severely.

933. Also, during this time, Mr. Reyes, other school committee members, and named Defendants made false statements about Plaintiff in other contexts, such as third parties, including some very influential third parties.

934. Plaintiff learned about many of these false statements.

935. All of the false statements made during this time by named Defendants about Plaintiff and her operation of PSD were defamatory per se as they related to her job performance and career.

936. These false statements were known to be false, were of the type to lessen Plaintiff's standing in the community and damage her reputation and did in fact damage Plaintiff's reputation.

937. In fact, these statements were so prevalent that a cease-and-desist letter was sent to all Defendants, through counsel, during this time.

938. During Plaintiff's FMLA leave, upon information and belief, several of Plaintiff's hires, especially those of minority races, were targeted for harassment and in some cases retaliation by PSD leadership.

939. This action is based upon Defendants' well-established custom of marginalizing minority groups, which was the moving force behind Plaintiff's injuries.

940. This resulted in Plaintiff's hires leaving PSD employment, as well as leading to others experiencing severe emotional distress.

941. Upon information and belief, some of these hires had responsibilities taken away and/or access necessary to perform job responsibilities removed unjustly and without legitimate reason; some hires were disciplined, assigned a different role, responsibility, and job assignment, and/or terminated or forced to leave, unjustly.

942. Upon information and belief, the primary perpetrator of the aforesaid harassment and differential treatment of Plaintiff's minority-race hires was Assistant Superintendent Ms. Rabbit.

943. Upon information and belief, Ms. Rabbit, who has no training or certifications in Human Resources (HR), took over the HR department during this time; to do so, she took control away from existing employees including staff Plaintiff hired.

944. During Plaintiff's FMLA leave Plaintiff was not consistently notified in advance of the school committee meetings where her case or matter would be discussed; at times she was not contacted or informed that she would be discussed during the executive session of meetings and/or otherwise, upon information and belief, appropriate procedures were not followed to ensure timely and adequate notification per district policies and applicable regulations.

945. Similarly situated employees on FMLA, even those in leadership, were not discussed at the frequency or for the purpose that Plaintiff was discussed in PSC executive session meetings.

946. The frequency of these PSC executive sessions discussing Plaintiff, upon information and belief, more frequent than required for any legitimate reason.

947. The PSC members' actions demonstrate a well-established custom of undermining and impairing Plaintiff's ability to be successful in her role as Superintendent as well as demonstrates the well-established custom of marginalizing and discrediting Plaintiff, which was the moving force behind Plaintiff's injuries.

948. Evidence of these discussions would, upon information and belief, be found in the sealed executive session minutes during this time.

949. It is neither PSD's nor PSC's policy, pattern, or practice to discuss employees on FMLA at PSC meetings in executive session at the frequency of, or for similar purposes, which Plaintiff was discussed.

950. Upon information and belief, the sealed executive session meeting minutes demonstrate an illegitimate purpose to some or all of these executive session discussions about Plaintiff.

951. During Plaintiff's FMLA, she had no access to the computer systems as it was cut off early on, as alleged above.

952. Similarly situated employees on FMLA, did not have their access to computer systems shut off.

953. It is neither PSD's nor PSC's policy, pattern, or practice to shut the computer access off for employees on FMLA.

954. During Plaintiff's FMLA, PSC and/or PSD cut off Plaintiff's email access and directed all emails to the Acting Superintendent, Mr. Buck, upon information and belief, and possibly Assistant Superintendent Lee Rabbit was also receiving all such communications.

955. .Notably, initially Plaintiff's FMLA request was only for a few weeks[11] and importantly, in the prior weeks when Plaintiff was on school vacation and then a short medical leave to recover from a minor medical procedure, her email was *not* cut off and redirected until Mr. Randy Buck was appointed acting superintendent.

956. Similarly situated employees on FMLA, did not have their access to email shut off and their emails forwarded to other PSD staff during relatively short FMLA leaves.

957. It is neither PSD's nor PSC's policy, pattern, or practice to shut the email access or forward emails for employees on FMLA.

958. During Plaintiff's FMLA leave, there were additional actions and omissions by PSD and PSC which lead to severe emotional distress for Plaintiff resulting in physical injury.

959. The PSC members' actions demonstrate a well-established custom of humiliating and marginalizing Plaintiff as well as undermining and impairing Plaintiff's ability to be successful in her role as Superintendent, or to ever return to her role, which was the moving force behind Plaintiff's injuries.

---

[11] Due to the ongoing harassment and differential treatment, including but not exclusive to the examples alleged above, which exacerbated Plaintiff's emotional distress – rather than healing so she could return – Plaintiff had to extend her FMLA after that initial short leave period.

960. Plaintiff's final request related to her FMLA leave demonstrates a non-exclusive example of the types of acts and omissions by Defendants which led to Plaintiff's severe emotional distress.

961. As to her final request related to FMLA, Plaintiff's federal FMLA job protection was, upon information and belief, set to expire on or about May 31, 2025, and her state job protection was to expire on or about June 6, 2025.

962. Under the Americans with Disabilities act (ADA), a reasonable accommodation that can be requested to granted, or at very least considered during the required 'interactive process' after an accommodation request is made, is a short extension to the FMLA job protection, if requested by an employee.

963. On or about May 16, 2025, Plaintiff sent a formal email requesting an extension to her FMLA leave until June 30, 2025, under the ADA.

964. Plaintiff informed PSD and PSC, and/or PSD and PSC already knew, that the reason for Plaintiff's request was to extend the FMLA for the same medical condition.

965. Further, Plaintiff informed PSD and PSC that at that point, her medical provider had recommended extending her time out of work until June 30, 2025, for that same condition.

966. In response to the request for accommodation to extend her FMLA job-protected leave, PSD and PSC neither accepted or declined the request for reasonable accommodation.

967. This action was based upon this Defendants' well-established custom of withholding information from Plaintiff, undermining, and impairing Plaintiff's ability obtain the information she needed to return to her position as Superintendent, and was a moving force behind Plaintiff's injuries.

968. Further, in violation of the protections for persons with disabilities, PSD and PSC did not engage in the interactive process with Plaintiff in response to that request for accommodation.

969. Instead, on or about May 21, 2025, Ms. Gallo, PSD's Director of Labor Relations and EEO, sent Plaintiff an email with a letter directed to Plaintiff's doctor, a 7-page "Job Analysis" for the Superintendent job, and a form titled "Pawtucket School Department Accommodation Request."

970. Upon information and belief, that accommodation request form was used, in pattern and practice at PSD, for what is referred to as a "504 plan" which are, as pattern and practice, most often used to accommodate disabilities *while at work or school.*

971. The letter that accompanied the "Pawtucket School Department Accommodation Form" and "Job Analysis" made it clear that the information and forms sent to Plaintiff and her healthcare provider were not at all applicable to her simple ADA accommodation request to extend her FMLA job protection – while still *out of work.*

972. Specifically, in pertinent part, the letter read:

Dear Healthcare Professional:

Thank you for taking the time to complete the medical inquiry form for our employee, Patricia Royal, **to determine if a reasonable accommodation can help the employee perform the essential functions of his/her job**.

References to specific physical or mental conditions and the employee's diagnosis are important, and **suggested workplace accommodation can also be helpful**. However, it is critical that the inquiry form **identify the specific workplace tasks or activities with which the condition interferes or how the condition prevents the employee from accessing an employee benefit**. When we understand the specific workplace activities the employee's condition affects, we are often in a better position to provide the most appropriate or cost-effective accommodation. Please help us by focusing on the workplace tasks or activities the condition affects.

In this case, the employee works as Superintendent of Pawtucket Schools, and the job description and/or job analysis for that position is enclosed.

If you have any questions, please contact hr@psdri.net. (emphasis added).

973. The letter's inclusion of phrases such as to "help the employee perform the essential functions of his/her job" and "identify the specific workplace tasks or … how the condition prevents the employee from accessing an employee benefit," as well as the request for "suggested workplace accommodations" are completely inapplicable to an employee *not at work.*

974. The letter's conclusion, "[w]hen we understand the specific workplace activities the employee's condition affects, we are often in a better position to provide the most appropriate or cost-effective accommodation" was likewise inapplicable to an employee *out of work.*

975. The letter, on its face, was in sum inapplicable to Plaintiff's situation and her simple request for the reasonable accommodation of an extension to her FMLA job protection.

976. Plaintiff needed FMLA job protection to ensure she would have a job to return to after her medical provider cleared her to return to work, should Plaintiff and her medical provider feel that was in Plaintiff's best interest.

977. The "Accommodation Request" form sent to Plaintiff was equally inapplicable to a simple request for an extension to FMLA job protection under the ADA *while still out of work.*

978. For example, the form first asked about Plaintiff's medical condition.

979. Plaintiff's medical condition, and the medical documentation supporting it, was fully known to and documented with PSD and PSC for months.

980. Second, under the section of the form titled "Questions to help determine if an accommodation is needed," the questions all focused on accommodations needed *at work.*

981. Plaintiff was not requesting, and had not requested, an accommodation to her actual work or any accommodations for *at work*.

982. For example, questions in that section asked the medical provider to answer "[w]hat job function(s)…is the employee having trouble performing…because of the limitation(s)[]" and "[h]ow does the employee's limitation(s) interfere with his/her ability to perform the job function(s)…of employment[.]"

983. Those questions were wholly inapplicable to Plaintiff's situation and her specifically requested accommodation of a short extension to FMLA job protection *while out of work*.

984. Likewise, the next section, titled "Questions to help determine effective accommodation options" was equally inapplicable to Plaintiff's situation or request.

985. For example, questions in that section asked the medical provider to answer, "[d]o you have any suggestions regarding possible accommodations to improve job performance[]" and "[h]ow would your suggestions improve the employee's job performance[.]"

986. Those questions were wholly inapplicable to Plaintiff's situation and her specifically requested accommodation of a short extension to FMLA job protection *while out of work*.

987. Despite the inapplicability of the directions and forms provided by PSD/PSC to Plaintiff's healthcare provider, Plaintiff contacted her healthcare provider.

988. On or about Tuesday, May 27, 2025, Plaintiff sent an email to eight (8) different PSC and PSD agents.

989. In that email, Plaintiff requested an extension to the inherent deadline that she must submit the paperwork before her FMLA expired, which was on or about May 31, 2025, for federal FMLA and June 6, 2025, for state FMLA.

990. In that email, Plaintiff asked that those PSD and PSC personnel on the email "confirm whether an extension will be granted…"

991. Plaintiff did not hear back from any of the eight (8) PSD and PSC agents who received that Tuesday, May 27, 2025, email.

992. Those eight (8) PSD and PSC agents included Ms. Gallo, Director of Labor Relations and EEO.

993. On or about May 29, 2025, Plaintiff had an in-person appointment with her medical provider.

994. At the appointment Plaintiff had with her medical provider, the medical provider was baffled by the forms and instructions because these did not apply to Plaintiff's situation or request at all because she was *out of work*.

995. Plaintiff's healthcare provider did not fill out the forms at that time due to confusion over, and a lack of instruction as to, how to fill these questions out for a situation and request like Plaintiff's situation where she was not requesting an accommodation for *at work* but one to stay *out of work* with job protection.

996. Thus, on or about May 29, 2025, Plaintiff emailed those same eight (8) agents of PSD and PSC stating, in pertinent part:

> Today, I delivered both the required letter and the forms to be completed to my healthcare provider. **However, they were unable to fill out the forms at this time, as they noted I am currently "not at work" and expressed some confusion about the purpose of the paperwork.** They inquired whether I had requested a 504 plan, to which I explained that I only requested an extension of my FMLA job protection through June 30, 2025, based on my current medical situation.
>
> **My provider was uncertain about how to proceed, given that I am "not at work" and that the only accommodation I requested is the extension of my FMLA leave**.
>
> Can you provide me with an explanation or wording that I can share with my medical provider to clarify that the paperwork is necessary solely for documenting the extension of my FMLA leave? Additionally, is the 504 plan paperwork needed in this context, given that it pertains to workplace accommodations, which are not relevant while I am out of work on leave?
>
> My provider asked why the paperwork is necessary since I am still under doctor's care until June 30th, and I would like to ensure I communicate the correct information to facilitate your request. (emphasis added).

997. On or about Friday, May 30, 2025, at 4:01 PM, Ms. Gallo emailed Plaintiff and stated only "[p]lease find the attached notice outlining the specific details of your authorized leave of absence."

998. On that email Ms. Gallo copied only four (4) prior to PSC and PSD agents which included Mr. Reyes, PSC Chairman, Mr. Buck, the Acting Superintendent, and the two legal counsel for the district and/or school committee.

999. Attached to that email was a document titled "Leave Confirmation Dates" which simply addressed *paid* leave but that is different – and under a different statute – than the laws that provide FMLA *job protection*.

1000.    Plaintiff was confused by the letter as a response to her request to an extension for her FMLA job protection only.

1001.    In fact, the letter referenced "paid FMLA" but Plaintiff was not aware that there was any pay under FMLA.

1002.    Notably, according to the RIDLT, [12] the Rhode Island Parental & Family Medical Leave Act (PFMLA) provides an "*unpaid* leave of absence" only. (Emphasis added).

1003.    Federal FMLA also provides no pay but only job protection.

1004.    Approximately fourteen (14) minutes after Ms. Gallo's email sending the irrelevant paid leave letter, on about Friday, May 30, 2025, 4:15 PM, Ms. Gallo sent another email which stated, in pertinent part: "[y]ou had previously requested an accommodation under the Americans with Disabilities Act (ADA) and/or Section 504. The paperwork sent to you was provided only if you are seeking an accommodation to be reviewed at this time. Otherwise, you will not need to complete and return this documentation."

1005. On that email Ms. Gallo copied the same four (4) prior to PSC and PSD agents which included Mr. Reyes, PSC Chairman, Mr. Buck, the Acting Superintendent, and the two legal counsel for the district and/or school committee.

1006. Plaintiff initially took the email as a response to her prior request for clarification on how to fill out the irrelevant forms that meant that PSD had checked and realized that the forms were actually irrelevant to her situation and sent in error.

---

[12] https://dlt.ri.gov/sites/g/files/xkgbur571/files/documents/requiredposters/familyleave.pdf

1007.   After the weekend, on or about June 3, 2025, Plaintiff emailed asking for clarification and to confirm her understanding was correct that PSD no longer needed the forms filled out; the same five (5) PSD and PSC agents, including Ms. Gallo, Mr. Reyes, PSC Chairman, Mr. Buck, the Acting Superintendent, and the two legal counsel for the district and/or school committee, were on that communication.

1008.   On or about Tuesday, June 3, 2025 Plaintiff specifically asked:

I would like to clarify that I never requested a 504 Plan. I wanted to let you know that my request was solely to have my extension of FMLA leave accommodated.

Based on your recent letter, I understand that no documentation is currently required from me.

1009.   Plaintiff did not hear back from any of the five (5) total agents from PSD and PSC who she had emailed.

1010.   Thus, on or about Thursday, June 5, 2025, Plaintiff emailed the same five (5) PSD and PSC agents, again trying to seek clarification on her ADA requested reasonable accommodation for FMLA job protection extension, asking in pertinent part:

I am writing to request clarification regarding my FMLA job protection and any potential extension under the ADA.

To date, I have received communications indicating that my FMLA leave was exhausted as of May 31st, which has now passed. Prior to that date, I requested an extension, but I have not yet received a definitive response confirming whether this request has been granted.

Due to this point in our communication, I have only received a summary of leave without explicit confirmation regarding whether my request for an extension has been approved under the ADA framework.

Could you please provide a clear and definitive answer regarding whether my request for a 30-day extension of my FMLA job protection has been granted? I believe this extension is reasonable, and I would appreciate confirmation of its status.

1011.   Plaintiff did not receive a response from any of the five (5) top agents for PSC and PSD *for a week*.

1012. During this time, and increasingly since Plaintiff initially made her request for an ADA accommodation to extend her FMLA job protection on May 16, 2025, Plaintiff's distress due to PSD's and PSC's ongoing acts and omissions continued.

1013. Then, after a week, on or about June 12, 2025, Ms. Gallo finally responded to Plaintiff's two (2) emails requesting clarification about her then *nearly-month-old* request for accommodation under the ADA for FMLA job protection extension.

1014. In that email, however, there was no clarification.

1015. Instead, in Ms. Gallo's Thursday, June 12, 2025 email, which copied the same top agents of PSD and PSC, Plaintiff was told – as if it had been crystal clear – that Plaintiff had to fill out the paperwork if she wanted her accommodation request considered.

1016. Specifically, Ms. Gallo's email stated:

You received a separate notification to advise you of your leave status because your FMLA leave was coming to an end. As a separate matter, in response to your request for an ADA accommodation, we provided you with the procedure and documents necessary to assess that request. If you are still seeking an ADA accommodation please return those documents as soon as possible.

Attached is the ADA accommodation request form. The 504 paperwork you previously received requests the same information that is needed to process your ADA accommodation request. As previously stated, we cannot consider providing you with any accommodations until the requested information is returned and reviewed.

1017. Notably, this time, instead of attaching the form PSD typically uses for 504 plans, titled "Pawtucket School Department Accommodation Request", Ms. Gallo clarified that now she had attached the actual ADA paperwork.

1018. However, that ADA paperwork was the *same exact form as the prior form sent* to Plaintiff *except* it was titled "Pawtucket School Department ADA Request" instead of "Pawtucket School Department Accommodation Request."

1019. That form, like the prior form, asked about Plaintiff's medical condition in the exact same wording as the prior form.

1020. As stated, Plaintiff's medical condition, and the medical documentation supporting it, was fully known to and documented with PSD and PSC for months.

1021. Second, under the section of the form titled exactly the same as the prior form with "Questions to help determine if an accommodation is needed" the questions were again identical and all focused on accommodations needed *at work.*

1022. As stated, Plaintiff was not requesting, and had not requested, an accommodation to her actual work or any accommodations for *at work*.

1023. For example, questions in that section were identical to the prior form and again asked the medical provider to answer "[w]hat job function(s)…is the employee having trouble performing…because of the limitation(s)[]" and "[h]ow does the employee's limitation(s) interfere with his/her ability to perform the job function(s)…of employment[.]"

1024. As stated, those questions were wholly inapplicable to Plaintiff's situation and her specifically requested accommodation of a short extension to FMLA job protection *while out of work*.

1025. Likewise, the next section, titled exactly the same as the prior form with "Questions to help determine effective accommodation options" was still inapplicable to Plaintiff's situation.

1026. For example, questions in that section were again identical to the prior form and again asked the medical provider to answer, "[d]o you have any suggestions regarding possible accommodations to improve job performance[]" and "[h]ow would your suggestions improve the employee's job performance[.]"

1027. As stated, those questions were wholly inapplicable to Plaintiff's situation requesting an accommodation to *be out of work* with job protection under the FMLA.

1028.   In fact, the form was identical to the prior form, from what Plaintiff could tell, except the title and the newer appearance of the form.

1029.   Thus, the "ADA" Accommodation Request form sent to Plaintiff was the same form that Plaintiff's medical providers had *already* not been able to fill out, due to confusion, weeks prior.

1030.   Moreover, it was the same form that Plaintiff had been attempting to obtain clarification about, from several top PSD and PSC agents, for weeks.

1031.   Plaintiff was beyond disheartened and frustrated.

1032.   Plaintiff believed that PSD, Ms. Rabbit, and PSC, its school committee members, the City of Pawtucket, its Mayor Grebien, his key staff, and the union, PTA and its president Mr. Beaupre, were all making actions and omissions directed at ensuring that Plaintiff would not feel comfortable returning to reclaim her job as Superintendent – ever.

1033.   This action was based upon this Defendants' well-established custom of withholding information from Plaintiff, undermining, and impairing Plaintiff's ability obtain the information she needed to return to her position as Superintendent, and was a moving force behind Plaintiff's injuries.

1034.   Thus, days later on or about Tuesday, June 17, 2025, Plaintiff was constructively discharged from her beloved position as Pawtucket's first African American Superintendent and the State of Rhode Island's first Female African American Superintendent.

1035.   Plaintiff's resignation letter emphasized her and her teams' accomplishments, including leaving the school district with a financial surplus, which ended in a too-short tenure unwillingly due to her unlawful mistreatment.

1036.   In this letter, Plaintiff specifically cited to the distress caused during her FMLA leave, including in response to her request for a short extension to her FMLA job protection.

1037.  Plaintiff was constructively discharged because no reasonable person in those circumstances could return to such a hostile environment.

1038.  In the alternative, Plaintiff had already been terminated or effectively terminated from her position as Superintendent on February 28, 2025, while on FMLA, because she was removed, replaced, PSD had no intention of allowing her to return to her position as Superintendent.

1039.  In the alternative, Plaintiff was demoted from her Superintendent position on February 28, 2025, while on FMLA and then was constructively discharged on June 17, 2025.

1040.  Due to the enormous amount of negative information about Plaintiff in the public domain, the emotional distress, along with the fact that she has to explain her separation from PSD and legal action, has proximately caused Plaintiff to be unable to work in her field or be a Superintendent potentially ever again.

1041.  Plaintiff has lost out on job opportunities, and will continue to, due to the violation of her liberty interest and the defamation by Defendants.

1042.  As a direct and proximate result of the Defendants' actions, in violation of the United States Constitution, Federal and State law, Plaintiff suffered and continue to suffer loss of income and earning capacity, deprivation of completion of the Superintendent Contract and deprivation of the three one-year automatic renewal terms, for a total deprivation of nearly five (5) years of Contract entitlements; suffered loss of work-related benefits, privileges, and status; suffered profound career and job-related public humiliation, defamation, embarrassment, and loss of standing in the community that may be *permanent*; suffered and continues to suffer from extreme emotional distress and mental anguish resulting in physical injury; and suffered other injuries.

## COUNT I
## 42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – SUBSTANTIVE DUE PROCESS FOR PROPERTY INTEREST

*United States Constitution Substantive Due Process – Property Interest and Right to Contract under the Fifth and Fourteenth Amendment, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution*
**As to Defendants:**
***City of Pawtucket, Mayor Grebien, Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District, Assistant Superintendent Lee Rabbit***

1043.  Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1044.  Plaintiff has a fundamental right to, and property interest in, her contractual employment because she had a legitimate claim of entitlement for her job to continue for the defined term, until June 2026, per her contract, and a right to be free from governmental interference in that contract.

1045.  Plaintiff also has a fundamental right to, and property interest in, employment for an additional term for three (3) years due to automatic renewal clauses, per the contract, and a right to be free from governmental interference.

1046.  The Fifth and Fourteenth Amendment of the United States Constitution, Civil Rights Act of 1871, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution provide that no person shall be deprived of liberty or property without due process of law.

1047.  The aforesaid Constitution provisions protect individuals from deprivations of rights protected by the Constitutions of the United States and Rhode Island, committed by state actors persons acting under the color of state authority.

1048.  Defendants and their agents are state actors.

1049.  By Defendants' acts and omissions, Plaintiff was deprived of her property right to her job until June of 2026 per her initial term because of Defendants' interference with that contractual right.

1050. By Defendants' acts and omissions, Plaintiff was deprived of her property right to her job until June of 2029 per her contractual automatically renewal terms because of Defendants' interference with that contractual right.

1051. Therefore, Defendants deprived Plaintiff of a substantive property right without due process of law, in violation of the right guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

1052. Defendants and their agents acted under the color of state authority.

1053. Defendants' agents' actions that resulted in deprivations were acts that shock the conscience.

1054. Plaintiffs seek redress for violations constitutionally protected interests and rights committed by Defendants while acting under the color of state law.

1055. Defendants' agents' actions were intentional and/or reckless; they were taken for the purpose of causing a deprivation of Plaintiff's stated property rights secured by the United State and Rhode Island Constitutions and in reckless disregard of Plaintiff's substantive due process rights.

1056. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

1057. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

1058. Defendants are liable for the actions of their agents, employees, and officers.

## <u>COUNT II</u>
### 42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – SUBSTANTIVE DUE PROCESS FOR LIBERTY INTEREST

*United States Constitution Substantive Due Process – Liberty Interest and Right to Reputation under the Fifth and Fourteenth Amendment, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution*
**As to Defendants:**

114

*City of Pawtucket, Mayor Grebien, Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District, Assistant Superintendent Lee Rabbit*

1059. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1060. Plaintiff has a fundamental right to, and liberty interest in, her reputation and the right to be free from government interference in the same.

1061. The Fifth and Fourteenth Amendment of the United States Constitution, Civil Rights Act of 1871, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution provide that no person shall be deprived of liberty or property without due process of law.

1062. The aforesaid Constitution provisions protect individuals from deprivations of rights protected by the Constitutions of the United States and Rhode Island, committed by state actors persons acting under the color of state authority.

1063. Defendants made numerous false statements about Plaintiff and her job competence, which placed Plaintiff's reputation in an unfavorable light.

1064. Plaintiff was deprived of her liberty interest in her reputation because of Defendants' actions and omissions.

1065. Therefore, Defendants deprived Plaintiff of a substantive liberty interest without due process of law, in violation of the right guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

1066. Defendants are state actors.

1067. Defendants were acting under the color of state authority.

1068. The statements about Plaintiff were levied without care or deliberation.

1069. Defendants' agents' actions that resulted in deprivations were acts that shock the conscience.

1070. Plaintiffs seek redress for violations constitutionally protected interests and rights committed by Defendants while acting under the color of state law.

1071. Defendants' agents' actions were intentional and/or reckless; they were taken for the purpose of causing a deprivation of Plaintiff's stated liberty interest secured by the United State and Rhode Island Constitutions and in reckless disregard of Plaintiff's substantive due process rights.

1072. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

1073. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

1074. Defendants are liable for the actions of their agents, employees, and officers.

<u>COUNT III</u>
**42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – EQUAL PROTECTION**
*Equal Protection under United States Constitution, 42 U.S.C. § 1983, and*
*Article 1, Section 2 of the Rhode Island Constitution*
**As to Defendants:**
***City of Pawtucket, Mayor Grebien, Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District, Assistant Superintendent Lee Rabbit***

1075. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1076. Defendants and their agents are state actors who, at all times relevant, acted under color of state authority.

1077. Plaintiff falls within a protected class.

1078. Plaintiff was singled out by the government and was the specter of arbitrary classification and differential treatment.

1079. Similarly-situated employees were not singled out, as Plaintiff was, for adverse and differential treatment.

1080. Thus, Defendants, by their actions and/or omissions, have deprived Plaintiff of her equal protection rights guaranteed under Article 1, Section 2 of the State Constitution and the Fifth and Fourteenth Amendments of the federal Constitution.

1081. Plaintiffs seek redress for constitutional violations.

1082. Defendants' agents' actions were intentional and/or reckless.

1083. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

1084. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

1085. Defendants are liable for the actions of their agents, employees, and officers.

## <u>COUNT IV</u>
### 42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – PROCEEDURAL DUE PROCESS
*United States Constitution Procedural Due Process under the Fifth and Fourteenth Amendment, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution*
*Article 1, Section 2 of the Rhode Island Constitution*
**As to Defendants:**
***City of Pawtucket, Mayor Grebien, Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District***

1086. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1087. Defendants and their agents are state actors who, at all times relevant, acted under color of state authority.

1088. The Fifth and Fourteenth Amendment of the United States Constitution, Civil Rights Act of 1871, 42 U.S.C. § 1983, and Article 1, Section 2 of the Rhode Island Constitution provide that no person shall be deprived of liberty or property without due process of law.

1089. The aforesaid Constitution provisions and statute protects individuals from violations of rights protected by the Constitution or laws of the United States and Rhode Island that are committed by persons acting under the color of state authority.

1090. Plaintiff was deprived of notice that she was going to be forced out of her Superintendent position and placed on administrative leave.

1091. Plaintiff was deprived of an opportunity to be heard prior to being forced out of her Superintendent position and placed on administrative leave.

1092. Plaintiff was deprived of an impartial tribunal prior to Defendants forcing her out of her Superintendent position and placing her on administrative leave

1093. Plaintiff was deprived of notice that an Acting Superintendent was, or could be, appointed, replacing Plaintiff.

1094. Plaintiff was deprived of an opportunity to be heard prior to Defendants' appointing the Acting Superintendent, replacing Plaintiff.

1095. Plaintiff was deprived of an impartial tribunal prior to Defendants appointing an Acting Superintendent.

1096. Plaintiff was therefore deprived of her procedural due process rights.

1097. Therefore, Defendants violated the Fifth and Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

1098. Plaintiffs seek redress for Defendants' Constitutional violations while acting under the color of state law.

1099. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

1100. Defendants' agents' actions were intentional and/or reckless.

1101. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

1102. Defendants are liable for the actions of their agents, employees, and officers.

## COUNT V
## DEFAMATION PER SE
### As to Defendants:
***City of Pawtucket, Mayor Grebien, Pawtucket Finance Director Mark Stankiewicz, Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District, Assistant Superintendent Lee Rabbit, the Pawtucket Teachers' Alliance, and Ron Beaupre, President of PTA***

1103. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1104. Defendants' agents published and republished, orally and/or in writing, false statements concerning Plaintiff as stated *supra.*

1105. The aforesaid statements were published to third parties.

1106. Defendants' agents published these statements in the course of performing their duties while employed and/or elected to represent the public of the entity-Defendants, and while on the government-entity Defendants' premises.

1107. Defendants' agents published false written and oral statements with knowledge that they were false and in reckless disregard of the truth of the statements.

1108. Defendants' agents published false written and oral statements negligently disregarding the truth of the statements.

1109. These false statements are of the type that a reasonable person would find to be of the character that would harm Plaintiff's professional reputation, standing in the community, and her career as a Superintendent/school district leader, as well as of the character that would cause both reputational and economic harm.

1110. Defendants' agents published the false statements despite foreseeability that such published false statements would cause economic harm and damage to Plaintiff's reputation, would lower the estimation of Plaintiff in the community and in her career, and would be understood by the party receiving the publication of the false statements that such a statement would harm Plaintiff.

1111. Parties receiving the publication did, in fact, understand the publication as a statement that would in fact actually harm Plaintiff's reputation and cause economic and other damage to Plaintiff.

1112. Defendants' agents' that published, republished, and received the statements in oral or written form did not have a 'need to know.'

1113. The published statements did in fact harm Plaintiff.

1114. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

1115. The false published statements were related to and impacted Plaintiff's career or vocation.

1116. Thus, presumed damages for defamation/slander *per se* are proper.

1117. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

1118. Defendants are responsible for the acts and omissions of the Defendants' agents under the theory of Respondeat superior.

## <u>COUNT VI</u>
## INTENTIONAL INTERFERNECE WITH EMPLOYMENT RELATIONS
### As to Defendants:
### *City of Pawtucket, Mayor Grebien, Pawtucket Finance Director Mark Stankiewicz, Pawtucket/PSD Chief of Technology Hersh Christino, the Pawtucket Teachers' Alliance, and Ron Beaupre, President of PTA*

1119. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1120.  Plaintiff had an advantageous relationship with PSD/PSC.

1121.  Defendants City of Pawtucket, Mayor Grebien, Pawtucket Finance Director Mark Stankiewicz, the Pawtucket Teachers' Alliance, and Ron Beaupre, President of PTA (collectively "City and PTA Defendants"), knowingly induced a decline of, and then a breaking of that relationship.

1122.  City and PTA Defendants' interference with the relationship, in addition to being intentional, was borne of improper motive or means.

1123.  Plaintiff was harmed by the City and PTA Defendants' actions.

1124.  City and PTA Defendants knew or should have known that their actions would result in Plaintiff's removal from her position as Superintendent, her termination and/or her constructive discharge, alleged above.

1125.  City and PTA Defendants knew or should have known that their actions would result in Plaintiff being removed from work and placed on administrative leave, alleged above.

1126.  City and PTA Defendants' interference with Plaintiff's employment relationship was therefore intentional.

1127.  City and PTA Defendants' interference with Plaintiff's employment contract was therefore intentional.

1128.  City and PTA Defendants' interference was improper in motive or as alleged above.

1129.  As a result of these unlawful actions, Plaintiff was harmed economically by the loss of her position, her current employment term, her renewal employment term, her compensation, her reputation, future job opportunities, and her career as a Superintendent in Pawtucket or another school district.

1130.  Plaintiff experienced the economic and other damages as a proximate result of City and PTA Defendants' agents' intentional conduct.

1131.  Because City and PTA Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

1132.  City and PTA Defendants' are vicariously responsible for all aforesaid liability to Plaintiff, through the acts and omissions of its agents, under Respondeat Superior.

## COUNT VII
### VIOLATION OF FMLA - RETALIATION
*Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA)and the Rhode Island Parental and Family Medical Leave Act (PFMLA) R.I. Gen. Laws § 28-48-5(b)*
**As to Defendants:**
***Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District, Assistant Superintendent Lee Rabbit***

1133.  Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1134.  Plaintiff was protected from retaliation for exercising her rights under FMLA and PFMLA.

1135.  Plaintiff was retaliated against for exercising her rights to take protected leave, as described above, including but not exclusive replacing Plaintiff as Superintendent with an "interim" and/or "acting" superintendent for no legitimate reason when she was to come off of a short medical leave, but after requesting FMLA/PFMLA, violating *inter alia*, FMLA and PFMLA.

1136.  Specifically, Defendants removed Plaintiff from her position just after she requested FMLA/PFMLA leave.

1137.  Defendants also replaced Plaintiff with an "interim" and/or "acting" Superintendent just after she requested FMLA/PFMLA leave.

1138.  Defendants otherwise violated *inter alia*, FMLA and PFMLA, by not offering Plaintiff the same or a substantially similar job to return to.

1139.  Defendants otherwise retaliated *inter alia*, FMLA and PFMLA, by retaliating against Plaintiff during her FMLA leave by the acts and omissions alleged above.

1140. Defendants otherwise retaliated *inter alia*, FMLA and PFMLA, by refusing to consider a reasonable accommodation under the Americans With Disabilities Act (ADA) to extend FMLA job protection for a brief period of time.

1141. Defendant's and its agents' aforesaid conduct retaliating against Plaintiff for exercising her rights was willful conduct and/or conduct in reckless disregard of whether the conduct was prohibited.

1142. Plaintiff was damaged as a direct and proximate result of Defendants' and its agents' intentional conduct in the ways aforesaid.

1143. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

1144. Defendants is responsible for its agents's acts and omissions under the theory of *Respondeat superior*.

1145. The individuals named as Defendants are officers who were acting in the interest of their employer and/or governing body.

## COUNT VIII
### *WHISTLEBLOWING RETALIATION - RETALIATORY TERMS AND CONDITIONS*
### *WHISTLEBLOWING RETALIATION - RETALIATORY TERMINATION*
*Violation of the Rhode Island Whistleblowers' Protection Act (WPA), R.I. Gen. Law § 28-50-1, et seq.*
**As to Defendants:**
*Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, City of Pawtucket, Mayor Grebien*

1146. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1147. Plaintiff was afforded protections from retaliatory harassment and termination because of taking part in a protected activity under the WPA.

1148. Defendants Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, and the other unnamed PSC members, as

well as Pawtucket School District (hereinafter "School Defendants"), were Plaintiff's employer.

1149. Upon information and belief, the PSC and named Defendant PSC members were involved with the City, the Mayor, and his allies in performing the perceived illegal acts.

1150. Upon information and belief, Defendants PSC members and School Defendants, Plaintiff's employer, allowed the City and the Mayor to perform the perceived unlawful acts.

1151. Upon information and belief, Defendants PSC members and School Defendants, Plaintiff's employer, assisted the City and the Mayor in performing the perceived unlawful acts.

1152. Upon information and belief, Defendants PSC members and School Defendants, Plaintiff's employer, attempted to cover up the City and the Mayor's performance of the perceived unlawful acts.

1153. Alternately, the City was a joint employer of Plaintiff.

1154. The City was involved in the operation of PSC and PSD, and retained a sufficient indication of control over the terms and conditions of Plaintiff's employment, to be considered a joint employer for purposes of the WPA, upon information and belief.

1155. Plaintiff engaged in protected conduct under the WPA, when she reported, to School Defendants, the perceived legal violations about the City trying to retain the $3.2 million in state funds mostly intended for the schools, and interfering with PSD finances including but not exclusive to forcing FY 24 to be closed early, deleting requisitions, and blocking access to MUNIS, all of which Plaintiff reasonably believed were violations of state law, regulations, or rules.

1156. Notably, Mr. Hersh, upon information and belief, was involved in the perceived unlawful acts, assisting with the technology portion.

1157. Mr. Hersh is an employee of the City and the Mayor.

1158. Mr. Hersh takes, upon information and belief, his direction from the Mayor.

1159. Mr. Stankiewicz, upon information and belief, was involved in the perceived unlawful acts in his capacity as the Director of Finance for the City.

1160. Mr. Stankiewicz is an employee of the City and the Mayor.

1161. Mr. Stankiewicz takes, upon information and belief, his direction from the Mayor.

1162. Plaintiff reported the unlawful activity to both PSD and the City.

1163. As a result of Plaintiff's protected activity, School Defendants' agents subjected Plaintiff to retaliatory treatment.

1164. The School Defendants subjected Plaintiff to retaliatory treatment at the direction of the Mayor and/or other agents of the City.

1165. Specifically, as to the retaliation, following Plaintiff's protected activity, employees of both the City and PSD subjected Plaintiff to targeting, harassment, and other unfair treatment in retaliation for her protected activity.

1166. The School Defendants targeted, harassed, and treated Plaintiff unfairly at the direction of and/or with the encouragement of the Mayor and/or other agents of the City.

1167. School Defendants and PSC members also removed Plaintiff from her position as Superintendent and replaced her with Mr. Buck in retaliation for these protected acts.

1168. The School Defendants replaced Plaintiff at the direction of and/or with the encouragement of the Mayor and/or other agents of the City.

1169. School Defendants and PSC members placed Plaintiff on administrative leave in retaliation for these protected acts.

1170. The School Defendants placed Plaintiff on administrative leave at the direction of and/or with the encouragement of the Mayor and/or other agents of the City.

1171. Upon information and belief, School Defendants and PSC members changed Plaintiff status to not be paid by administrative leave and/or other paid sick leave, and instead use her banked leave, in retaliation for these protected acts.

1172. The School Defendants changed Plaintiff's leave type at the direction of and/or with the encouragement of the Mayor and/or other agents of the City.

1173. But for Defendants' agents' retaliatory conduct, Plaintiff would not have been removed from her position.

1174. Defendants' agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, WPA.

1175. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

1176. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

1177. Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

1178. Pursuant to § 28-50-4 Relief and damages, Plaintiff seeks treble damages.

## <u>COUNT IX</u>
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### As to Defendants:
*City of Pawtucket, Mayor Grebien, Pawtucket Finance Director Mark Stankiewicz, Pawtucket/PSD Chief of Technology Hersh Christino, Pawtucket School Committee, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District, Assistant Superintendent Lee Rabbit, the Pawtucket Teachers' Alliance, and Ron Beaupre, President of PTA*

1179. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1180. All Defendants acted intentionally to inflict severe emotional distress upon Plaintiff by the acts and omissions alleged *supra*.

126

1181. All Defendants acted recklessly to cause Plaintiff severe emotional distress by the acts and omissions alleged *supra.*

1182. All Defendants' acts and omissions, alleged *supra,* were extreme and outrageous.

1183.  For example, the Defendants PSC and PSD replaced Plaintiff as Superintendent, upon information and belief, because she was out on medical leave even though Plaintiff was returning to work and her leave ending in approximately one working day, and the related fact that the PSC replaced Plaintiff with Mr. Buck, who himself was on medical leave at the time, but for a much longer period than Plaintiff.

1184. For example, Defendant Omar Reyes' conduct in bombarding Plaintiff, for an extended period, with time sensitive requests for extensive amounts of unutilized information, which often required Plaintiff to pull her staff from normal duties to produce multi-inch-thick binders of information that he did not review or use, was extreme and outrageous conduct in which intended to and resulted in Plaintiff experiencing severe emotional distress.

1185. For example, Defendant Mayor Grebien's conduct in making numerous negative comments about their working relationship to others in or around the fall of 2024 through Plaintiff's unlawful removal in February of 2025, was extreme and outrageous conduct in which intended to and resulted in Plaintiff experiencing severe emotional distress.

1186. Additionally, as an example, Mayor Grebien's conduct in having his Assistant tongue-lash Plaintiff for taking a picture with, and speaking to the Mayor's rivals, during non-partisan charity events that Plaintiff put on, was extreme and outrageous conduct that was intended to and resulted in Plaintiff experiencing severe emotional distress.

1187. For example, Defendant Mark Stankiewicz's conduct in unilaterally and wrongfully closing the books on the PSD fiscal year *prior to it* ending and without proper notice, as well as intentionally deleting numerous PSD purchase orders which caused enormous shock and strain on Plaintiff and work for her staff, , was extreme and outrageous conduct in which intended to and resulted in Plaintiff experiencing severe emotional distress.

1188.   For example, on or about January 18, 2025, during a school committee training, Defendant Kimberly Grant intentionally and publicly remarked to third parties, within earshot of Plaintiff, "how do you get rid of a superintendent?" This conduct, by Defendant Kimberly Grant, was extreme and outrageous conduct that was intended to and resulted in Plaintiff experiencing severe emotional distress.

1189.   For example, Defendant Joanne Bonollo's conduct in directing Plaintiff to "[w]ear her hair curly so she can relate better to the little black and brown girls," stating, in front of Plaintiff, "[y]ou know what? I can't help it that my mother raised me to avoid colored people, I was brought up to not like people of color," and stating publicly she is not the chair because, "[t]hey didn't want a little old white lady. They said the Chair had to be a person of color," was extreme and outrageous conduct in which intended to and resulted in Plaintiff experiencing severe emotional distress.

1190.   For example, on or about November 12, 2024, Defendant Mathew Wildenhain's conduct in yelling at Plaintiff and levying insults about Plaintiff's staff, as a means solely to demean her in public, along with refusing to shake Plaintiff's hand as if he was disgusted by her, was extreme and outrageous conduct in which intended to and resulted in Plaintiff experiencing severe emotional distress.

1191.   For example, Defendant Lee Rabbit would intentionally withhold information from Plaintiff that was necessary to run the school district and comply with RIDE, and then not being truthful with Plaintiff about the same when asked, was extreme and outrageous conduct in which intended to and resulted in Plaintiff experiencing severe emotional distress.

1192.   For example, Defendant Hersh Christino would intentionally not work on school district work, despite him being assigned to do that work in addition to the technology work for the City, causing Plaintiff to have to employ Mr. Christino still but hire others to do his work, was extreme and outrageous conduct in which intended to and resulted in Plaintiff experiencing severe emotional distress.

1193.  For example, Defendant James Chellel would, upon information and belief, text Mayor Grebien about Plaintiff during School Committee meetings, and also sabotaged Plaintiff from the beginning of her employment by, as an example, not sharing with other School Committee members that Plaintiff would not be present on her start date due to her attendance at a preplanned, and preapproved, conference, leading to other School Committee members to not only question where Plaintiff was, but also scold her for her approved absence.

1194.  All Defendants' conduct caused severe emotional distress.

1195.  But for Defendants' conduct, Plaintiff would not have experienced severe emotional distress.

1196.  Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

1197.  Defendants, by its intentional acts, caused severe emotional distress to Plaintiff, who, as a result, experienced physical symptoms including but not limited to headaches, including migraine headaches, sleep disturbances and insomnia, gastrointestinal disturbances, and other physical manifestations.

1198.  Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

1199.  Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## COUNT X
### NEGLIGENCE / NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
**As to Defendants:**
*City of Pawtucket, Mayor Grebien, Pawtucket Finance Director Mark Stankiewicz, Pawtucket School Committee, Pawtucket School District, Pawtucket/PSD Chief of Technology Hersh Christino, Chairman Omar Reyes, Members James Chellel, Matthew Wildenhain, Joanne Bonollo, Kim Grant, Pawtucket School District, Assistant Superintendent Lee Rabbit, the Pawtucket Teachers' Alliance, and Ron Beaupre, President of PTA*

1200.  Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1201.  During her employment, Plaintiff was treated severely negatively, as alleged *supra.*

1202.  Defendants owed a duty of care to Plaintiff to act as reasonable, prudent persons.

1203.  Specifically, the basis for the Defendants' duties vary based upon their roles which include but are not exclusive to duties established based upon the employment relationship/contract, general unqualified duty, and affirmative duties which include but are not exclusive to affirmative misconduct, and negligent undertaking.

1204.  Defendants' breached its duty by their treatment of Plaintiff via their acts and omissions alleged *supra,* and were otherwise negligent.

1205.  The infliction of emotional distress onto Plaintiff was a natural and ordinary consequence of Defendants' actions and thus Plaintiff's injury was reasonably foreseeable.

1206.  As a direct and proximate result of Defendants' conduct, Plaintiff was harmed by Defendants' failure to use due care and suffered the aforesaid physical and emotional damages.

1207.  Further Plaintiff's emotional distress was a natural, direct, and foreseeable consequence of the Defendants' breach.

1208.  Furthermore, there were no superseding causes, nor was Plaintiff contributorily negligent.

1209.  Defendants, by its negligent acts, caused severe emotional distress to plaintiff, who, as a result, experienced physical symptoms including but not limited to headaches including migraine headaches, sleep disturbances and insomnia, gastrointestinal disturbances and other physical manifestations.

1210.  Emotional distress was a field of danger that Defendants should reasonably have anticipated and guarded against.

1211.  A reasonable person would have suffered emotional distress under the circumstances Plaintiff endured as a result of Defendants' negligence, as alleged *supra*.

1212.  Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

1213.  Defendants are responsible for the acts and omissions of the Defendants' agents under the theory of Respondeat superior.

## COUNT XI
### RACE/COLOR/NATION OF ORIGIN – DISCRIMINATORY TERMS AND CONDITIONS
### RACE/COLOR/NATION OF ORIGIN – DISCRIMINATORY TERMINATION/CONSTRUCTIVE DISCHARGE

*Violation of the* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, Rhode Island Fair Employment Practices Act, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA")

**As to Defendants:**
*As to Pawtucket School Committee (PSC), Pawtucket School District (PSD), and Joint Employer City*

1214.  Plaintiff incorporates by reference paragraphs 1041 above as if fully set forth herein.

1215.  The City is a joint employer under law as it applies to this count, upon information and belief.

1216.  Plaintiff was protected from discrimination on the basis of race, color, and nation of origin under Title VII, FEPA, and RICRA.

1217.  Defendants PSD and PSC, and the City as a joint employer, subjected Plaintiff to disparate treatment, which created an unresolved severe and pervasive hostile work environment because of race, color and/or nation of origin, which changed the terms and conditions of Plaintiff's employment as described herein, in violation of, *inter alia*, Title VII, FEPA, and RICRA.

1218.  Defendants PSD and PSC, and the City as a joint employer, maintained employment policies, practices, and customs which treated African Americans differently than Caucasians, including Plaintiff, in contravention of Title VII, FEPA, and RICRA.

1219.  Defendants PSD and PSC, and the City as a joint employer, not only discriminated against Plaintiff with individual disparate treatment, but Defendants' agents also have a pattern or practice of systemic discrimination against African American persons, as described herein.

1220.   Defendants PSD and PSC, and the City as a joint employer, terminated Plaintiff because of her race, color and/or nation of origin in violation of, *inter alia,* Title VII, FEPA, and RICRA.

1221.  Defendants, PSD and PSC, and the City as a joint employer, constructively discharged Plaintiff because of her race, color and/or nation of origin in violation of, *inter alia,* Title VII, FEPA,

and RICRA; no reasonable person in Plaintiff's circumstance could have returned to that environment with harassment and discrimination which was worse than severe and pervasive.

1222. But for Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory treatment of Plaintiff, Plaintiff would not have been terminated.

1223. But for Defendants PSD's and PSC's, and the City's, if a joint employer, discriminatory treatment of Plaintiff, Plaintiff would not have been constructively discharged.

1224. Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICRA.

1225. Plaintiff was damaged as a proximate result of Defendants' intentional conduct.

1226. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted, if applicable under statute or rule.

1227. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## COUNT XII
### *RACE/COLOR/NATION OF ORIGIN – DEMOTION*
*Violation of* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, Rhode Island Fair Employment Practices Act, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA")
**As to Defendants:**
***Pawtucket School Committee (PSC), Pawtucket School District (PSD), and Joint Employer City***

1228. Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1229. The City is a joint employer under law as it applies to this count, upon information and belief.

1230. Plaintiff was protected from discrimination on the basis of race, color, and nation of origin under Title VII, FEPA, and RICRA.

1231. Defendants PSD and PSC, and the City as a joint employer, maintained employment policies, practices, and customs which treated African Americans differently than Caucasians, including Plaintiff, in contravention of Title VII, FEPA, and RICRA.

1232. Defendants PSD and PSC, and the City as a joint employer, not only discriminated against Plaintiff with individual disparate treatment, but Defendant's agents also have a pattern or practice of systemic discrimination against African American persons, as described herein.

1233.  Defendants PSD and PSC, and the City as a joint employer, demoted Plaintiff from her role of Superintendent for no legitimate reason and for pretextual reasons when the real reason was because of her race, color and/or nation of origin in violation of, *inter alia,* Title VII, FEPA, and RICRA.

1234. But for Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory treatment of Plaintiff, Plaintiff would not have been demoted.

1235. Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICRA.

1236.  Plaintiff was damaged as a proximate result of Defendants' intentional conduct.

1237. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted, if applicable under statute or rule.

1238. Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

## <u>COUNT XIII</u>
### *DISABILITY - FAILURE TO ACCOMODATE*

***Violation of*** Title I of the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), Rhode Island Fair Employment Practices Act, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA")
**As to Defendants:**
***As to Pawtucket School Committee (PSC), Pawtucket School District (PSD), and Joint Employer City***

1239.  Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1240. The City is a joint employer under law as it applies to this count, upon information and belief.

1241. During and through the time of Plaintiff's FMLA leave, she had a disability because she had a physical or mental impairment which substantially limited one or more life functions under the ADA, FEPA, and RICRA.

1242. Plaintiff was, however, a qualified person with a disability because she was able to perform the necessary job functions with or without accommodations.

1243. Therefore, Plaintiff was protected from disability discrimination under ADA, FEPA, and RICRA.

1244. Failure to provide reasonable accommodation is disability discrimination.

1245. Plaintiff sought a reasonable accommodation during her FMLA leave by notifying PSD and PSC leadership.

1246. Plaintiff notified the Defendants of her disability and need for an accommodation.

1247. The accommodation sought in this case was a short extension to the FMLA job protected leave.

1248. The requested accommodation was reasonable and not an undue hardship on Defendants given they had already replaced Plaintiff with an "acting" Superintendent prior to the request for accommodation.

1249. Defendants PSD and PSC, and the City as a joint employer, maintained employment policies, practices, and customs which failed to accommodate Plaintiff's disability.

1250. In fact, the Defendants failed to even start or engage in an interactive process – for weeks in violation of the ADA, FEPA, and RICRA.

1251. Defendants never engaged in the interactive process and never provided Plaintiff with the accommodation.

1252. As a direct and proximate result of the failure to accommodation, Plaintiff did not have job protection under FMLA anymore, to ensure she had a job to return to after her doctor cleared her to return to work a few week later.

1253. But for Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory treatment of Plaintiff, and specifically the failure to accommodate Plaintiff would not have been constructively discharged.

1254. Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, ADA, FEPA, and RICRA.

1255. Plaintiff was damaged as a proximate result of Defendants' intentional conduct.

1256. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted, if applicable under statute or rule.

1257. Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## <u>COUNT XIV</u>
### *SEX – DISCRIMINATORY TERMS AND CONDITIONS*
### *SEX – DISCRIMINATORY TERMINATION/CONSTRUCTIVE DISCHARGEViolation of*
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, Rhode Island Fair Employment Practices Act, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA") \
**As to Defendants:**

### *As to Pawtucket School Committee (PSC), Pawtucket School District (PSD), and Joint Employer*

1258.  Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1259.  The City is a joint employer under law as it applies to this count, upon information and belief.

1260.  Plaintiff was protected from discrimination on the basis of sex and gender under Title VII, FEPA, and RICRA.

1261.  Defendants PSD and PSC, and the City as a joint employer, maintained all-male top leadership and final decision makers.

1262.  Defendants PSD and PSC, and the City as a joint employer, employment policies, practices, and customs which treated employees differently than gender and sex, including Plaintiff, in contravention of Title VII, FEPA, and RICRA.

1263.  Defendants PSD and PSC, and the City as a joint employer, not only discriminated against Plaintiff with individual disparate treatment, but Defendant's agents also have a pattern or practice of systemic discrimination because of gender and sex, as described herein.

1264.  Defendants PSD and PSC, and the City as a joint employer, terminated Plaintiff because of her gender and sex in violation of, *inter alia,* Title VII, FEPA, and RICRA.

1265.  Defendants, PSD and PSC, and the City as a joint employer, constructively discharged Plaintiff because of her gender and sex in violation of, *inter alia,* Title VII, FEPA, and RICRA; no reasonable person in Plaintiff's circumstance could have returned to that environment with harassment and discrimination which was worse than severe and pervasive.

1266.  But for Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory treatment of Plaintiff, Plaintiff would not have been terminated.

1267.  But for Defendants PSD's and PSC's, and the City's, if a joint employer, discriminatory treatment of Plaintiff, Plaintiff would not have been constructively discharged.

1268.  Plaintiff was replaced by a male, Mr. Buck.

1269.  The final decision makers in the termination/constructive discharge of Plaintiff was the male Chair of PSC, Mr. Reyes, and the male Mayor, Mr. Grebien.

1270.  Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICRA.

1271.   Plaintiff was damaged as a proximate result of Defendants' intentional conduct.

1272.  Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted, if applicable under statute or rule.

1273.  Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

### COUNT XV
### *SEX – DEMOTION*
*Violation of* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, Rhode Island Fair Employment Practices Act, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA")**As to Defendants: Pawtucket School Committee (PSC), Pawtucket School District (PSD), and Joint Employer City**

1274.   Plaintiff incorporates by reference paragraphs 1043 above as if fully set forth herein.

1275.  The City is a joint employer under law as it applies to this count, upon information and belief.

1276.   Plaintiff was protected from discrimination on the basis of sex and gender under Title VII, FEPA, and RICRA.

1277.  Defendants PSD and PSC, and the City as a joint employer, maintained all-male leadership.

1278.  Defendants PSD and PSC, and the City as a joint employer, employment policies, practices, and customs which treated employees differently on the basis of gender and sex, including Plaintiff, in contravention of Title VII, FEPA, and RICRA.

137

1279. Defendants PSD and PSC, and the City as a joint employer, not only discriminated against Plaintiff with individual disparate treatment, but Defendant's agents also have a pattern or practice of systemic discrimination against employees based on sex, as described herein.

1280.  Defendants PSD and PSC, and the City as a joint employer, demoted Plaintiff from her role of Superintendent for no legitimate reason and for pretextual reasons when the real reason was because of her gender in violation of, *inter alia,* Title VII, FEPA, and RICRA.

1281. Plaintiff was replaced by a male, Mr. Buck.

1282. The final decision makers in the replacement of Plaintiff was the male Chair of PSC, Mr. Reyes, and the male Mayor, Mr. Grebien.

1283. But for Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory treatment of Plaintiff, Plaintiff would not have been demoted.

1284. Defendants PSD's and PSC's, and the City's, as a joint employer, discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICRA.

1285.  Plaintiff was damaged as a proximate result of Defendants' intentional conduct.

1286. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted, if applicable under statute or rule.

1287. Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*


## **PRAYER FOR RELEIF**

WHEREFORE, Plaintiff prays that this Court:

a.  Order judgment for Plaintiff against applicable Defendants on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b.  Order, for all applicable Counts, that Defendants make Plaintiff whole by awarding appropriate contract damages, back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c.  Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her complete loss of reputation, and permanent online defamatory information, which disparages Plaintiff, her career, and her job performance, and/or defames her per se, along with causing her economic and other damages;

d.  Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for his mental anguish, emotional pain and suffering, other damage to her reputation, loss of standing in the community, and other damages incurred;

e.  Order, for all applicable Counts, that the Defendants pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

f.  Order, for all applicable Counts, that the Defendants pay punitive or exemplary damages, as appropriate to punish Defendants for their malicious conduct, reckless conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

g.  Order, for all applicable Counts, multiple damages were allowed by statute or rule;

h.  Order, for all applicable Counts, that Defendants pay post-judgment interest where appropriate and allowable by law;

i.  Order, for all applicable Counts, that Defendants pay pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

j.  Retain jurisdiction of this action to ensure full compliance; and

k.  Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

### *PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

September 8, 2025

Respectfully Submitted,
**PLAINTIFF PATRICIA ROYAL,**
By her attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq. #9291
Munro-Delotto Law, LLC
400 Westminster St., Ste. 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2025 I electronically filed the herein documents with the

United States District Court for the District of Rhode Island by using the *CM/ECF* system. I

further certify that a copy of the documents herein were sent to all counsel of record that are

registered as CM/ECF Filers and that they will be served by the *CM/ECF* system; copies of all

documents herein were additionally emailed to the following known counsel of Defendants:

      William Conley, Esq.
      wconley@conleylawri.com
      *Upon information and belief Counsel for PSC/PSD and Individually Named Defendants*

      Marc Desisto, Esq.
      marc@desistolaw.com
      *Upon information and belief Counsel for Interlocal Trust, PSD/PSC, City and Individually Named Defendants*

      William O'Gara, Esq.
      wogara@pldolaw.com
      *Upon information and belief Counsel for Interlocal Trust, PSD/PSC, City and Individually Named Defendants*

      Scott Bielecki, Esq.
      sbielecki@cm-law.com
      *Upon information and belief Counsel for PTA and Mr. Beaupre*

                              /s/ Paige Munro-Delotto